```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF DELAWARE

 3

 4    FERRING PHARMACEUTICALS INC.,     )
      FERRING INTERNATIONAL CENTER      )
 5    S.A., FERRING B.V., and           )
      POLYPEPTIDE LABORATORIES A/S,     )
 6                                      )
                      Plaintiffs,       )
 7                                      ) C.A. No. 20-431-MN
      v.                                )
 8                                      )
      FRESENIUS KABI USA, LLC,          )
 9                                      )
                      Defendant.        )
10
                                         J. Caleb Boggs Courthouse
11                                       844 North King Street
                                         Wilmington, Delaware
12
                                         Friday, October 23, 2020
13                                       2:02 p.m.
                                         Motion Hearing
14                                       Via Teleconference

15    BEFORE:  THE HONORABLE MARYELLEN NOREIKA, U.S.D.C.J.

16    APPEARANCES:

17                 WOMBLE BOND DICKINSON
                   BY:  MARY W. BOURKE, ESQUIRE
18                 BY:  DANA K. SEVERANCE, ESQUIRE

19                                  For the Plaintiffs

20                 FARNAN LLP
                   BY:  BRIAN E. FARNAN, ESQUIRE
21
                            -and-
22
                   SCHIFF HARDIN LLP
23                 BY:  IMRON T. ALY, ESQUIRE
                   BY:  JOEL M. WALLACE, ESQUIRE
24                 BY:  THOMAS A. RAMMER, II, ESQUIRE

25                                  For the Defendant
```

1                    ***   PROCEEDINGS   ***

2              THE COURT:  Good afternoon, counsel.  Who's

3    there, please?

4              MS. BOURKE:  Good afternoon, Your Honor.  This

5    is Mary Bourke and Dana Severance from Womble Bond Dickinson

6    on behalf of the Ferring plaintiffs.

7              THE COURT:  Okay.

8              MR. FARNAN:  Good afternoon, Your Honor.  Brian

9    Farnan on behalf of the defendant.  And with me is Imron

10   Aly, Joel Wallace, and Thomas Rammer, all from Schiff Hardin

11   in Chicago.

12             THE COURT:  Okay.  Good afternoon to all of you.

13   Thank you for being on the line.  We're here for the

14   arguments on the motion to dismiss and the motion to sever.

15   We're doing this on the phone and that presents a few

16   challenges, but I'm sure we can make it work.

17              I do have the slides submitted by each party,

18   and I'll ask you to identify slides by number when you refer

19   to them.  I have the briefing in front of me and the

20   complaint in front of me, the amended complaint in front of

21   me.  So if you need me to look at anything in those that's

22   not on a slide, just give me a minute until I can get to the

23   correct page so I can follow your argument.

24              I ask you to identify yourself each time you

25   begin to speak after someone else has spoken.  My court

1    reporter is also remote, and if you identify yourself it

2    will make the record more clear.

3          One of the challenges of doing this remotely is

4    it's harder for me to ask questions.  I'm on the phone, and

5    there's often a delay when I start talking such that the

6    attorneys keep talking until I say wait, wait, or stop a few

7    times because the system doesn't click over to let them hear

8    that I'm asking a question.  So I will just ask you to be

9    mindful to listen for questions, and maybe you can stop

10   every once in a while just to see if I have any.

11         And finally, I will remind everyone that

12   recording or broadcasting these proceedings is prohibited.

13         Are there any questions before we begin?

14         MS. BOURKE:  No, Your Honor.

15         MR. ALY:  Not from defendant.

16         THE COURT:  Thank you.  Then I will hear first

17   from the defendant.

18         MR. ALY:  Thank you very much, Your Honor.  It's

19   Imron Aly, A-L-Y, and I appreciate you making the time for

20   this hearing.

21         I have the presentation where I'd like to start,

22   and slide one is the cover page.  And then slide two has the

23   outlines for the three issues that we intend to address.

24         I'll just pause here to make sure that everybody

25   can look and follow along with the presentation and is able

1   to do so.

2                THE COURT:  Okay.  That last bit, whatever you

3   just said, you sounded a little bit like you were under

4   water and speaking kind of quickly.  So I don't know if you

5   got farther away from the phone or something, but something

6   happened, and I didn't understand the words that you said in

7   that last sort of sentence.  I realize it probably wasn't

8   important, but just so you know.

9                MR. ALY:  Thank you, Your Honor.  Let me try

10  again.  Fortunately, I am not under water at the moment, so

11  I'm sorry if it sounds that way.  But I was just saying on

12  slide two to make sure that Your Honor has the presentation

13  and to orient that we're on the outline for the three issues

14  that we intend to cover today.

15               THE COURT:  Okay.

16               MR. ALY:  Thank you.

17               THE COURT:  I have that.

18               MR. ALY:  Now, I'm on slide three which is to

19  identify the patents which are Orange Book listed, that

20  those are on top, and those relate to Counts 1 and 2.

21  Counts 1 and 2 are proceeding in the case.  They are not the

22  subject of the motion.

23               The bottom two patents are non-Orange Book

24  listed and not on label method claims.  And those are

25  Counts 3 and 4, and they are the subject of motions to

1    dismiss.

2              THE COURT:  Can I ask a question just to give

3    me --

4              MR. ALY:  Yes.

5              THE COURT:  -- some understanding of where this

6    is coming from?  I mean, one of the primary purposes of the

7    Hatch Waxman Act is to allow the patentee to litigate

8    infringement claims before the generic, the ANDA applicant

9    enters the market.  And if that is the purpose of this, why

10   is it that your client doesn't want -- why are we moving to

11   dismiss these claims rather than just get them adjudicated

12   where then you'd have to deal with them after you got

13   approval and came on the market?  That's what I -- can you

14   just explain to me like why we have this motion in front of

15   us?

16             MR. ALY:  Yes, Your Honor.  For 12(b)(6), the

17   motion would be dispositive on the merits then for these

18   claims.  And the efficiency that Your Honor's talking about

19   with regard to resolution would be addressed by dismissing

20   them now for failure to state a claim.

21             THE COURT:  Okay.  Let's say that I am going to

22   say at the very least I think there should be some discovery

23   on the inducement issue because I don't think it is just I'm

24   going to dismiss it on the merits saying there cannot be

25   inducement.  So let's say that you're not going to win that

1    one.  Then tell me where we are.

2              MR. ALY:  Sure.  If Your Honor is saying we need

3    discovery to move forward, and we're not going to win that

4    one, then the issue would switch to the 12(b)(1).  And the

5    idea is here for timing and efficiency to get to trial.  And

6    the argument that we have in this case for Counts 3 and 4,

7    and we'll hear it also with the API patent issue on Count 5,

8    is that the more work there is for everybody to do, the

9    longer the case could get postponed, and just the burden on

10   everybody will be higher, particularly when we think about

11   the trial issue.

12             And the reason that's important, Your Honor, is

13   the 30-month stay is only for Orange Book listed patents

14   which are the Counts 1 and 2.  That means a lot of work has

15   to be completed within that 30-month stay, including trial

16   and a decision to avoid an injunction.  Whereas anything

17   else on top of that can be resolved in separate proceedings

18   later or even after March, and there's nothing that would

19   prohibit that from happening later.

20             And this is really a tiny efficiency effect

21   trying to make sure that as fast as Fresenius Kabi can get a

22   decision, it will be able to do so because that's in its

23   interest to get approval as fast as possible rather than

24   postpone resolution or make it more complicated.

25             THE COURT:  Do we have a scheduling order in

1    this case?

2              MR. ALY:  Yes, Your Honor, we do.

3              THE COURT:  So we already have a scheduling

4    order based on the case as it is.  So why do you -- I mean,

5    you have a schedule that's going to get you to trial in time

6    to address things before the 30-month stay ends; right?

7              MR. ALY:  Yes, Your Honor.  And the work that --

8              THE COURT:  So are you going to -- if I granted

9    your motion, are you going to change the schedule on me?

10             MR. ALY:  No, I don't think we would.  We would

11   try to make it faster.  I think the plaintiff would agree,

12   and the schedule is what it is, the January of 2022.

13             The point we're making now is that the trial

14   itself and then the time for the opinion, that could be

15   taking longer with more additional patents that are not

16   necessary to be resolved.  And --

17             THE COURT:  But I could if I wanted to after the

18   trial decide the issues on the Orange Book patent before the

19   end of the 30-month stay, and then I could decide the other

20   issues separately; right?

21             MR. ALY:  Yes, Your Honor.  And the only other

22   burden then would be on the parties and the Court for any

23   disputes regarding the discovery, and third-party discovery,

24   and expert discovery that might be very indifferent among

25   the various patents.

```
1              THE COURT:  And the discovery, though, with
2    respect to the non-Orange Book patents, putting aside the
3    API patents, which that one I understand that may be just on
4    different issues.  But I mean, the discovery with respect to
5    the Orange Book and the non-Orange Book patents in Counts 1
6    and 2 for the Orange Book and 3 and 4 for the non-Orange
7    Book, that's going to be largely overlapping; right?
8              MR. ALY:  Your Honor, I would say somewhat
9    overlapping.  The reason I say that is because as we will
10   look at the contentions that are in the amended complaint,
11   they point to -- the plaintiffs point to various third-party
12   references and materials, and there would then be a
13   requirement to look at all of the articles and get
14   third-party discovery from physicians in the field about
15   what they do and how they interpret the labels, even as a
16   factual matter, which is different than Counts 1 and 2 which
17   is looking at the label and comparing to the claim.  The
18   experts, I would agree, could overlap, and that's part of
19   the analysis, but not the entire analysis.
20             THE COURT:  Got it.  Okay.  All right.  Sorry I
21   interrupted you.  I'm just trying to understand the sort of
22   rationale.  But you can go on and tell me anything else you
23   want me to know.
24             MR. ALY:  I appreciate that, Your Honor.  I
25   would actually segue way from what Your Honor was asking
```

1    about to look at slide four where we're looking on the left

2    side of the slide, a claim.  That's the representative claim

3    1.  And then on the right side, we're looking at the

4    FIRMAGON label.

5              It's important to look at that label because

6    that's the brand drug, and it's public.  And there's no

7    allegation that Fresenius Kabi could add to that label or is

8    going to add to that label which especially it cannot do

9    since it's an ANDA submission.

10             So now if we go to that comparison, identify two

11   issues that justify the motion to dismiss.  One is that the

12   claim requires metastatic stage prostate cancer.  On there

13   on the right side, we see an indication that this is for

14   advanced prostate cancer.  We'll talk about that difference

15   in a moment.

16             The second issue is the S-ALP testing that the

17   claim requires.  Here, there's no reference to it in the

18   label.  In fact, if anything, going above and beyond, we've

19   included the laboratory testing section here from the label,

20   and that is referring to another test altogether, a PSA

21   test, not the S-ALP test.  And they're different tests and

22   no allegation that they're the same test.

23             So if I move to slide five now, the question is:

24   What are the plaintiff's allegations to try to bridge the

25   gap?  They're not saying that the label is the same as the

1    claim.

2            So what they are saying is, first on

3    paragraph 101, that there is a package insert referenced to

4    TS 21 and then a person of ordinary skill in the art would

5    have "wanted to know more about the result."  And then we'll

6    get the results from TS 21.

7            I'll stop there.  TS 21 is a code number.  That

8    itself is not on the clinical study section that's shown on

9    the bottom.  But for the benefit of the doubt, let's bridge

10   the gap that TS 21 is the same as the NCT number that's in

11   the clinical study.

12           In that label, that still only refers to the

13   clinical trial.  And again, the information here is about

14   PSA testing which again is not S-ALP testing.  They're two

15   different and distinct tests, and those are not the same.

16           So when we connect the dots, and as plaintiff is

17   trying to do, it would be on paragraph 109 of the first

18   amended complaint that they're saying following the

19   FDA-approved package insert, and after a review of the

20   literature, that's what will measure the patient's PSA level

21   and S-ALP level.

22           But the question for inducement is:  Where is

23   the instruction to go look at any literature, much less the

24   literature that would point to S-ALP when, to the contrary,

25   the clinical study section of the label, even if we go past

1    the indication, the clinical study section of the label

2    talks about the clinical trials, and any information

3    provided is about PSA levels.

4            So what are the third-party information?  Slide

5    six.  It is where plaintiffs start cataloging and discussing

6    these third-party references.  And we suggest that shows the

7    egregiousness of the issue here in terms of trying to deal

8    with and address irrelevant issues by talking about all

9    these third-party articles which, of course, by definition

10   are not our label and not referenced in our label.

11           Slide seven.  We do have the case law and briefs

12   and some experts here.  And the point of the case law is all

13   that the label is what you focus on for inducement.  And if

14   there's something not on the label, then there can't be

15   inducement.

16           And the bottom of this slide seven we've

17   identified and highlighted --

18           THE COURT:  Wait a second.  Wait a second.  Wait

19   a second.  Wait a second.  Let me just back up on the label.

20           You say the label is that, and if it's not the

21   label.  I mean, I understand from the responses I got asking

22   about the Glaxo case why the Glaxo case is somewhat

23   different because this isn't a carve-out issue.  But didn't

24   the Glaxo case suggest that you can look at circumstantial

25   evidence to show inducement, and that it wasn't limited to

1    the label?

2              MR. ALY:  Your Honor, in that case, it did, but

3    that's because it was an approved product, and the extrinsic

4    evidence for circumstantial proof was a press release and

5    promotional materials.  Those can't be possible here as

6    Fresenius Kabi does not have approval of any product, so

7    they can't market anything.  No press releases, no

8    promotional material.  That would be yet again another

9    reason to --

10             THE COURT:  Okay.  So let me then ask you this.

11   So when you said, oh, if you dismiss those claims, then

12   essentially I'm addressing them now.  I mean, it sounded to

13   me like you were saying if I dismiss these claims because I

14   say you can't show that it's for treating metastatic or you

15   can't show that there's a -- with the inducement for the

16   measuring of the S-ALP levels, are you saying that those --

17   that then when you -- if your client gets to the point where

18   it has approval and it can sell things, it can then go

19   market the heck out of it saying, you know, something about

20   measuring these levels when --

21             MR. ALY:  No, Your Honor.

22             THE COURT:  -- at that point --

23             MR. ALY:  No, Your Honor.  Fresenius Kabi would

24   never have approval of talking about marketing the things

25   that are not on the current label.  And if in the future

1   Fresenius Kabi -- if -- assuming that this case were

2   dismissed as to the two patents, and in the future Fresenius

3   Kabi took any action, whether in the ANDA or whether in the

4   public, that would be new acts of infringement that could

5   support a new claim of infringement.  Then plaintiffs could

6   bring that claim.  So it supports another reason to wait for

7   any further actions that plaintiffs believe could happen in

8   the future which is currently just speculative.

9                    THE COURT:  Okay.

10                   MR. ALY:  And on this slide, we would like to

11  emphasize a point in the briefing that the plaintiffs did

12  not list these method claims in the Orange Book.  That's

13  important because for method claims that are covered by a

14  label, that is a requirement that plaintiff has to list any

15  such patents that they believe are covered by their label.

16  That is a shell requirement.  And for that purpose, when

17  they don't even list them in the Orange Book, plaintiffs

18  have a very small response to this in their opposition that

19  simply says they think there's a different standard between

20  listing and patent infringement.  But if anything, the

21  listing is broader than the patent infringement, and they

22  still do not list it in the Orange Book.

23                   There's case law I want to address that

24  plaintiffs will be talking about which is regarding whether

25  or not a patent has to be listed in the Orange Book to be

1    asserted in litigation.  And there's case law going both

2    ways on that point, but that is in a different scenario

3    where there isn't a requirement in the first place to have

4    listed the Orange Book patent.  And those cases do not

5    address the situation where plaintiffs do not have any

6    explanation for why those patents were not listed in the

7    Orange Book.

8            And some of the cases they cite, for example,

9    there's later listed patents.  These are patents that come

10   up after litigation has already been filed.  Of course those

11   are not going to be on the Orange Book at the time of the

12   litigation.

13           Whereas, in this case, plaintiffs had the

14   patent.  They could have listed it on the Orange Book, and

15   they chose not to do so.  That's a very important factor, in

16   our view.

17           I'd like to go to slide eight just to talk about

18   the GSK case as Your Honor brought it up.  And we submitted

19   the letters.  We do think that is different.  The biggest

20   takeaway for us is the S-ALP test is nowhere on any label.

21   So no one should be talking about it or marketing to it

22   because without FDA approval, no one is allowed to market

23   for S-ALP whether that's the brand here again or whether

24   it's Fresenius' patent.

25           Sticking to the motion to dismiss for Counts 3

1   and 4, but on a different ground.  It would be slide nine.

2   This is a separate and additional issue on top of the S-ALP

3   issue.

4               The issue here is the claim is referring to

5   metastatic stage prostate cancer, and the label is referring

6   to advanced prostate cancer.  This is an important and a

7   separate issue because the patent specification makes the

8   distinction between these two.  They're not overlapping.

9   And slide ten we have shown that, the specification

10  distinguishing metastatic and locally advanced.

11              THE COURT:  Is this one more of a claim

12  construction issue?

13              MR. ALY:  Your Honor, it could be deemed as a

14  claim construction issue, but we don't believe so.  We

15  believe that as the allegation issue that what plaintiffs

16  can allege with any factual basis under the 12(b)(6)

17  standard are that metastatic prostate cancer is locally

18  advanced cancer.  And the specification is just showing the

19  distinction that they've made.

20              Now, what plaintiffs will argue to get around

21  that is that they had an allegation, that's paragraph 88 in

22  their first amended complaint, and that allegation says the

23  two are the same.  But there's no factual basis for that to

24  make it plausible, and the argument we're making here is

25  that a plaintiff can't say black is white and survive a

1    motion to dismiss.  This is a separate second reason that

2    Fresenius Kabi requests dismissal of Counts 3 and 4.

3                    THE COURT:  Okay.

4                    MR. ALY:  Your Honor, I'll turn now to --

5                    THE COURT:  You know, what were you going to

6    turn to?

7                    MR. ALY:  The second motion.  This is to sever

8    and stay for the --

9                    THE COURT:  Yeah, I think, if you don't mind,

10   I'd rather hear a response and just address each one with a

11   back and forth.  It will just be easier for me to remember

12   what I wanted to ask and to follow the argument.  So let

13   me --

14                   MR. ALY:  Of course.

15                   THE COURT:  -- hear from the plaintiff.  Let me

16   hear from the plaintiff on the first issue, the motion to

17   dismiss.  And specifically I do want to understand how it is

18   that you're saying that anything that Fresenius is doing is

19   inducing this aspect of the patent claims talking about the

20   S-ALP level.

21                   MS. BOURKE:  Good afternoon, Your Honor.  This

22   is Mary Bourke.  I think we have to start at the beginning

23   with the allegations, and what we're faced with is the

24   patent claims are to a -- and I've got to start with the

25   indication.  The indication, approved indication in the

1    label is for advanced prostate cancer.  The patent claims

2    are directed to, and this is important to point out, and you

3    can look at slide -- I would say slide one of our

4    presentation.  It's to a method of treating metastatic stage

5    prostate cancer.  Metastatic stage importantly.

6              So if we go to -- what our position is, contrary

7    to what defendants have stated, is that metastatic stage

8    prostate cancer is the last stage of advanced prostate

9    cancer.  If you look at the specification, and this is on

10   slide four of our presentation, there is a whole discussion

11   of prostate -- the definition of prostate cancer.

12             THE COURT:  So, okay.  Stop.  Stop.  Stop,

13   please.

14             MS. BOURKE:  Sure.

15             THE COURT:  Let's say I get it, and I

16   understand.  And if the issue here were simply that the

17   claims talk about a method for treating metastatic stage

18   prostate cancer, I would say that makes sense to me, that

19   you have at least proved it enough to go forward.

20             Now, focus on the other aspect which is dealing

21   with the S-ALP levels and, you know, measuring those levels

22   and where is it that we're getting anything about inducement

23   that is anything that Fresenius is doing on that issue.

24             MS. BOURKE:  So let's -- there's some

25   instructive language in the GSK case which we did not point

1   out in our letter that I would like to direct the Court to

2   right now.  And that is on page 7 of the GSK case where the

3   Court, the majority opinion says that the District Court

4   applied an incorrect legal standard whose precedent makes

5   clear that when the provider of an identical product knows

6   of and markets the same product for intended direct

7   infringing activity, the criteria of induced infringement

8   are met.

9           That is --

10          THE COURT:  I get it.  I get it.  I know.  Look,

11  I get that.

12          I'm asking you:  Where did you plead something

13  that I can understand where you are saying they are doing

14  anything with respect to this element of the claim?  Show me

15  what your best -- what you pleaded part is.

16          MS. BOURKE:  So what we pled first off -- what

17  we pled is that the -- well, beyond the fact that metastatic

18  prostate cancer is --

19          THE COURT:  Yeah, that one I told you, I'm with

20  you on that one.

21          MS. BOURKE:  Okay.

22          THE COURT:  Tell me about this other aspect.

23          MS. BOURKE:  So we say in paragraph 94 of the

24  amended complaint --

25          THE COURT:  I've got to -- do you have that on a

1    slide?  If not, just give me a second to pull it up.

2              MS. BOURKE:  That one is not in a slide.

3              THE COURT:  Okay.  Fine.  Let me just get it up.

4    Okay.  I have it.

5              MS. BOURKE:  Okay.  So we pled that in

6    paragraph 94 that S-ALP testing is generally used as a test

7    of liver function, but also is known as an indicator for

8    metastatic lesions in the bone for different malignancy in

9    metastatic prostate cancer.  Baseline S-ALP levels are

10   consistently higher and in localized or locally advanced.

11             What I also want to clear up before I take a

12   step further is that S-ALP testing is not required in all of

13   the claims.  If you look on slide two of our presentation,

14   there's claim 1, an independent claim of the '999.

15             THE COURT:  Just give me a second because I have

16   to go back and look at it.

17             MS. BOURKE:  Sorry.  Sorry.

18             THE COURT:  It's okay.  I'm happy to do it.  I

19   just need to make sure I'm with you.  Okay.  I see it.

20             MS. BOURKE:  Okay?

21             THE COURT:  I have claim 1 on slide two.

22             MS. BOURKE:  Correct.  And there are 14 claims

23   that are dependent of it.  Claim 1 only requires identifying

24   a subject with metastatic stage prostate cancer having an

25   S-ALP level above the normal range.  It does not require you

1    to test.  It just requires reducing that subject S-ALP level

2    by administrating Degarelix.

3            So that is not identifying -- it is not an

4    active method step to do S-ALP testing here.  The important

5    thing is that what a physician is going to look at when it

6    has the generic ANDA product in hand, it's going to say

7    first off, can I use Degarelix to treat metastatic stage

8    prostate cancer?  Yes.  That's in the label.  It's part of

9    the approved indication.

10           Then -- remember, this product has been on the

11   market since 2008, so there is already a body of knowledge

12   that is out there to physicians to know what Degarelix has

13   been used for, including all of the published literature

14   that we cite in our amended complaint, specifically in

15   paragraph 102 that defendant pointed you to.  So a physician

16   is going to know that he's got to determine how a patient is

17   at the last stage of advanced prostate cancer, metastatic

18   prostate cancer.  There is a well-known method to determine

19   that with blood chemistry testing, and that is the S-ALP

20   testing.  And they would either look to the literature for

21   that or they would already know that.

22           But under GSK, that's not what matters.  What

23   matters is did Fresenius know that.  And does Fresenius know

24   that by marketing its product with the same label for the

25   same intended direct infringing activity to treat metastatic

1    prostate cancer, it is inducing infringement.  And Fresenius

2    knows that, and we pled that in paragraph -- and this is on

3    a slide, Your Honor.  It's on slide 11.

4              Fresenius had knowledge of the S-ALP patents of

5    Ferring.  Fresenius filed a European opposition in 2015

6    trying to invalidate the S-ALP patents.  It knew of the

7    advantages of administering Degarelix to reduce S-ALP

8    levels, and that is what GSK says is all that is required to

9    meet the criterion of induced infringement.  So we believe

10   that we have pled sufficiently the elements of induced

11   infringement.

12             We also believe that at this stage with the law

13   on inducement as it is with the current controlling

14   precedent from the Federal Circuit in GSK which also adopts

15   or points to precedent from *Sanofi v. Watson* which is the

16   Federal Circuit's affirmance of Judge Andrews' decision in

17   *Sanofi v. Glenmark* which we also cited in our brief which

18   points to the fact that you can show induced infringement by

19   circumstantial evidence.  In the *Sanofi v. Glenmark* case,

20   Judge Andrews relied not only on the label and the clinical

21   study section of the label, but also considerable amount of

22   expert testimony to demonstrate how a physician would read

23   that label.  He also relied on actual use of the branded

24   product.  In that case, it was Multaq, and what that

25   real-world use was.  And that is the very discovery that we

1    have indicated in our brief at page 18 and in slide 13 that

2    we should be entitled to develop to prove our allegations of

3    induced infringement.

4              THE COURT:  Okay.  Mr. Aly.

5              MR. ALY:  Yes, Your Honor.  It's Imron Aly.  A

6    couple of points to address here.

7              Firstly, Your Honor had asked the question:

8    What does Fresenius Kabi do?  Any allegations?  And still

9    there is no allegation that Fresenius Kabi has or will do

10   anything to induce infringement.

11             The reference then went to a discussion to

12   paragraph 94 of the complaint which addresses a body of

13   knowledge that counsel is admitting is before the filing of

14   the complaint and before Fresenius Kabi's actions.  And

15   Fresenius Kabi did not make any of that or contribute to the

16   body of language.  So in answer to the question of what does

17   Fresenius Kabi do, it's still nothing.

18             We can move on to the next question that was

19   raised and second issue is:  Do the claims all require

20   testing?  That was brought up.  And claim 1 of the '999

21   patent where counsel identified, and that uses the term

22   identifying a subject with metastatic stage prostate cancer

23   having a S-ALP level above the normal range for S-ALP.  I

24   haven't heard and it isn't alleged how to do that without

25   testing the S-ALP level.  And in addition, there is nothing

1    in the label even to identify the S-ALP level, much less to

2    test it.

3              The third point which I believe was raised is

4    about *GSK vs. Teva* pointing to the portion on page 7 which

5    is also on our slip opinion, page 16.  And that sentence is

6    saying that the "provider of an identical product knows of

7    and markets the same product for intended direct infringing

8    activity."  And it goes on in the very next sentence to say

9    that there was ample record evidence of promotional

10   materials, press releases, product catalogs, FDA labels, and

11   testimony of witnesses from both sides to support the jury

12   verdict of inducement to infringe.

13             The distinction here is counsel is using that

14   point to say that knowledge alone is sufficient for

15   infringement.  A lot of case law on that to show that is

16   wrong.

17             And GSK does not stand for that proposition.

18   What it's identifying is that the marketing action can be

19   additional at this step in this current version of the

20   opinion.  That is the focus which is totally inaccurate

21   because here where you don't have product approval in the

22   market.

23             THE COURT:  Okay.

24             MS. BOURKE:  This is Mary Bourke, Your Honor.

25   May I respond just briefly?

1          THE COURT:  Very briefly.  Very briefly.

2          MS. BOURKE:  There is a case on point on the

3    claim 1 of the '999 patent that I'd like the Court to be

4    aware of.  It's called *Orexigen Therapeutics vs. Actavis*.

5    It's 282 F. Supp 793.  There was a case where it was a

6    method of treating an overweight or obese person who had

7    been diagnosed as suffering from overweight or obesity and

8    similar -- which is similar to our claim 1 of the '999

9    patent.  And Judge Andrews found that while a diagnosis at

10   some point had to have been done for obesity, it did not

11   comprise an active method step in those claims.

12         THE COURT:  And did he determine that at claim

13   construction?

14         MS. BOURKE:  No.  I believe that was as a

15   finding of infringement.

16         THE COURT:  So it was at trial then?  It wasn't

17   at a motion --

18         MS. BOURKE:  I believe so.

19         THE COURT:  Okay.

20         MS. BOURKE:  It was not at the pleadings stage.

21   No.

22         THE COURT:  Okay.  Let's move to the motion to

23   sever.  And on this one, I understand your -- this one I

24   understand more how it is, you know, somewhat unlike the

25   other patent.

1              What I'm trying to understand, you know, from my

2      point of view, I would rather deal with all the issues

3      together once.  Right.  It's just more efficient for me, but

4      I understand that's not necessarily what the parties would

5      want.

6              And so what I'm trying to understand here is,

7      you know, if we're talking about the API, and there's

8      already going to be reasons why the DMF is requested or why

9      there may be issues regarding this, is it just more

10     efficient for me to address this when I address the other

11     patents?

12             And again, what I'm concerned about here is, you

13     know, I don't want to have discovery disputes in front of me

14     where they're asking for the DMF in the case, if I've

15     severed off the '938, and you're saying, Look, maybe that's

16     relevant to the '938, but it's not relevant here.  And then

17     they're arguing that it still is.  And I'm just trying to

18     figure out how severing this patent really will make things

19     more clean and streamlined for me going forward in the

20     litigation.

21             MR. ALY:  Yes, Your Honor.  We believe it will

22     be absolutely.  One point I'll start with, and I'll

23     emphasize it when I get to the slides as well is that right

24     now when any person submits an ANDA, they do put in a

25     manufacturer for it, but nobody is bound by that

1    manufacturer that they submit in the opening submission.

2    And API manufacture is one thing that does commonly change

3    or evolve over the time of an ANDA submission.

4              I raise that as important because when we're

5    looking at the Hatch Waxman scheme, we believe that's one

6    reason why API synthesis patents are not included in what a

7    plaintiff can even list in the Orange Book.  So my point

8    here is that in terms of efficiency, there are reasons to

9    think things will change; and therefore, we should wait and

10   see and then wait for closer to the approval date.  And I'll

11   emphasize that when we get to more of the slides on this

12   issue.

13             THE COURT:  Okay.  All right.  Just give me a

14   second.

15             So are you proposing that when you say sever,

16   are you saying sever it and stay it, or sever it and go

17   forward with it separately, or what are we doing here?

18             MR. ALY:  Our request is to sever it and stay

19   it, but at a minimum if it's severed, it's severed, and it

20   takes on a life of its own.  At least that would be an

21   opportunity to take that case and have its own, whatever

22   extended discovery it needs, whatever international

23   discovery it needs because of the additional parties that

24   would be involved there on the plaintiff's side.  And any

25   other expert materials would all be in that other case.

1          I don't anticipate an issue of using the same

2    discovery if there is any overlap.  There's no point in us

3    or plaintiffs doing two times the same document production,

4    for example.  They can use whatever they want.

5          The point of the severing is to say that case

6    should have a life of its own for reasons of efficiency.

7          THE COURT:  Right.  But the staying point is

8    more relevant to your assertion that the API manufacturer

9    and the way the API is made may change as the ANDA process

10   goes forward.  So that's why you would want it stayed;

11   right?

12         MR. ALY:  Yes, Your Honor.  And I would like to

13   emphasize here that the Count 5 from the complaint is not a

14   271(e) claim.  It is not an ANDA-based claim or a Hatch

15   Waxman claim.  It is a claim of infringement under what I

16   call standard infringement 271(a) or 271(g).  And these are

17   about what will happen upon the launch of the product, not

18   about the filing of the ANDA.

19         THE COURT:  Right.  Now, how do you respond to,

20   you know, the issue that lots of things can change during an

21   ANDA; right?  But we still go forward with these litigations

22   even though things that can impact infringement can change

23   during the course of the attempt to get regulatory approval.

24         So how does that figure in or why is it

25   different for the '938 patent and the making of the API

1    versus everything else?

2              MR. ALY:  Sure, Your Honor.  It's because from

3    the Hatch Waxman scheme, if I can start there, when there's

4    a submission to the FDA, there is a label requirement that

5    pretty much has to match the branded label when there is a

6    generic emitting submission to the FDA.  Similarly, for the

7    formulation, it doesn't have to be the same, but changes

8    that are made have to be benchmarked against the plaintiff's

9    formulation changes to make sure that they're bioequivalent

10   in an ANDA litigation.

11             There is no such requirement for API itself or

12   how it's made, tested in any way that line up or match

13   anything that the plaintiff or anyone else is doing.  It's a

14   completely independent exercise.  And for that reason, it's

15   different in even how the FDA looks at it and why we believe

16   the Hatch Waxman Act doesn't address the patent.

17             THE COURT:  Okay.  And Ms. Bourke, what is it

18   that we're going to do here if we litigate the API

19   manufacture and then it turns out at some point that they

20   changed their supplier?  Is everything that we've done up to

21   that point just going to be for nothing?

22             MS. BOURKE:  I would say no, Your Honor.  I

23   mean, there's -- I've been involved in many cases, as I'm

24   sure Your Honor has, where there have been changes in the

25   ANDA itself that have impacted some of the allegations in

1    the case, and we have proceeded forward in every single

2    instance.  It is not uncommon that things like complete

3    response letters get filed and things have -- specs have to

4    be changed and other things, but I don't think I've ever

5    seen a judge use that to slow down a case.

6              I will say that this -- when we entered into the

7    scheduling order that was agreed to between the parties, it

8    was contemplated that this patent would be in the case.  And

9    those were the dates that were agreed upon by the parties.

10   Your Honor selected a trial date based on that.

11             The comment about international discovery for

12   the API patent is equally applicable to the method of

13   treatment patents, all of whom have named inventors that are

14   based in Europe, just like the API patent.  And even if they

15   were to have to change a DMF supplier, they can't get

16   approval until they have a DMF supplier that's approved by

17   the FDA.  So the approval of the ANDA is going to require an

18   approval of the DMF holders, so it is all intimately

19   intertwined.

20             I would just address the stay issue real

21   quickly, but the stay is prejudicial to us.  I mean, it does

22   lead to the potential for irreparable harm if there's a

23   premature launch.  It also leads to unnecessary emergency

24   motions like TROs and preliminary injunctions.

25             And as I heard Your Honor say at the beginning

1    of this hearing, the whole purpose of the Hatch Waxman Act

2    is to obtain early resolution of patent disputes to avoid

3    the very emergency motions that something such as a stay on

4    this patent would contemplate.  If there is a very true

5    concern about the fact that there's not enough time to get

6    to trial with the API patent in the case, I'm more than

7    happy to discuss a slight adjustment to the trial date if

8    that is the big concern that I am hearing from defendants.

9              But I will say that the DMF has already been

10   produced in this case.  We've already put in initial

11   infringement contentions and supplemental infringement

12   contentions addressing that patent.

13             THE COURT:  Okay.  Just give me one second.

14             Okay.  So thanks for the arguments that we just

15   had.  They were helpful to me, but I think that at this

16   point I'm going to deny the motion.  With respect to subject

17   matter jurisdiction, I do think that there's a real and

18   immediate controversy that's been ongoing with the patent.

19   Defendant filed its ANDA and declared its intent to

20   manufacture, market and sell potentially infringing product

21   in the event it gets approval.  It's actively preparing to

22   get regulatory approval.  It's told plaintiff of its

23   intentions to sell its product as soon as it gets regulatory

24   approval.  So I do think that it meets the real and

25   immediate controversy.

1         As to inducement as to the law, the general law

2    on pleading requirements and pleading of inducement as set

3    out in my opinion in *Dodots Licensing Solutions LLC v.*

4    *Lenovo Holding Co., Inc.,* No. 18-098, 2018 WL 6629709 on

5    December 19th of 2018, and in my subsequent opinion in that

6    case at 2019 WL 3069773.  So I'll incorporate that law here.

7    But generally to state a claim of inducement, a plaintiff

8    must plausibly allege that the accused infringer had

9    knowledge of the patent and knowledge that the induced act

10   constitutes patent infringement.

11        Here, the amended complaint read in the light

12   most favorable to plaintiff, as I must do at this point,

13   plaintiff alleges facts from which it could be plausibly

14   inferred that Fresenius would specifically intend doctors to

15   prescribe a product to treat metastatic prostate cancer as a

16   form of advanced prostate cancer and to reduce S-ALP levels.

17        I also think that some of the issues raised by

18   Fresenius may implicate claim construction and that also

19   makes the issues not amenable to addressing on the motion to

20   dismiss.  And I do agree with plaintiff that inducement can

21   be shown by circumstantial evidence, and I think that

22   discovery here is warranted to explore that issue.

23        As to the motion to sever, in deciding whether

24   to sever claims, the Courts must balance several

25   considerations, including convenience of the party,

1   avoidance of prejudice to either party, and promotion of

2   expeditious resolution of the litigation.  Here, I am

3   sensitive to defendant's argument that the API manufacturer

4   may change.  But that being said, I still think that

5   severing the '938 patent will result in inefficiencies and

6   in duplicative litigation that may draw out the resolution

7   of the case rather than expedite it.

8            The '938 patent is a process patent directed to

9   the manufacture of the active ingredients in the ANDA

10  product at issue rather than the method of treatment, but it

11  seems that there will still be overlapping issues and

12  overlapping discovery involving the '938 patent, and the

13  others including, for example, information in the drug

14  master file.  That being said, if during this litigation the

15  API manufacturer changes in a way that is material to the

16  infringement of that patent such that new discovery needs to

17  be taken or go forward to address the changes, I will allow

18  the defendant to raise the issue of severance again if not

19  severing would slow down the litigation and the trial of the

20  other patents in this case.  So that's my ruling on the

21  pending two motions.

22           I'm going to deny the motion to dismiss and deny

23  the motion to sever, but with leave to renew if

24  circumstances change such that that patent actually would

25  result in slowing down rather than promoting the expeditious

1   litigation.

2          So now I want to hear about the proposed

3   protective order issue.  And for this one, it seems to me

4   that everybody should be on the same footing.  Either nobody

5   gets to have their regulatory folks see the information or

6   everybody does.

7          So Mr. Aly, it seems like Fresenius was amenable

8   at the beginning to saying nobody would see that.  Is

9   Fresenius still amenable to that?

10         MR. ALY:  Yes, Your Honor.  But if it's okay

11  with Your Honor, I wanted to give a chance to Mr. Rammer to

12  address this issue.

13         THE COURT:  Oh, sure.  Sure.  Go ahead.

14         MR. RAMMER:  Good afternoon, Your Honor.  This

15  is Tom Rammer for Fresenius Kabi.  And yes, Your Honor is

16  correct that Fresenius Kabi originally did propose a

17  complete regulatory bar without exception.  But when

18  presented with plaintiff's proposal for a carve-out for

19  in-house counsel, we realized that that was a more or a less

20  rather, a less restrictive option and serves both sides far

21  better.

22         Now, some regulatory bar is needed on both sides

23  concerning new related products and applications.  And

24  specifically citizen's petitions where I can address later,

25  but we would be -- so we would rather have a complete bar

1    without the carve-outs.  That would be the minimum.

2              But the symmetrical balanced proposal that

3    Fresenius Kabi has for the protective order here gives a far

4    more reasonable level of restriction for both sides.

5              THE COURT:  Okay.  Thank you.  Who's going to

6    handle this for plaintiff?

7              MS. BOURKE:  Your Honor, I'm going to let my

8    colleague, Dana Severance, handle it.  This is Mary Bourke

9    speaking.

10             MS. SEVERANCE:  Good afternoon, Your Honor.

11   This is Dana Severance on behalf of the plaintiff.  As we

12   stated in our second letter, we are fine with reverting back

13   to a complete FDA bar.  I think that a complete FDA bar

14   would serve both sides' concerns.

15             Fresenius has raised a concern about citizen's

16   petitions.  The FDA bar would prohibit plaintiff designees

17   from engaging in any such activities, and likewise, a

18   complete FDA bar would serve our concern which is having

19   Fresenius have access to our NDA and continue to seek

20   approval of its ANDA with that information in hand.  So we

21   are fine with being on equal footing with having a complete

22   FDA bar.

23             THE COURT:  All right.  And Mr. Rammer, was that

24   first choice for Fresenius or second choice?

25             MR. RAMMER:  This is Tom Rammer for Fresenius

1    again.  Well, Your Honor, the first choice is the balanced

2    proposal that we have in the proposed protective order where

3    in-house counsel can still work on the specific NDA and ANDA

4    in this case.

5                 The second choice would be the complete bar.

6    But again, I would like to -- I would just like to point out

7    Your Honor that the more restrictive option that plaintiffs

8    are proposing, it is their burden to show good cause under

9    the Deutsche Bank case at 605 F. 3d at 1378.  And they have

10   not shown -- they have not met their burden to show good

11   cause why their more restrictive proposal of a complete bar

12   is better than the symmetrical balanced proposal that

13   Fresenius Kabi has in the proposed order.

14               MS. SEVERANCE:  Your Honor, may I respond?

15               THE COURT:  Yes.

16               MS. SEVERANCE:  This is Dana Severance.  So

17   having the bilateral exemption which Fresenius Kabi is

18   mentioning, it's not an even exemption.  Basically if

19   there's an exemption such that Fresenius' in-house designees

20   can continue to work on their ANDA or seeing our NDA, that

21   obfuscates the FDA bar, from our perspective, in its

22   entirety.  So basically they would be getting a one-way bar

23   where we can't work on citizen's petitions, but yet they're

24   continuing to work on their ANDA.  And so I do not think

25   that it's equal.

1        And the reason why we were suggesting a one-way

2   exemption is because they have not expressed any concern

3   with having our in-house designees continuing to work on our

4   NDA.  Indeed, there is no concern, and we're the branded

5   company.  They're filing a generic version of our product.

6   And there's no information in their ANDA or what they're

7   going to produce that we would use continuing to work on

8   maintaining our NDA or any supplements thereto.

9        And so that's why we were, you know, proposing

10  an exemption for continuing to work on our NDA, but not

11  allowing them to continue to work on their ANDA because,

12  again, their concern is citizen's petitions which is what is

13  already covered by the FDA bar.

14       MR. RAMMER:  Your Honor, if I may briefly

15  respond.  This is Tom Rammer for Fresenius.  But there is no

16  special risk of harm to the plaintiffs here.  The work with

17  the FDA, either pre or post-approval, these are not

18  competitive decision making.  And in fact, as plaintiff's

19  counsel said that they understand that there is

20  post-approval work to be done with the FDA which is why they

21  proposed the carve-out in the first place.

22       But Fresenius Kabi doesn't need any of

23  plaintiff's NDA information.  Their product is already

24  developed.  The ANDA is already filed.  Whatever

25  physiochemical properties or test methods that plaintiffs

1    mentioned in their letter certainly have counterparts in

2    Fresenius Kabi's ANDA.  So any risk of harm of this

3    disclosure of confidential NDA or ANDA information does go

4    both ways.

5              The real risk of tangible harm is, of course,

6    the use of Fresenius Kabi's confidential information in

7    citizen's petitions, but there are ample protections against

8    that risk in the protective order just as there are ample

9    protections against the risk of misuse of plaintiff's

10   confidential information in FDA submissions.  And plaintiffs

11   are going to be able to see all the communications to and

12   from the FDA and Fresenius Kabi over the course of the

13   litigation.  And in fact, Fresenius Kabi produced some of

14   those communications even this week.  The plaintiffs will

15   have every opportunity to police any potential violations

16   should anything occur.

17             MS. SEVERANCE:  Your Honor, may I respond?

18             THE COURT:  Yeah, but hold on.  In this case,

19   the ANDA and NDA, are they produced as confidential

20   information or highly confidential information?

21             MS. SEVERANCE:  They are confidential for the

22   protective order.

23             MR. RAMMER:  Yeah, correct.

24             THE COURT:  Okay.  And so what I'm trying to

25   understand is what is your specific concern that -- give me

1    an example of what kind of thing you're worried about can

2    happen if someone in Fresenius' legal department has, let's

3    say, your NDA, and they want to respond to something that

4    they need to in pursuing their ANDA.

5              Like I guess I'm just not sure I understand what

6    the concern is here.

7              MS. SEVERANCE:  Sure.  Well, as I stated in our

8    letter brief, number one, Degarelix is a peptide product.

9    It's classified by the FDA as a complex generic product.

10   And it's listed on the FDA's website that it's due to get

11   product-specific guidance.  No product-specific guidance

12   exists right now for Degarelix.  So that is one of our

13   concerns that they could be looking at our ANDA and looking

14   at the specification for certain physiochemical properties

15   relevant to the quality of the drug product and the method

16   that we use to test those specifications.

17             And for instance, if they get a rejection from

18   the FDA and say, you know, your specifications aren't on

19   point, you know, we want you to adjust them, somebody,

20   in-house counsel at Fresenius viewing our NDA could see how

21   we achieve those objectives, and whether they do it

22   intentionally or not, implement those in Fresenius' ANDA.

23             THE COURT:  All right.  I'm not going to adopt

24   the proposed changes, and I think I'm just going to go with

25   the complete bar here.  I think that plaintiff has made out

1   a showing of potential harm from allowing the exemptions, so

2   I'm not going to allow them.  If it turns out that there is

3   some specific harm or some specific issue that someone needs

4   to be able to address after having seen confidential

5   information, you can bring that back to me.  But I'm not

6   going to just, as a general matter, allow the two

7   exemptions.  And I'm certainly not going to allow just the

8   one-way exemption.

9               So with that, I'd ask you to put that provision

10  into the protective order when you submit it to us for

11  approval.  Is there anything else that we need to discuss

12  while we're on the phone?

13              MS. BOURKE:  Your Honor, this is Mary Bourke.

14  Not from the plaintiff's side.

15              THE COURT:  Okay.  Mr. Aly?

16              MR. ALY:  No.  Thank you very much, Your Honor.

17              THE COURT:  All right.  Thank you all very much

18  and have a good weekend.  Bye-bye.

19              (Motion Hearing was concluded at 3:01 p.m.)

20              I hereby certify the foregoing is a true and

21  accurate transcript from my stenographic notes in the

22  proceeding.

23              /s/ Heather M. Triozzi
                Certified Merit and Real-Time Reporter
24              U.S. District Court

25