**PROPOSED PRETRIAL ORDER**

**EXHIBIT 17-A**

**PLAINTIFFS' MOTION *IN LIMINE* NO. 1**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| FERRING PHARMACEUTICALS INC., FERRING INTERNATIONAL CENTER, S.A., FERRING B.V., and POLYPEPTIDE LABORATORIES A/S | ) ) ) ) ) | |
| Plaintiffs, | ) | C.A. No. 20-cv-431 (MN) |
| v. | ) ) ) | |
| FRESENIUS KABI USA, LLC, | ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' MOTION *IN LIMINE* NO. 1

Joshua P. Davis
811 Main Street
Suite 3130
Houston, TX 77002

Kenneth Mueller
Independence Wharf
470 Atlantic Avenue, Suite 600
Boston, MA 02110

*Of Counsel*

Dated: December 1, 2021

WOMBLE BOND DICKINSON (US) LLP
Mary W. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
John B. Bourke (#6534)
1313 North Market Street, Suite 1200
Wilmington, DE 19801
(302) 252-4320

*Counsel for Plaintiffs*

Plaintiffs respectfully move *in limine* to preclude Fresenius from making an untimely new invalidity argument at trial. This argument, on which Fresenius bears the burden of proof, was improperly raised for the first time in the reply report of Fresenius's expert Edward Yun, M.D. Specifically, in paragraphs 134 to 137 of his reply report, Dr. Yun provides new opinions regarding lack of enablement of asserted claims 7, 8, 9, and 10 of U.S. Patent No. 8,841,081 ("the '081 patent") and asserted claims 4, 5, 6, 7, and 8 of U.S. Patent No. 9,877,999 ("the '999 patent") (collectively, "the S-ALP patents") that were not in his opening report. (*See* Ex. 1 [Yun Reply Report] at ¶¶ 134-137.)

## I.     Background

In his opening report, Dr. Yun provided identical lack of enablement/written description arguments for U.S. Patents Nos. 9,579,359; 10,729,739; and 10,873,870 (the "side effect patents") and the S-ALP patents. (*Compare* Ex. 2 [Yun Opening Report] at ¶¶ 504-508 *with* Ex. 2 at ¶¶ 990-994.) Dr. Yun stated that certain claims of both sets of patents are directed to the treatment of prostate cancer using an initiation dose of degarelix between 160 mg and 320 mg and a maintenance dose of between 60 mg and 160 mg of degarelix. (Ex. 2 at ¶¶ 504, 990.) Dr. Yun then opined that the specification of the side effect patents and the specification of the S-ALP patents lack written description support for the full scope of the claimed dose ranges to successfully treat prostate cancer because "there is no data that initiation doses as low as 160 mg would be capable of achieving the rapid lowering of testosterone" and "[t]here is no data that a low initiation dose in combination with low maintenance doses would be sufficient to maintain testosterone levels at below 0.5 ng/mL." (Ex. 2 at ¶¶ 505, 991.) Dr. Yun further opined that a POSA would not consider the claims directed to the broad dosing ranges to be enabled across the full scope of the claims to successfully treat prostate cancer because (i) "[t]he studies using 40 mg as a maintenance dose did not achieve the required long-term reduction of testosterone levels

1

below 0.5 ng/mL," (ii) "some combinations of doses using 80 mg as a maintenance dose were indicated as not successful in maintaining castrate levels of testosterone," and (iii) "a [POSA] would be skeptical that the lower doses, given 36 days apart, would be capable of maintaining castrate levels of testosterone in subjects." (Ex. 2 at ¶¶ 507-508, 993-994.) Dr. Yun did not argue in Section XII.D of his opening report that the specific reductions of S-ALP claimed in claims 7, 8, 9, and 10 of the '081 patent and claims 4, 5, 6, 7, and 8 of the '999 patent are not enabled.

Plaintiffs' expert Dr. Shore responded to the written description/enablement argument for the side effect patents. (Ex. 3 [Shore Rebuttal Report] at ¶¶ 89-97.) Because, as described above, Dr. Yun's opinions for the side effect patents were the same as the S-ALP patents, Plaintiffs' expert Dr. Higano responded to the written description/enablement argument for the S-ALP patents by agreeing with and adopting Dr. Shore's opinions. (Ex. 4 [Higano Rebuttal Report] at ¶¶ 78-79.)

In his reply to Dr. Higano's opinions, Dr. Yun shifted his enablement argument away from testosterone suppression to instead focus on a new argument—"[t]here are no data that the claimed specific reductions of S-ALP levels identified in the specification and claims would be achieved by doses other than the single specific doses used in the CS21 study, upon which the analysis in the patent is based." (Ex. 1 at ¶ 134; *see also id.* at ¶¶ 136-137.) Dr. Yun then criticizes Dr. Higano for relying "entirely on the opinions of Dr. Shore related to invalidity of entirely different claims, from an entirely different patent family, directed to an entirely different subject matter" (Ex. 1 at ¶ 135), despite the fact that Dr. Yun made identical arguments for the side effect patents and the S-ALP patents.

## II.    Argument

Preclusion for untimely disclosure is governed by the *Pennypack* factors: "(1) the prejudice or surprise in fact of the party against whom the [excluded evidence is offered], (2) the

ability of that party to cure the prejudice, (3) the extent to which [the evidence or testimony] . . . would disrupt the orderly and efficient trial of the case . . . , and (4) bad faith or willfulness in failing to comply with the district court's order." *TrustID, Inc. v. Next Caller, Inc.*, No. 18-172-MN, 2021 WL 3015280, at *3 (D. Del. July 6, 2021). On balance, these factors favor preclusion.

First, Fresenius's attempt to raise a new enablement argument surprised Ferring. In his opening report, Dr. Yun provide identical written description/enablement opinions for the side effect patents and the S-ALP patents despite the patents being directed to different subject matter. (Ex. 2 at ¶¶ 504-508, 990-994.) Plaintiffs relied on the opinions Dr. Yun provided in his opening report, and Plaintiffs' expert Dr. Higano responded to the arguments that were made. (Ex. 4 at ¶¶ 78-79.) Apparently realizing its mistake, Fresenius attempts to shoehorn in a new enablement argument on the S-ALP patents in Dr. Yun's reply brief. (Ex. 1 at ¶¶ 134-137.) Plaintiffs will be unfairly prejudiced if Fresenius is permitted at trial to make a new enablement argument to which Dr. Higano was not afforded the opportunity to respond.

Second, there is no reasonable way to cure this prejudice. Expert discovery is now closed, and trial is set to begin on January 18, 2022. There is no time in the schedule to allow for additional expert reports or additional depositions.

Third, Fresenius should not be rewarded for failing to abide by the Court's scheduling order by holding back on positions that should have been in Dr. Yun's opening report. In its July 30, 2021 final invalidity contentions, Fresenius argued the claimed S-ALP reduction limitations lacked enablement. (Ex. 5 [Final Invalidity Contentions] at 296-297.) Fresenius chose not to advance this position in Dr. Yun's opening report, despite bearing the burden of proof on the issue. Fresenius should not be permitted to advance this argument at trial based on an untimely argument made for the first time in Dr. Yun's reply report.

Dated: December 1, 2021

OF COUNSEL:

Joshua P. Davis
811 Main Street
Suite 3130
Houston, TX 77002

Kenneth Mueller
Independence Wharf
470 Atlantic Avenue, Suite 600
Boston, MA 02110

Respectfully submitted,

*/s/ Mary W. Bourke*
Mary W. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
John B. Bourke (#6534)
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 252-4320
Mary.Bourke@wbd-us.com
Dana.Severance@wbd-us.com
Daniel.Attaway@wbd-us.com
Ben.Bourke@wbd-us.com

*Counsel for Plaintiffs*

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FERRING PHARMACEUTICALS INC.,　　　)
FERRING INTERNATIONAL CENTER S.A.,　)
FERRING B.V., and　　　　　　　　　　)
POLYPEPTIDE LABORATORIES A/S　　　)
　　　　　　　　　　　　　　　　　　) C.A. No. 20-431 (MN)
　　　　　　Plaintiffs,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　) CONTAINS CONFIDENTIAL
　　　　　　　　　　　　　　　　　　) INFORMATION
FRESENIUS KABI USA, LLC,　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　Defendant.　　　　　　　)

## EDWARD J. YUN, M.D.'S REPLY EXPERT REPORT

cardiovascular side effects as compared to treatment with a GnRH agonist. This is almost the exact definition of a natural law.

99.     As noted in my Opening Report, the other elements of the claims are related to the administration of an FDA-approved drug according to the FDA-approved dosing regimen. The remaining correlation in the claims between the history of cardiovascular events and risk of additional events is based on GnRH agonist therapy, and not tied to degarelix. This is an attempt to exclude doctors from using degarelix based on the naturally occurring side effects of an entirely different drug.

## VII.    S-ALP PATENTS

100.     As identified in my Opening Report, U.S. Patent Nos. 8,841,081 ("the '081 patent") and 9,877,999 ("the '999 patent") are directed to the treatment of metastatic stage prostate cancer with degarelix, which inherently results in a reduction of serum alkaline phosphatase (S-ALP) levels in patients with elevated S-ALP levels before treatment. I refer to the '081 and '999 patents as the S-ALP Patents.

101.     I understand that Plaintiffs have asserted that Fresenius Kabi's ANDA Product will infringe claims 2-10 and 15-18 of the '081 patent and claims 2-8 and 12-16 of the '999 patent.

102.     I have reviewed Dr. Higano's Responsive Expert Report Related to Validity of the '081 and '999 Patents. I disagree with some of Dr. Higano's analysis, and I disagree with her conclusion that the S-ALP Patents are valid.

A. **The Asserted Claims Would Have Been Obvious to a Person of Ordinary Skill in the Art as of the Filing Date**

1. **Claim 2 of the '081 Patent and Claim 2 of the '999 Patent Would Have Been Obvious Over the Prior Art**

103. As detailed in my Opening Report, claim 2 of the '081 patent and claim 2 of the '999 patent would have been obvious over van Poppel 2006 in combination with Huggins, Garnero, or Takeushi and the general knowledge of a POSA. Dr. Higano combines her analysis of these two claims, and so I will do the same.

104. First, Dr. Higano disagrees that a person of skill in the art would be aware of van Poppel 2006 because it was published in European Urology. I understand that a person of ordinary skill in the art is aware of all relevant prior art. Dr. Higano does not provide any reason why this abstract would have been unavailable to a person of skill in the art, and its contents are highly relevant to the subject matter of the claim, as detailed in my Opening Report.

105. Second, Dr. Higano states that the prior art did not render this claim obvious because—according to confidential, non-public data—at least some individual subjects did not achieve S-ALP levels below baseline levels throughout treatment. This does not disprove that a person of skill in the art, based on the public prior art, would have had a reasonable expectation that treatment of prostate cancer with degarelix would result in lower S-ALP levels.

106. Dr. Higano points to only two limitations that she opines is not rendered obvious by the prior art:  the "identifying" limitation and the "reducing" limitations. I disagree with Dr. Higano's analysis.

107. The "identifying" limitations require that the subject is identified as having an elevated baseline S-ALP level. As detailed in my Opening Report, and supported by Dr. Higano's report, is that a person of skill in the art would have found it obvious to test subjects with potential metastatic stage prostate cancer for their S-ALP levels. Higano Resp. ¶ 32.

28

108.     Dr. Higano's report does not appear to actually dispute that a person of skill in the art would have found it obvious to identify subjects using S-ALP levels. Instead, Dr. Higano opines that not all metastatic stage prostate cancer patients will present with elevated S-ALP levels. Higano Resp. ¶ 32. This is not relevant to the analysis, since these claims are directed only to subjects with metastatic stage prostate cancer that have elevated baseline S-ALP levels.

109.     Dr. Higano's other paragraphs related to this limitation do not dispute the obviousness, but point out that the references are not specific to degarelix. Higano Resp. ¶¶ 33-35. I do not disagree with that, but this is irrelevant to the obviousness of the "identifying" limitation.

110.     Dr. Higano also states that the prior art does not render the "reducing" limitations obvious. I disagree with Dr. Higano's analysis. At the most fundamental level, and as discussed by Dr. Higano in her report, elevated S-ALP levels are an indication of damage caused by bone metastases of prostate cancer. It was well understood by the filing date that degarelix was capable of treating prostate cancer by reducing testosterone levels. This treatment of prostate cancer would have been thought, as of the filing date, to reduce S-ALP levels of subjects below the baseline.

111.     Dr. Higano argues that it was unexpected that the administration of degarelix would result in longer reduction of S-ALP levels than treatment with a GnRH agonist. As noted by Dr. Higano, these are the same arguments presented by Dr. Higano in her Secondary Considerations Report. I have addressed those arguments already, and incorporate my responses to those considerations presented in my Responsive Report.

112.     I also disagree that there is no motivation to combine van Poppel 2006 with Huggins, Garnero, or Takeuchi. First, the Huggins, Garnero, and Takeuchi references are cited

for the knowledge of a person of skill in the art related to the use of S-ALP testing and the relationship between S-ALP levels and bone metastases. A person of skill in the art would have been motivated to combine the references because van Poppel 2006 specifically discusses S-ALP levels in subjects, which makes highly relevant the discussions of S-ALP testing. The references are all directed to the same problems of identifying metastatic stage prostate cancer by use of S-ALP testing.

      **2.**    **Claims 3-6 of the '081 Patent Would Have Been Obvious in View of the Prior Art**

113.    Each of claims 3 through 6 of the '081 patent further requires that the baseline S-ALP levels of subjects are above a particular measured level. As described in my Opening Report, each of these claims would have been obvious.

114.    Dr. Higano asserts that these claims are not obvious, but the reasoning is not clear. As noted in my Opening Report, the prior art taught that testing S-ALP levels would have been obvious in 2008. Dr. Higano agreed with that characterization in the art in her analysis of claim 2 of the '081 patent and claim 2 of the '999 patent. Because testing is obvious, then identifying any particular value would also be obvious since all baseline levels require administration of the same doses of degarelix. Dr. Higano disagrees because the claims "require an active step." Higano Resp. ¶ 48. This does not address the underlying obviousness of the identification claim limitation.

115.    Moreover Dr. Higano repeats that S-ALP levels are widely variable among subjects with metastatic stage prostate cancer. However, this reinforces that identifying a subject with an elevated S-ALP level would have been obvious. Higano Resp. ¶ 49.

116.    Instead, Dr. Higano states that there is no motivation to combine van Poppel 2006 with the teachings of Garnero. I disagree. As described above, a person of ordinary skill in the art

would have been motivated to combine the teachings because both are addressing the same art of levels of S-ALP levels in subjects with metastatic stage prostate cancer. Additionally, Garnero is cited to show the levels of baseline S-ALP levels that a person of skill in the art would expect to encounter in practice. Dr. Higano does not dispute that these levels would have been expected to be encountered by a person of skill in the art, thus rendering each of these additional claim limitations obvious.

### 3. Claims 7-10 and 18 of the '081 patent and claims 5-8 of the '999 patent would have been obvious over the prior art

117.    Claims 7-10 of the '081 patent and claims 5-8 of the '999 patent would have been obvious over van Poppel 2006 in combination with Huggins, Garner, or Takeuchi and the knowledge of a person of skill in the art. These claims add the "S-ALP reduction limitations" requiring a particular reduction of S-ALP levels at a particular time point.

118.    Dr. Higano opines that these claim limitations are not obvious because, according to proprietary, non-public data, not all subjects that received degarelix achieve the claimed reductions of S-ALP levels at the claimed times. This opinion does not change my obviousness conclusion, but does raise serious concerns for both enablement and infringement for Plaintiffs.

119.    As it relates to obviousness, Dr. Higano does not offer any analysis about under what conditions a subject will not achieve a lowering of S-ALP levels. The data that Dr. Higano relies on to support her point are confidential and were not available to a person of ordinary skill in the art at the time. As such, they would not have been considered. In contrast, a person of ordinary skill in the art would have had a reasonable expectation that the administration of degarelix would have resulted in a reduction of S-ALP levels in subjects.

120.    Dr. Higano repeats that a person would not have expected long-term reduction of S-ALP levels, but offers no evidence to support this assertion. Dr. Higano appears to

mischaracterize the evidence related to Ferring's "surprise" related to S-ALP levels. It was not surprising that S-ALP levels were reduced, instead it was a surprise that degarelix reduced S-ALP levels to a greater extent than the reduction when using a GnRH agonist. Dr. Higano points to no evidence that would suggest that a person of ordinary skill in the art would have expected that degarelix would not achieve at least as good results as the previous results with a GnRH agonist.

121.    Given that it was obvious to administer degarelix to subjects with prostate cancer, the dosing regimen was also disclosed in the prior art, and there was an expectation that administration of degarelix would reduce S-ALP levels, the results identified in the "reduction" limitations are nothing more than results that would have been obvious to try to a person of skill in the art in 2008.

122.    Moreover, neither the patentees nor Dr. Higano identify any particular clinical significance of the precise reduction amounts or time points. Instead, these appear to be the results of the post-hoc analysis placed in claim form. Dr. Higano asserts that the outliers that did not meet these claim limitations do not undermine the enablement of the claim because the claim limitations are the "mean data that demonstrate, on average, patients with metastatic prostate cancer who are administered degarelix according to the claimed dosing regimen meet the claimed S-ALP reduction limitations." Higano Resp ¶ 58. This is consistent with my opinion, that a person of ordinary skill in the art would have expected a reduction in S-ALP levels in subjects with prostate cancer who receive the obvious dosing regimen of degarelix.

123.    In section F of her report, Dr. Higano addresses claim 18 of the '081 patent and claim 16 of the '999 patent. Higano Resp. ¶¶ 71-76. This section incorporates her analysis

related to claim 7 of the '081 patent. For the same reasons stated above, claim 18 of the '081 patent and claim 16 of the '999 patent would have been obvious in view of the cited prior art.

### 4. Claim 15 of the '081 patent and claims 4 and 15 of the '999 patent would have been obvious in view of the prior art.

124. As detailed in my Opening Report, claim 15 of the '081 patent and claims 4 and 15 of the '999 patent would have been obvious over van Poppel 2006 in combination with Huggins, Garnero, or Takeuchi and the general knowledge of a person of skill in the art by 2008. These dependent claims require that the subject also has a PSA level of greater than or equal to 50 ng/mL before being administered degarelix.

125. Dr. Higano agrees with my analysis that a person of skill in the art would have recognized the importance of testing a subject's PSA level before administering degarelix. Moreover, Dr. Higano does not dispute that if a subject had a PSA level of above 50 ng/mL, then he would have been eligible to receive degarelix.

126. It is unclear exactly why Dr. Higano believes these claims to not be obvious. Dr. Higano incorporates her responses "set forth in Sections IV.A.3 above." Higano Resp. ¶ 63. Her report does not contain a section IV.A.3 so I cannot discern what opinions she intended to incorporate.

127. Dr. Higano states that I have not offered a motivation to combine van Poppel 2006 with Huggins, Garnero, or Takeuchi and the knowledge of a POSA. I have addressed this criticism multiple times above, and incorporate my response here.

128. Dr. Higano does not offer any other basis that claim 15 of the '081 patent and claims 4 and 15 of the '999 patent would not have been obvious in view of the prior art.

> **5.     Claims 16 and 17 of the '081 patent would have been obvious over the prior art**

129.     Claims 16 and 17 of the '081 patent depend from claim 15 of the '081 patent. Each further requires different baseline measurements of S-ALP. As with the other baseline measurement claims, the patent does not offer any clinical significance to the particular baseline levels. Additionally, the claimed treatment regimen is not altered, or therapy otherwise changed based on the baseline S-ALP measurements. Instead, these appear to only be informational data for the treating physician with no practical impact on the claimed method.

130.     Dr. Higano does not offer any additional opinions about why these claims would be invalid, except to incorporate her analysis related to dependent claims 3-6 of the '081 patent, and to repeat her assertion that there is no motivation to combine the identified prior art. I have already addressed these arguments, and incorporate my responses here.

> **6.     There are no secondary considerations of non-obviousness for the S-ALP Patents**

131.     Dr. Higano incorporates by reference her Opening Report related to secondary considerations to further rebut my opinions that the S-ALP Patents are invalid as obvious. I have separately addressed Dr. Higano's Opening Report in my Responsive Report, and so incorporate by reference my responses here.

> **B.     The Asserted Claims of the S-ALP Patents Are Invalid for Lack of Written Description and Lack of Enablement**

132.     As detailed in my Opening Report, the asserted claims of the '081 and '999 patents lack a sufficient written description and are not enabled across their full scope.

133.     First, as it relates to written description, Dr. Higano states that Ferring has again changed its position as it relates to the meaning of the "identifying" claim limitation in the '999 patent. Higano Resp. ¶ 80. Dr. Higano states that Ferring is again agreeing that all claims of the

'081 and '999 patents require that the subject's S-ALP level in the blood be tested. If true, then this would resolve the written description issues. But this change in position further strengthens my non-infringement opinions previously presented, because Fresenius Kabi's proposed prescribing information does not contain any instruction to test a patient's S-ALP levels.

134.    As it relates to enablement, Dr. Higano does not offer any of her own opinions that the claims of the '081 and '999 patents are fully enabled across their scope. Setting aside claim 2 of the '081 patent and claim 2 of the '999 patent, all other asserted claims are directed to the treatment of prostate cancer using a range of initiation doses of between 160 mg and 320 mg and maintenance doses of between 60 mg and 160 mg of degarelix. There are no data that the claimed specific reductions of S-ALP levels identified in the specification and claims would be achieved by doses other than the single specific doses used in the CS21 study, upon which the analysis in the patent is based.

135.    Dr. Higano instead relies entirely on the opinions of Dr. Shore related to invalidity of entirely different claims, from an entirely different patent family, directed to an entirely different subject matter. The claims Dr. Shore addressed did not include any specific data measurements, and there is no mention of S-ALP measurements at baseline or at specific time points. Instead, the claims Dr. Shore was addressing are related to the comparative reduction of side effects between subjects treated with degarelix and a GnRH agonist. Dr. Shore's analysis is not applicable to the S-ALP claims.

136.    The precise nature of the reduction claims makes the enablement issue particularly problematic for the patentee. Specifically, the prior art indicated that there are significant clinical differences between the ability of the lowest claimed doses to reduce testosterone levels below castrate levels in subjects for long periods of time. It appears from the

35

'081 and '999 patents, as well as Dr. Higano's analysis, that effective treatment of prostate cancer is at least part of the way that degarelix achieves the long-term reduction of S-ALP levels. Without any further data, a person of ordinary skill in the art would not believe that the entire claimed dosing range would achieve these results.

137.     Given the specific values of S-ALP that must be reduced at the specific time points, multiple clinical trials would need to be conducted for more than a year, with multiple dosing arms to determine whether some, part, or all of the claimed range of dose combinations could achieve the long-term S-ALP reduction claimed in the '081 and '999 patents. This would be undue experimentation given the time, cost, and complexity of the work required to confirm whether the full scope of the claims are enabled. Neither Dr. Shore's analysis nor Dr. Higano's report addresses this undue burden.

## VIII.   RESERVATION OF RIGHTS

138.     I have based my opinions and analysis on documents and information available to me at the time I signed this report. If and when any new evidence arises, I reserve the right to supplement or modify my opinions to reflect such additional evidence.

139.     In the event that Plaintiff submits any response to this expert report, I reserve the right to respond to any issues raised therein.

140.     If called to testify, my testimony may include an explanation of scientific principles that underlie the opinions expressed in this report.

141.     I reserve the right to make and use demonstratives to help explain the opinions set forth in this or any supplemental report I may submit.

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

FERRING PHARMACEUTICALS INC.,  )
FERRING INTERNATIONAL CENTER S.A.,  )
FERRING B.V., and  )
POLYPEPTIDE LABORATORIES A/S  )
        )   C.A. No. 20-431 (MN)
        )
    Plaintiffs,  )
        )
    v.    )   CONTAINS CONFIDENTIAL
        )   INFORMATION – SUBJECT TO
FRESENIUS KABI USA, LLC  )   PROTECTIVE ORDER
        )
    Defendant.  )

**OPENING EXPERT REPORT OF EDWARD J. YUN, M.D.**

'739 patents are not specifically identified. Instead, these claims include the reduction of the general testosterone surge side effects, which was disclosed in the prior art. The claims of the '870 patent are more specifically related to musculoskeletal or connective tissue disorders. As discussed above, bone pain is specifically identified as a side effect associated with the testosterone surge in GnRH agonist therapy. Doehn at 569. As such, these side effects were also disclosed in the prior art and not "unexpected." Claim 3 of the '870 patent is specifically directed to arthralgia. To the extent that is not covered by the description of "bone pain," there is no evidence that a person of skill in the art would have had an expectation that degarelix would result in arthralgia, such that the reduction of the risk of arthralgia would have been unexpected.

503.   Taken as a whole, the evidence of unexpected results presented by Plaintiffs is very weak, and would not be sufficient to overcome the strong evidence of obviousness presented in the prior art.

### E.   The Asserted Claims of the '359 and '739 patents, and Claims 3, 6, 8, and 14 of the '870 Patent Are Invalid for Lack of Enablement and Written Description

504.   Claims 3 and 13 of the '359 patent, claims 3, 13, 16, and 26 of the '739 patent, and claims 3, 6, 8, and 14 of the '870 patent each are directed to a dosing regimen with an initial dose of between 160 mg to 320 mg of degarelix and a monthly maintenance dose of 60 mg to 160 mg of degarelix that results in the successful treatment of prostate cancer. The claims of the '739 patent additional require that the administration of degarelix according to this dosing regimen continually results in a testosterone level below 0.5 ng/mL. These claims are not enabled across their full scope and lack a written description.

505.   First, the only efficacy and safety data in the Side Effect Patents are from the phase III trial for degarelix that tested only the initiation dose of 240 mg and the maintenance doses of 80 mg and 160 mg. *E.g.*, '359 pat., 16:4-18. There is no data in the patent that initiation

doses as low as 160 mg would be capable of achieving the rapid lowering of testosterone. Additionally, there is no data that a low initiation dose in combination with low maintenance doses would be sufficient to maintain testosterone levels at below 0.5 ng/mL. A person of skill in the art would have understood that the successful treatment of prostate cancer requires reliably achieving this level in patients to stop the growth of prostate cancer tumors. The specification lacks any written description that the inventors were in possession of the invention across the full scope of the claims, as written.

506.    Additionally, a person of skill in the art would have known, based on the prior art publications by Ferring, that doses at the lower ends of these ranges were not successful in lowering testosterone levels below 0.5 ng/mL in an acceptable number of patients to reliably treat prostate cancer. For example, in Doehn, it reports that trials using initiation doses of 160 mg degarelix and maintenance doses of 40 mg degarelix were not capable of achieving long term suppression of testosterone. Doehn at 568. That is the only data related to the 160 mg initiation dose, and it does not show sufficient efficacy to meet the requirements of the asserted claims.

507.    There is no data available for a maintenance does of 60 mg. Some phase II trials tested 40 mg and others tested 80 mg, 120 mg or 160 mg of degarelix. Doehn at 568. The studies using 40 mg as a maintenance dose did not achieve the required long-term reduction of testosterone levels below 0.5 ng/mL. Additionally, some combinations of doses using 80 mg as a maintenance dose were indicated as not successful in maintaining castrate levels of testosterone. Doehn at 568; Tombal.

508.    Because of the large number of possible combinations of initiation and maintenance doses, a person of skill in the art would have to engage in undue experimentation to ensure that the claims are enabled across their full scope. In fact, each test would require large

scale, long term studies involving hundreds of subjects and multiple test sites. The scope of this experimentation would be costly and intensive. Further complicating the analysis, is that according to the claims, the maintenance doses may be administered anywhere from every 20 days to 36 days after the previous dose of degarelix. A person of skill in the art would be skeptical that the lower doses, given 36 days apart, would be capable of maintaining castrate levels of testosterone in subjects. Moreover, there is strong evidence that at least some combinations of doses, i.e., 160 mg/60 mg would not be capable of achieving the successful treatment of prostate cancer required by the claims. A person of skill in the art would not consider the claims directed to the broad dosing ranges to be enabled across the full scope of the claims.

## XI.   **CARDIOVASCULAR EVENT PATENTS**

509.   Plaintiffs have asserted that Fresenius Kabi's ANDA product will infringe claims of the '085 patent and the '398 patent. These two patents are related, which I understand to mean that they descend from the same original patent application. I understand that these two patents share a common specification and the same effective filing date of April 27, 2012.

510.   The '085 and '398 patents generally are directed to the treatment of prostate cancer using degarelix to reduce the risk of cardiovascular events caused by GnRH agonist treatment.

### A.   **U.S. Patent No. 9,415,085 ("the '085 Patent")**

511.   The '085 patent, entitled "Method of Treating Prostate Cancer with GnRH Antagonist," issued on August 16, 2016 from U.S. Patent Application No. 13/458,330 ("the '330 application"), filed April 27, 2012. The cover of the '085 patent cites foreign priority to EP Application 08250703, filed February 29, 2008. However there is a Certificate of Correction

989.    Moreover, the reduction of S-ALP levels identified in the claims are an inherent property of the use of degarelix according to the claimed dosing regimen. As discussed above, use of this dosing regimen would have been obvious to a person of ordinary skill in the art. For this reason, the identified evidence of unexpected results are weak, and do not overcome the incredibly strong evidence of obviousness in the prior art.

D.    **The Asserted Claims of the S-ALP Patents Are Not Enabled and Lack Written Description**

990.    Each of the asserted claims of the '081 and '999 patents are directed to the treatment of prostate cancer using an initiation dose of degarelix of between 160 mg and 320 mg and a maintenance dose of between 60 mg and 160 mg of degarelix. These claims are not enabled across their full scope and lack a written description.

991.    First, the only efficacy and safety data in the Serum Alkaline Phosphatase patents are from the phase III trial for degarelix that tested only the initiation dose of 240 mg and the maintenance doses of 80 mg and 160 mg. *E.g.*, '081 pat., 14:31-35; 19:1-14.. There is no data in the patent that initiation doses as low as 160 mg would be capable of achieving the rapid lowering of testosterone. Additionally, there is no data that a low initiation dose in combination with low maintenance doses would be sufficient to maintain testosterone levels at below 0.5 ng/mL. A person of skill in the art would have understood that the successful treatment of prostate cancer requires reliably achieving this level in patients to stop the growth of prostate cancer tumors. The specification lacks any written description that the inventors were in possession of the invention across the full scope of the claims, as written.

992.    Additionally, a person of skill in the art would have known, based on the prior art publications by Ferring, that doses at the lower ends of these ranges were not successful in lowering testosterone levels below 0.5 ng/mL in an acceptable number of patients to reliably

treat prostate cancer. For example, in Doehn, it reports that trials using initiation doses of 160 mg degarelix and maintenance doses of 40 mg degarelix were not capable of achieving long term suppression of testosterone. Doehn at 568. That is the only data related to the 160 mg initiation dose, and it does not show sufficient efficacy to meet the requirements of the asserted claims.

993.    There is no data available for a maintenance does of 60 mg. Some phase II trials tested 40 mg and others tested 80 mg, 120 mg or 160 mg of degarelix. Doehn at 568. The studies using 40 mg as a maintenance dose did not achieve the required long-term reduction of testosterone levels below 0.5 ng/mL. Additionally, some combinations of doses using 80 mg as a maintenance dose were indicated as not successful in maintaining castrate levels of testosterone. Doehn at 568; Tombal.

994.    Because of the large number of possible combinations of initiation and maintenance doses, a person of skill in the art would have to engage in undue experimentation to ensure that the claims are enabled across their full scope. In fact, each test would require large scale, long term studies involving hundreds of subjects and multiple test sites. The scope of this experimentation would be costly and intensive. Further complicating the analysis, is that according to the claims, the maintenance doses may be administered anywhere from every 20 days to 36 days after the previous dose of degarelix. A person of skill in the art would be skeptical that the lower doses, given 36 days apart, would be capable of maintaining castrate levels of testosterone in subjects. Moreover, there is strong evidence that at least some combinations of doses, i.e., 160 mg/60 mg would not be capable of achieving the successful treatment of prostate cancer required by the claims. A person of skill in the art would not consider the claims directed to the broad dosing ranges to be enabled across the full scope of the claims.

995.    Separately, of the '081 and '999 patent lack written description for the "identifying" limitation, in view of Plaintiffs' position at claim construction. I am informed that at the claim construction hearing, Plaintiffs asserted that a person of skill in the art could identify a subject having a serum alkaline phosphatase level above the normal range without having that subject's serum alkaline phosphatase level tested. I disagree.

996.    The only teaching in the specifications of identifying and selecting a subject is based on review of measured S-ALP levels. In fact, the claim also requires, according to the definitions adopted by the Court that "having a serum alkaline phosphatase (S-ALP) level above a normal range for S-ALP" is based on a specific numerical value of 147 IU/L. As a result, even if the physician that administers degarelix need not conduct the S-ALP test, there would be no way to identify and select the subject with an elevated S-ALP level above this specific threshold without some testing being conducted at some point for reference.

997.    The shared specification indicates that the only criteria for selecting a subject based on the "identifying" claim limitation would be by basing the identification on baseline S-ALP testing. *E.g.,* '081 pat., 3:29–59; 4:32–49; 4:63–5:10. To the extent Plaintiffs assert that this "identifying" claim limitation can be met based on other criteria, such as bone scans or other testing methods, those methods of identifying are not disclosed with in the specification and so lack any written description in the shared specification of the S-ALP patents.

## XIII.   RESERVATION OF RIGHTS

998.    I have based my opinions and analysis on documents and information available to me at the time I signed this report. If and when any new evidence arises, I reserve the right to supplement or modify my opinions to reflect such additional evidence.

999.    In the event that Plaintiff submits any response to this expert report, I reserve the right to respond to any issues raised therein.

248

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FERRING PHARMACEUTICALS INC., <br> FERRING INTERNATIONAL CENTER S.A., <br> FERRING B.V., and <br>　　POLYPEPTIDE LABORATORIES A/S <br><br>　　　　　　　Plaintiffs, <br><br> v. <br><br> FRESENIUS KABI USA, LLC, <br><br>　　　　　　　Defendant. | )<br>)<br>)<br>)<br>)　C.A. No. 20-cv-431 (MN)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**REBUTTAL EXPERT REPORT OF NEAL D. SHORE, M.D., FACS
<u>REGARDING VALIDITY OF U.S. PATENT NOS. 9,579,359, 10,729,739, AND 10,973,870</u>**

IV.   **THE ASSERTED CLAIMS OF THE SIDE EFFECT PATENTS ARE NOT INVALID FOR LACK OF ENABLEMENT OR WRITTEN DESCRIPTION**

89.     In § X.E of the Yun Report, Dr. Yun opines that the asserted claims of the side effect patents are invalid for lack of enablement and written description. (Yun Report at § X.E (¶¶ 504-508).)

90.     Dr. Yun opines that "[t]hese claims are not enabled across their full scope and lack a written description" because:

> [T]he only efficacy and safety data in the Side Effect Patents are from the phase III trial for degarelix that tested only the initiation dose of 240 mg and the maintenance doses of 80 mg and 160 mg. *E.g.*, '359 pat., 16:4-18. There is no data in the patent that initiation doses as low as 160 mg would be capable of achieving the rapid lowering of testosterone. Additionally, there is no data that a low initiation dose in combination with low maintenance doses would be sufficient to maintain testosterone levels at below 0.5 ng/mL. A person of skill in the art would have understood that the successful treatment of prostate cancer requires reliably achieving this level in patients to stop the growth of prostate cancer tumors. The specification lacks any written description that the inventors were in possession of the invention across the full scope of the claims, as written.
>
> Additionally, a person of skill in the art would have known, based on the prior art publications by Ferring, that doses at the lower ends of these ranges were not successful in lowering testosterone levels below 0.5 ng/mL in an acceptable number of patients to reliably treat prostate cancer . . .

(Yun Report at ¶¶ 504-506.) I disagree.

91.     First, I disagree that "[t]he specification lacks any written description that the inventors were in possession of the invention across the full scope of the claims." (Yun Report at ¶ 505.) It is my understanding that the specification only needs to sufficiently describe what is claimed in the specification in order to demonstrate that the applicant was in possession of the invention at the time of filing in order to satisfy the written description requirement. In my opinion, the inventors did so. Specifically, the inventors noted that "[t]he method includes

administering an initial dose of 160-320 mg of degarelix to the subject; and administering a maintenance dose of 60-160 mg of degarelix to the subject. . ." (**Ex. 10 ['359 patent]** at 4:1-8; *see also* **Ex. 10 ['359 patent]** at 17:12-25 (Table 3).) Thus, the claimed dose ranges in the side effect patents do not lack written description.

92.     In addition, I disagree that "a person of skill in the art would have known, based on the prior art publications by Ferring, that doses at the lower ends of these ranges were not successful in lowering testosterone levels below 0.5 ng/mL." (Yun Report at ¶ 506.) The side effect patents limit the initiation dose to a range of between 160-320 mg of degarelix and the maintenance doses to a range of between 60-160 mg. As discussed above, these ranges are based on Ferring's phase II dose finding studies, which found doses within these ranges to be effective. (*See* ¶¶ 26-32, *supra*.) First, Ferring's CS07, a single-dose study, tested initiation doses ranging from 120 mg to 240 mg to 320 mg at various concentrations, finding that a majority of patients in all treatment groups suppressed testosterone below 0.5 mg/mL at day 3 and day 28. (**Ex. 5 [Tammela Abstract 2005]** at FKDEG011953 (Table 1).) Notably, this even included doses below the claimed range. Second, Ferring's CS12, a phase II dose finding study incorporating both initiation and maintenance doses, tested maintenance doses ranging from 80 mg to 120 mg to 160 mg following an initiation dose of either 200 mg or 240 mg, finding that "all doses produced fast (by day 3) and profound suppression of [testosterone] levels to ≤0.5 mg/mL and suppression was sustained up to at least day 28." (**Ex. 6 [Tombal Abstract 2006]** at FKDEG011954.) In my opinion, if a maintenance dose of 80 mg was effective in inducing profound suppression of testosterone levels, then a maintenance dose of 60 mg at the proper degarelix concentration would also likely be effective.

93.     Thus, Ferring's own phase II dose finding studies, which have been published and are therefore in the prior art, demonstrate that initiation doses were effective across the entire claimed dose range of 160-320 mg and that maintenance doses were effective across the entire claimed dose range of 60-160 mg. (*See* ¶¶ 26-32, *supra*.) Therefore, it is my opinion that the claimed dose ranges in the side effect patents are in fact enabled.

94.     Dr. Yun also opines on enablement, stating that:

> Because of the large number of possible combinations of initiation and maintenance doses, a person of skill in the art would have to engage in undue experimentation to ensure that the claims are enabled across their full scope. In fact, each test would require large scale, long term studies involving hundreds of subjects and multiple test sites. The scope of this experimentation would be costly and intensive. Further complicating the analysis, is that according to the claims, the maintenance doses may be administered anywhere from every 20 days to 36 days after the previous dose of degarelix. A person of skill in the art would be skeptical that the lower doses, given 36 days apart, would be capable of maintaining castrate levels of testosterone in subjects. Moreover, there is strong evidence that at least some combinations of doses, i.e., 160 mg/60mg would not be capable of achieving the successful treatment of prostate cancer required by the claims. A person of skill in the art would not consider the claims directed to the broad dosing ranges to be enabled across the full scope of the claims.

(Yun Report at ¶ 508.) I disagree.

95.     As previously stated, a POSA can rely on Ferring's phase II dose finding studies, which are published and in the prior art, to choose a combination of an initiation dose and a maintenance dose that would effectively suppress testosterone levels and, thereby, treat prostate cancer. Furthering this point, WO 049 even acknowledges:

> The precise concentration range effective for the purposes of the invention may vary somewhat from case to case, e.g. according to the identities of peptide and solvent and of secondary ingredient(s) when present, and to intended storage time. It is evident that in any given instance the result to be achieved and the effective concentration range therefor[e] are directly and positively verifiable

> by the simplest tests and observations requiring minimal
> experimentation.

(**Ex. 9 [WO 049]** at FKDEG012004-5.) Even as of January 2003, the prior art taught that "in any

given instance," a POSA could decide on the details of dosology to achieve a desired result,

which in this case is testosterone suppression, by optimizing an initiation dose and maintenance

doses, which, according to WO 049, "are directly and positively verifiable by the simplest tests

and observations requiring minimal experimentation." Surely it follows that such "minimal

experimentation" would be further simplified by the priority date of the side effect patents given

Ferring's published phase II dose-finding studies, which a collection is listed on the patents after

the Abstract as "References Cited." These published phase II dose finding studies would

certainly guide a POSA to select a combination of initiation and maintenance doses that would

be effective.

96.     Dr. Yun does not provide any support or rationale for his argument that the

possibility "maintenance doses may be administered anywhere from every 20 days to 36 days

after the previous dose of degarelix" "further complicat[es his] analysis." In my opinion, it would

not be undue experimentation to determine the optimal dosing schedule based on the teachings in

the common specification. In fact, in clinical practice, it is often the case that patients are

administered degarelix outside the recommended 28-day dosing schedule.

97.     Thus, again, it is my opinion that the claimed dose ranges in the side effect

patents are enabled.

38

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FERRING PHARMACEUTICALS INC.,<br>FERRING INTERNATIONAL CENTER S.A.,<br>FERRING B.V., and<br>POLYPEPTIDE LABORATORIES A/S<br><br>         Plaintiffs,<br><br>v.<br><br>FRESENIUS KABI USA, LLC,<br><br>         Defendant. | C.A. No. 20-cv-431 (MN)<br><br>**CONFIDENTIAL –**<br>**SUBJECT TO PROTECTIVE ORDER** |

**REBUTTAL EXPERT REPORT OF CELESTIA S. HIGANO, M.D., FACP**
**REGARDING VALIDITY OF U.S. PATENT NOS. 8,841,081 AND 9,877,999**

V.     THE ASSERTED CLAIMS OF THE S-ALP PATENTS ARE NOT INVALID FOR LACK OF
       WRITTEN DESCRIPTION OR LACK OF ENABLEMENT

78.     In paragraphs 990 to 994 of the Yun Report, Dr. Yun opines that the asserted

claims of the '081 and '999 patent are not enabled across their full scope and lack a written

description with respect to the dosing limitations. Specifically, in paragraph 990, Dr. Yun opines:

> 990. Each of the asserted claims of the '081 and '999 patents are
> directed to the treatment of prostate cancer using an initiation dose
> of degarelix of between 160 mg and 320 mg and a maintenance dose
> of between 60 mg and 160 mg of degarelix. These claims are not
> enabled across their full scope and lack a written description.

(Yun Report at ¶ 990.) Preliminary, I note that asserted claim 2 of the '081 patent and asserted

claims 2 of the '999 patent claim a specific dosing regimen—"The method of claim 1, wherein

the initial dose of degarelix is about 240 mg, and the at least one maintenance dose of degarelix

is about 80 mg administered to the subject approximately 28 days after the previous dose of

degarelix." (**Ex. 2 ['081 patent]** at claim 2; **Ex. 3 ['999 patent]** at claim 2.) Thus, Dr. Yun is

incorrect that each of the asserted claims is directed to an initiation dose of degarelix of between

160 mg and 320 mg and a maintenance dose of between 60 mg and 160 mg of degarelix.

79.     I understand that Dr. Yun makes identical arguments with respect to certain

claims from other patents in this litigation—specifically, claims 3 and 13 of the U.S. Patent No.

9,579,359 ("the '359 patent"), claims 3, 13, 16, and 26 of U.S. Patent No. 10,729,739, and claims

3, 6, 8, and 14 of U.S. Patent No. 10,973,870. (Yun Report at ¶¶ 504-508.) I have studied Section

IV of the Rebuttal Expert Report of Neal D. Shore, M.D. FACS regarding Invalidity of U.S.

Patent Nos. 9,579,359, 10,729,739, and 10,973,870 where Dr. Shore responds to paragraphs 504

to 508 of the Yun Report on this issue. I agree with and adopt Dr. Shore's opinions as far as they

are the same from the S-ALP patents. I specifically note that similar citations to Dr. Shore's

citations to 4:1-11 and 17:12-25 (Table 3) from the '359 patent can be found in the common

specification of the '081 and '999 patents. (See **Ex. 2 ['081 patent]** at 3:29-36, 4:32-41, 4:54-62, 19:33-49 (Table 3).)

80.     In paragraphs 995 to 997 of the Yun Report, Dr. Yun opines that the asserted claims of the '081 and '999 patent "lack written description for the 'identifying' limitation, in view of Plaintiffs' position at claim construction. I am informed that at the claim construction hearing, Plaintiffs asserted that a person of skill in the art could identify a subject having a serum alkaline phosphatase level above the normal range without having that subject's serum alkaline phosphatase level tested." (Yun Report at ¶ 995.) I understand that Plaintiffs are no longer maintaining that position. Indeed, as I stated in my Infringement Opening Report, in my opinion, "a healthcare professional presented with a patient with potential metastatic prostate cancer is going to do imaging, as well as blood work to obtain baseline values against which to monitor relevant levels over the duration of treatment. ALP is a known biomarker for metastatic prostate cancer, and healthcare professionals in their routine practice of diagnosing and treating patients with metastatic prostate cancer will measure ALP." (Higano Infringement Opening Report at ¶ 56.) I therefore understand this to be a moot point.

## VI.     CONCLUSION

81.     Based on the information discussed above as well as my knowledge and experience, it is my opinion that the asserted claims of the S-ALP patents are not invalid for any of the reasons provided by Dr. Yun.

## VII.    OTHER TESTIMONY

82.     I may testify further as to subject matter that is within my area of expertise and which will be useful to inform the Court as to the bases for my opinions. Specifically, I may provide a tutorial on the state of the art during trial or other technical overview to assist the Court if asked. I may also testify concerning additional subject matter properly raised at trial that is

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

FERRING PHARMACEUTICALS INC.,   )
FERRING INTERNATIONAL CENTER S.A., )
FERRING B.V., and        )
POLYPEPTIDE LABORATORIES A/S  )
              ) C.A. No. 20-431 (MN)
   Plaintiffs,      )
              )
   v.         )
              )
FRESENIUS KABI USA, LLC,    )
              )
   Defendants.     )

**<u>FRESENIUS KABI'S FINAL INVALIDITY CONTENTIONS</u>**

- the identification of a subject with metastatic stage prostate cancer for treatment with degarelix including measurement of S-ALP at 150 IU/L or greater, to detect bone metastases and assess the effectiveness of treatment, and

- the reduction of S-ALP to below baseline throughout the course of treatment with degarelix, including by at least 50 IU/L between day 60 and day 364 of treatment, by at least about 90 IU/L between day 112 and day 364 of treatment, and by at least about 50 IU/L between day 364 and day 450 of treatment.

In sum, the subject matter of claims 2–10 and 15–18 of the '081 patent would have been obvious in view of the prior art and, thus, the claims are invalid under 35 U.S.C. § 103(a).

## Q.    All Claims of the '081 Patent are Invalid Under 35 U.S.C. § 112

Claims 2–10 and 15–18 of the '081 patent require a method of treating prostate cancer comprising, *inter alia*, "identifying a subject with metastatic stage prostate cancer comprising measuring the subject's baseline serum alkaline phosphatase (S-ALP) level." Claims 3–6 and 16–18 further recite that "identifying the subject comprises measuring" a particular baseline S-ALP level in the subject. To satisfy the written description requirement of 35 U.S.C. § 112, first paragraph, the disclosure of the application must reasonably convey to a person of ordinary skill in the art that the inventor had possession of the claimed subject matter as of the filing date of the application. *See, e.g., Ariad Pharms., Inc. v. Eli Lilly and Co*., 598 F.3d 1336, 1351 (Fed. Cir. 2010) (citations omitted). The '081 patent, however, does not describe "identifying a subject with metastatic prostate cancer comprising measuring the subject's baseline S-ALP level." Indeed, the limitation "identifying a subject with metastatic stage prostate cancer comprising measuring the subject's baseline serum alkaline phosphatase (S-ALP) level" is not used anywhere in the specification of the '081 patent.

Instead, the specification of the '081 patent describes "identifying" a subject with metastatic prostate cancer based on a two-step process tied to S-ALP: first, "testing the S-ALP level of a potential subject," and second, "selecting the subject for treatment" if the subject's

baseline S-ALP level is greater than a certain amount (3:46–59; *see also* 4:42–53, 4:63–5:10).
According to the specification, the potential subject is "selected" for treatment when the subject's
baseline S-ALP level is greater than the range described as "normal" by the '081 patent, *i.e.*, greater
than 44–147 IU/L (*see* 14:54–55). More specifically, according to the specification:

> In a first aspect, the invention provides a method of treating metastatic stage prostate cancer in a subject. The method includes the initial step of identifying a suitable subject with metastatic stage prostate cancer, and then administering an initial dose of degarelix of 160 to 320 mg to the subject. The subject is then administered a maintenance dose of degarelix of 60 to 160 mg once every 20 to 36 days thereafter. The method thereby treats the metastatic stage prostate cancer in the subject. In a particular aspect, the invention provides a method of treating metastatic stage prostate cancer in a subject, which includes the initial step of identifying a suitable subject with metastatic stage prostate cancer, and then administering an initial dose of degarelix of about 240 mg to the subject. The subject is then administered a maintenance dose of degarelix of 60 to 160 mg once every 20 to 36 days thereafter. The method thereby treats the metastatic stage prostate cancer in the subject.

> In certain embodiments of the methods of the invention, the subject to be treated is identified by testing the serum alkaline phosphatase (S-ALP) level of a potential subject and then selecting the subject for treatment if the subject's baseline S-ALP level is 150 IU/L or greater, e.g. 160 IU/L or greater. In further embodiments, the subject to be treated is identified by testing the serum alkaline phosphatase (S-ALP) level of a potential subject and then selecting the subject for treatment if the subject's baseline S-ALP level is 200 IU/L or greater. In still further embodiments, the subject to be treated is identified by testing the serum alkaline phosphatase (S-ALP) level of a potential subject and then selecting the subject for treatment if the subject's baseline S-ALP level is 300 IU/L or greater.

> \*\*\*

> In another aspect, the invention provides methods of using degarelix for the treatment of metastatic stage prostate cancer in a subject. The methods of use of degarelix include an initial step of identifying a suitable subject with metastatic stage prostate cancer. The suitable subject thus identified is then administered an initial dose of degarelix of 160 to 320 mg, followed by maintenance doses of 60 to 160 mg of degarelix once every 20 to 36 days thereafter, thereby using degarelix for the treatment of metastatic stage prostate cancer.

In certain embodiments of the methods of use of degarelix, the subject with metastatic stage prostate cancer is identified by testing the serum alkaline phosphatase (S-ALP) level of a potential subject and then selecting the subject for treatment if the subject's baseline S-ALP level is 150 IU/L or greater, e.g. 160 IU/L or greater. In further embodiments, the subject with metastatic stage prostate cancer is identified by testing the serum alkaline phosphatase (S-ALP) level of a potential subject and then selecting the subject for treatment if the subject's baseline S-ALP level is 200 IU/L or greater. In still further embodiments, the subject with metastatic stage prostate cancer is identified by testing the serum alkaline phosphatase (S-ALP) level of a potential subject and then selecting the subject for treatment if the subject's baseline S-ALP level is 300 IU/L or greater.

***

In certain embodiments of the methods of use of degarelix, the subject with metastatic stage prostate cancer is identified by testing the serum alkaline phosphatase (S-ALP) level of a potential subject and then selecting the subject for treatment if the subject's baseline S-ALP level is 150 IU/L or greater, e.g. 160 IU/L or greater. In further embodiments, the subject with metastatic stage prostate cancer is identified by testing the serum alkaline phosphatase (S-ALP) level of a potential subject and then selecting the subject for treatment if the subject's baseline S-ALP level is 200 IU/L or greater. In still further embodiments, the subject with metastatic stage prostate cancer is identified by testing the serum alkaline phosphatase (S-ALP) level of a potential subject and then selecting the subject for treatment if the subject's baseline S-ALP level is 300 IU/L or greater.

(3:29–59; 4:32–49; 4:63–5:10).

Thus, the specification of the '081 patent illustrates that Applicants did not possess the claimed method of "identifying a subject with metastatic stage prostate cancer comprising measuring the subject's baseline serum alkaline phosphatase (S-ALP) level," without also selecting the subject for treatment if the subject's S-ALP was greater than a certain amount.

"[T]he purpose of the written description requirement is to 'ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification.'" *University of Rochester v.*

*G.D. Searle & Co., Inc.*, 358 F.3d 916, 920 (Fed. Cir. 2004) (quoting *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000)). Here, Applicants described an "identifying" step based on (1) testing S-ALP in a potential subject, and (2) selecting a subject for treatment when the subject's S-ALP was greater than a certain amount. Applicants have claimed, however, a broader "identifying" step that merely requires "measuring the subject's baseline S-ALP level," without requiring a selection step based on the subject's S-ALP level.[15] Even claims 3–6 and 16–18, which recite that "identifying" a subject "compris[es] measuring" a particular baseline S-ALP, do not recite selecting the subject based on the subject's baseline S-ALP.

In view of the foregoing, claims 2–10 and 15–18 of the '081 patent are invalid for failing to satisfy the written description requirement of 35 U.S.C. § 112, first paragraph.

Additionally, claims 3-10 and 15-18 purport to claim the entire range for an initial dose of 160–320 mg of degarelix and then the entire range for a maintenance dose of 60–160 mg. The specification, however, discloses administration results using an initial dose of 240 mg, followed by monthly maintenance doses of 160 or 80 mg. The specification therefore lacks written description and does not support the claim scope, because the patent does not show that the named inventors were in possession of the invention as claimed, in order to have the claimed dose ranges result in the claimed S-ALP reduction effect. These claims also lack enablement because testing each individual dose, and combination of doses, for their effect, would require clinical trials which

---

[15] Written description is an independent basis for invalidity distinct from obviousness. Accordingly, even though the "identifying" step would have been obvious in view of the prior art discussed herein (as discussed above in Section IV.M), this claim limitation must be adequately described in the specification of the '081 patent. Because "identifying a subject with metastatic stage prostate cancer comprising measuring the subject's baseline S-ALP level" is not described in the specification, claims 1–10 and 12–18 are invalid for failure to satisfy the written description requirement.

a POSA would understand to reflect undue experimentation, and view these claims as an introduction to experiment.

### R.     Claims 2-8 and 12-16 of the '999 patent are Invalid as Obvious Under 35 U.S.C. § 103

The asserted claims of the '999 patent would have been obvious to a person of ordinary skill in the art. A determination of obviousness under 35 U.S.C. § 103 involves ascertaining (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) objective evidence of nonobviousness.

#### 1.     The Scope and Content of the Prior Art

The scope and content of the prior art is discussed above with respect to the '081 patent.

However, each of Gonzalez-Barcena, Garnero 2001, Debruyne, Doehn, and Van Poppel 2007 was cited by Applicants in an IDS during prosecution of the '825 application that issued as the '999 patent. During prosecution of the application that issued as the '999 patent, the Patent Office relied on Van Poppel 2007 instead of Van Poppel 2006.

#### 2.     Level of Ordinary Skill in the Art

A person of ordinary skill in the art pertaining to the subject matter of the '999 patent, as of the earliest possible effective filing date of February 10, 2009, is a person with a medical degree and at least 2–3 years of experience treating cancer patients, such as, for example, patients with prostate cancer.

**PROPOSED PRETRIAL ORDER**

**EXHIBIT 17-B**

**OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 1**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FERRING PHARMACEUTICALS INC.,<br>FERRING INTERNATIONAL CENTER S.A.,<br>FERRING B.V., and<br>POLYPEPTIDE LABORATORIES A/S<br><br>　　　　　　Plaintiffs,<br><br>　　　v.<br><br>FRESENIUS KABI USA, LLC,<br><br>　　　　　　Defendant. | )<br>)<br>)<br>)<br>)　C.A. No. 20-431 (MN)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION *IN LIMINE* NO. 1

Defendant disagrees with Plaintiffs' Motion in Limine No. 1. Defendant asks the Court to deny the Motion in its entirety. Plaintiffs' own motion belies that Dr. Yun did not provide any new arguments in his reply report, but instead replied to the opinions provided by Plaintiffs' numerous experts. His argument did not change at all.

As noted in Plaintiffs' Opening Brief, Dr. Yun opined in his Opening Report that certain claims of each of the patent families are not enabled across their entire scope because the claims are directed to a wide range of doses:  initiation doses of 160 to 320; maintenance doses of 60 mg to 160 mg; and intervals of 20 to 36 days. However, the specification of each of the patents in suit provide data only about the Phase III trial for degarelix that tested only one initiation doses (240 mg), two maintenance doses (80 mg and 160 mg) and one timing interval (28 days). Dr. Yun opined that for the claims that include specific efficacy and treatment limitations, there is no data in the specification that the claimed results would be reached by using the entire scope of the claimed ranges, for each of the possible dosing combinations, and for each combination at each of the potential dosing intervals. This argument was also disclosed in Fresenius Kabi's contentions. Pls' MIL Ex. 5 at 296-97.

For the family of patents related to the reduction of serum alkaline phosphatase (S-ALP) in subjects with metastatic stage prostate cancer, Dr. Yun opined that the specific reductions of S-ALP identified in the claims are an inherent property of the administration of degarelix according to the prior art dosing regimen, i.e. the doses also used in the specification. As part of his obviousness analysis, Dr. Yun also stated, "if not inherently obvious, then these claims lack a sufficient written description and are not enabled, because a person of skill in the art could not find the necessary teaching in the patent specification to be able to achieve these results without undue experimentation." Ex. A, Yun Opening Rpt ¶¶ 761, 817, 910; *see also id.* ¶ 938. Dr. Yun included in his opinions that these claims were not enabled and lacked written description. Additionally, Dr. Yun included an entire section of his Opening Report devoted to the lack of enablement and written description of the S-ALP claims because of the lack of data for the entire claimed range. Pls' MIL Ex. 2 (Yun Opening Rpt) ¶¶ 990-997. Contrary to plaintiffs' assertion, Dr. Yun's report provided extensive detail regarding his opinions.

In response to Dr. Yun's Opening Report, Plaintiffs submitted reports from three different experts, each addressing a different patent family:  Dr. Shore addressed the Side Effect Patents, Dr. Higano addressed the S-ALP Patents, and Dr. Keane addressed the Cardiovascular Event Patents. However, Dr. Higano chose not to rebut Dr. Yun's opinions regarding the lack of enablement and written description in the S-ALP Patents. Instead, Dr. Higano deferred her opinions to Dr. Shore's report. Pls' MIL Ex. 4 ¶ 79. However, Dr. Shore's report addressed whether the limitations of the Side Effect Patents were enabled and had a sufficient written description—different patents from a different patent family with different claim limitations based on different data. Pls' MIL Ex. 5 ¶¶ 91-96.

In his reply report, Dr. Yun did not offer any new opinions. Instead, Dr. Yun rebutted Dr. Higano's report related to the S-ALP Patents. Dr. Yun pointed out that Dr. Shore's opinions regarding whether the disclosures of Side Effect Patents enabled and supported the Side Effect claims did not address his opinions regarding the lack of enablement and written description of the S-ALP Patent claims. This is not a new argument, it is rebuttal to Dr. Higano's report.

Plaintiffs identify one statement as "new:"  "[t]here are no data that the claimed specific reductions of S-ALP levels identified in the specification and claims would be achieved by doses other than the single specific doses used in the CS21 study, upon which the analysis in the patent is based."  Br. at 2 (citing Yun Reply ¶ 134). This is not a new argument. It is a restatement of the same enablement argument made in his Opening Report that "[a] person of skill in the art would not consider the claims directed to the broad dosing ranges to be enabled across the full scope of the claims." Pls' Ex 2 ¶ 994; *see also* ¶ 991 ("The specification lacks any written description that the inventors were in possession of the invention across the full scope of the claims, as written."). Dr. Yun specifically tied his enablement opinion to the S-ALP reduction limitations. Ex. A ¶¶ 761, 817, 910; *see also id.* ¶ 938. Dr. Yun's further explanation of an argument made in his Opening Report is not a new argument that should be excluded.

Finally, Plaintiffs have suffered no prejudice. Plaintiffs did not raise this "new" argument during expert discovery. Moreover, counsel for Plaintiffs deposed Dr. Yun regarding his opinions regarding validity of the S-ALP patents, and could have asked for clarification and to confirm his opinions have not changed. And this argument was disclosed in the contentions, putting Plaintiffs on notice. Pls' Ex. 5 at 293-97.

Plaintiffs' Motion in Limine No. 1 should be dismissed in its entirety.

Dated: December 8, 2021                    Respectfully submitted,


                                           Farnan LLP


                                           */s/      Brian E. Farnan*
                                           Brian E. Farnan (#4089)
                                           Michael J. Farnan (#5165)
                                           919 North Market Street, 12th Floor
                                           Wilmington, DE 19801
                                           (302) 777-0300
                                           bfarnan@farnanlaw.com
                                           mfarnan@farnanlaw.com

                                           OF COUNSEL:

                                           Imron T. Aly (admitted *pro hac vice*)
                                           Joel M. Wallace (admitted *pro hac vice*)
                                           Schiff Hardin LLP
                                           233 S. Wacker Drive, Suite 7100
                                           Chicago, IL 60606
                                           (312) 258-5500
                                           ialy@schiffhardin.com
                                           jwallace@schiffhardin.com

                                           John K. Hsu
                                           SCHIFF HARDIN LLP
                                           901 K Street NW
                                           Suite 700
                                           Washington, DC 20001
                                           202.778.6400 (tel.)
                                           202.778.6460 (fax)
                                           jhsu@schiffhardin.com

                                           *Attorneys for Defendant*
                                           *Fresenius Kabi USA, LLC*

**PROPOSED PRETRIAL ORDER**

**EXHIBIT 17-C**

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION *IN LIMINE* NO. 1**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| FERRING PHARMACEUTICALS INC.,<br>FERRING INTERNATIONAL CENTER,<br>S.A., FERRING B.V., and<br>POLYPEPTIDE LABORATORIES A/S<br><br>Plaintiffs,<br><br>v.<br><br>FRESENIUS KABI USA, LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) C.A. No. 20-cv-431 (MN)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' REPLY IN FURTHER SUPPORT OF
## PLAINTIFFS' MOTION *IN LIMINE* NO. 1

Joshua P. Davis
811 Main Street
Suite 3130
Houston, TX 77002

WOMBLE BOND DICKINSON (US) LLP
Mary W. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
John B. Bourke (#6534)
1313 North Market Street, Suite 1200
Wilmington, DE 19801
(302) 252-4320

*Of Counsel*

*Counsel for Plaintiffs*

Dated: December 13, 2021

Fresenius chose to have Dr. Yun make identical written description and enablement arguments for both the side effect patents and the S-ALP patents. Specifically, Dr. Yun opined that "for the claims that include specific efficacy and treatment limitations, there is no data in the specification that the claimed results would be reached by using the entire scope of the claimed ranges, for each of the possible dosing combinations, and for each combination at each of the potential dosing intervals." (Fresenius Resp. at 1.)  As the arguments were identical, Dr. Shore provided a substantive response, and Dr. Higano agreed with and adopted those opinions insofar as they were the same for the S-ALP patents and noted that similar citations to the ones that Dr. Shore relied on for the side effect patents were also in the S-ALP patents. (Higano Rebuttal at ¶ 79.) Dr. Higano could not rebut an argument Dr. Yun never made.

Perhaps realizing that his opening report failed to include separate S-ALP arguments, Dr. Yun, in his reply, included an entirely new enablement argument related to the S-ALP reduction limitations, not the "specific efficacy and treatment limitations" in his opening report (to which Dr. Higano responded). This was improper. Fresenius now tries to bootstrap Dr. Yun's new opinions regarding the S-ALP reduction limitations to Dr. Yun's opening report, citing a single statement therein and arguing that "Dr. Yun specifically tied his enablement opinion [from paragraph 991 and 994 of his opening report] to the S-ALP reduction limitations." (Fresenius Resp. at 3 (citing Ex. A to Fresenius Resp. at ¶¶ 761, 817, 910, 938).) However, the section of Dr. Yun's opening report titled "The Asserted Claims of the S-ALP Patents Are Not Enabled and Lack Written Description" makes clear that Dr. Yun's written description and enablement arguments had nothing to do with the S-ALP reductions, rather it was directed to the efficacy and treatment limitations. (Ex. 2 to MIL No. 1 at 246-247.) Plaintiffs respectfully request their Motion *In Limine* No. 1 be granted.

Dated: December 13, 2021

Of Counsel:

Joshua P. Davis
811 Main Street
Suite 3130
Houston, TX 77002

Respectfully submitted,

*/s/ Mary W. Bourke*
Mary W. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
John B. Bourke (#6534)
Womble Bond Dickinson (US) LLP
1313 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 252-4320
Mary.Bourke@wbd-us.com
Dana.Severance@wbd-us.com
Daniel.Attaway@wbd-us.com
Ben.Bourke@wbd-us.com

*Counsel for Plaintiffs*