**PROPOSED PRETRIAL ORDER**

**EXHIBIT 18-A**

**PLAINTIFFS' MOTION *IN LIMINE* NO. 2**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| FERRING PHARMACEUTICALS INC.,<br>FERRING INTERNATIONAL CENTER,<br>S.A., FERRING B.V., and<br>POLYPEPTIDE LABORATORIES A/S | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )  C.A. No. 20-cv-431 (MN)<br>) |
| v. | )<br>) |
| FRESENIUS KABI USA, LLC, | )<br>) |
| Defendant. | )<br>) |

## PLAINTIFFS' MOTION *IN LIMINE* NO. 2

Joshua P. Davis
811 Main Street
Suite 3130
Houston, TX 77002

Kenneth Mueller
Independence Wharf
470 Atlantic Avenue, Suite 600
Boston, MA 02110

*Of Counsel*


Dated: December 1, 2021

WOMBLE BOND DICKINSON (US) LLP
Mary W. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
John B. Bourke (#6534)
1313 North Market Street, Suite 1200
Wilmington, DE 19801
(302) 252-4320

*Counsel for Plaintiffs*

Plaintiffs respectfully move *in limine* to preclude Fresenius from asserting that claim 2 of U.S. Patent No. 10,695,398 ("the '398 patent") is invalid as anticipated by Smith MR et al., *Cardiovascular safety of degarelix: results from a 12-month, comparative, randomized, open label, parallel group Phase III trial in patients with prostate cancer*, J UROL 184(6):2313-2319 (2010) ("Smith 2010"). This argument was in Fresenius's invalidity contentions, but was not addressed by Fresenius's experts. Plaintiffs reasonably relied on the omission to conclude that Fresenius was no longer asserting its anticipation argument on the '398 patent; a conculsion bolstered by the fact that Fresenius's expert did address anticipation based on the Smith 2010 reference for a nearly identical claim in U.S. Patent No. 9,415,085 ("the '085 patent"). Allowing Fresenius to raise this argument at trial or in post-trial briefing will prejudice Plaintiffs.

I.    **Background**

There are two patents directed to the cardiovascular benefits of degarelix administration—the '085 patent and the '398 patent (collectively, "the CV patents"). Plaintiffs have asserted infringement of claim 2 of the '085 patent and claim 2 of the '398 patent. These claims are nearly identical to one another, and Fresenius advanced nearly identical anticipation and obviousness arguments on these claims in its final invalidity contentions served on July 30, 2021. (Ex. 1 [Final invalidity contentions] at 166-185, 195-211.) During expert discovery, Fresenius's expert Dr. Yun maintained Fresenius's obviousness arguments (Ex. 2 [Yun Opening Report] at ¶¶ 533-574, 584-658), but only opined that claim 2 of the '085 patent is anticipated by Smith 2010 (*id.* at ¶¶ 518-532). Dr. Yun did not opine that Smith 2010 anticipates claim 2 of the '398 patent. This alone demonstrates that Fresenius made a strategic decision on which arguments to pursue and which arguments to drop.

Despite this, Fresenius has now attempted to revive its anticipation argument on claim 2 of the '398 patent by including it in a draft exhibit to the pretrial order submitted during the

parties' November 15, 2021 pretrial exchanges. On November 19, 2021, the parties had a meet

and confer to discuss, *inter alia*, this new argument. Counsel for Fresenius confirmed that Dr.

Yun would not be providing opinions on anticipation of claim 2 of the '398 patent. Instead,

counsel suggested that Fresenius can prove this argument through cross-examination of

Plaintiffs' experts despite Fresenius bearing the burden of proof on this issue.

## II.     Argument

Preclusion for untimely disclosure is governed by the *Pennypack* factors: "(1) the

prejudice or surprise in fact of the party against whom the [excluded evidence is offered], (2) the

ability of that party to cure the prejudice, (3) the extent to which [the evidence or testimony] . . .

would disrupt the orderly and efficient trial of the case . . . , and (4) bad faith or willfulness in

failing to comply with the district court's order." *TrustID, Inc. v. Next Caller, Inc.*, No. 18-172-

MN, 2021 WL 3015280, at *3 (D. Del. July 6, 2021). On balance, these factors favor preclusion.

First, Fresenius's attempt to revive its anticipation argument on the '398 patent in the

pretrial order surprised Plaintiffs. Fresenius bears the burden of proof on invalidity and, when

Dr. Yun provided an opinion on anticipation of claim 2 of the '085 patent but not on claim 2 of

the '398 patent, Plaintiffs reasonably assumed Fresenius had dropped that argument.

Importantly, permitting Fresenius to argue anticipation of claim 2 of the '398 patent

would prejudice Plaintiffs. As part of his opinions on obviousness, Dr. Yun relies on inherency

to supply a missing limitation from claim 2 of the '398 patent. (Ex. 2 at ¶ 597.) Dr. Yun similarly

relies on inherency to supply that same missing limitation in his anticipation argument on claim

2 of the '085 patent (Ex. 3 [Yun Reply Report] at ¶ 65) and, if allowed, Fresenius will similarly

rely on inherency to supply that same missing limitation from claim 2 of the '398 patent (Ex. 1 at

197). In response, Plaintiffs' expert Dr. Keane has opined that the invention claimed in claim 2

of the '085 patent and claim 2 of the '398 patent was as unexpected result. But the standard for

inherent anticipation is different than the standard for inherent obviousness when assessing unexpected results. *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). While unexpected results may not be sufficient to overcome an inherent anticipation argument, the Federal Circuit has recognized that "the use of inherency in the context of obviousness must be carefully circumscribed because '[t]hat which may be inherent is not necessarily known' and that which is unknown cannot be obvious." *Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. De C.V.*, 865 F.3d 1348, 1354 (Fed. Cir. 2017). Because Fresenius made a strategic decision to *not* have its expert opine that claim 2 of the '398 patent is anticipated, Fresenius should be limited to arguing that claim 2 of the '398 patent is invalid for obviousness, not anticipation.

Second, there is no reasonable way to cure this prejudice. Counsel for Fresenius has suggested that Fresenius can prove anticipation through cross-examination of Plaintiffs' experts, but the fact remains that Plaintiffs relied on Fresenius's decision not assert anticipation of claim 2 of the '398 patent and Fresenius should not be permitted to revive that argument at trial.

Lastly, it strains credulity to believe that, despite Dr. Yun opining that the '085 patent is anticipated, Fresenius intended to maintain its anticipation argument on the '398 patent while not having Dr. Yun opine on this issue. Fresenius affirmatively chose not to assert anticipation of the '398 patent and now is attempting to revive that argument under the pretense that it can prove this issue (an issue it bears the burden of proof on) through cross-examination of Plaintiffs' experts. Fresenius should not be rewarded for shifting positions.

Accordingly, Fresenius should be precluded from arguing at trial or in post-trial briefing that claim 2 of the '398 patent is anticipated by Smith 2010.

Dated: December 1, 2021

OF COUNSEL:

Joshua P. Davis
811 Main Street
Suite 3130
Houston, TX 77002

Kenneth Mueller
Independence Wharf
470 Atlantic Avenue, Suite 600
Boston, MA 02110

Respectfully submitted,

*/s/ Mary W. Bourke*
Mary W. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
John B. Bourke (#6534)
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 252-4320
Mary.Bourke@wbd-us.com
Dana.Severance@wbd-us.com
Daniel.Attaway@wbd-us.com
Ben.Bourke@wbd-us.com

*Counsel for Plaintiffs*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

FERRING PHARMACEUTICALS INC.,
FERRING INTERNATIONAL CENTER S.A.,
FERRING B.V., and
POLYPEPTIDE LABORATORIES A/S

       Plaintiffs,

       v.

FRESENIUS KABI USA, LLC,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 20-431 (MN)

**<u>FRESENIUS KABI'S FINAL INVALIDITY CONTENTIONS</u>**

> GnRH antagonists offer the hope of improved long-term survival
> without the risk of worsening of symptoms in the short term and
> could be an important development in the management of advanced
> prostate cancer.

(page 1005).

XX.   **"Highlights from the 29th European Society for Medical Oncology Congress,"**
**CLIN. PROSTATE CANCER, 3(3): 136-140 (Dec. 2004) ("Vienna Highlights")**

YY.   **Weston et al., "Degarelix; a novel GnRH antagonist tested in a multicenter,**
**randomized dose-finding study in prostate cancer patients," BJU Int'l, (94)**
**Suppl. 2, 57-82 (2004) ("Weston")**

Weston, published in 2004, is an abstract that accompanied a podium session presentation

describing a phase II dose-finding study for degarelix. Weston describes three dosing regimens

testing whether multiple initiation doses were required for efficacy. Two regimens included two

initiation doses on day 0 and 3 (40 mg, or 80 mg), with maintenance doses of 40 mg given every

28 days. The third arm tested a single initiation dose of 80 mg on day 0 with no dose on day 3, and

then maintenance doses of 20 mg every 28 days. Weston reports that the 80/80/40 cohort achieved

the best testosterone suppression, and that further dosing regimen development was needed to

achieve the optimal dosing schedule and regimen.

IV.   **BASES OF INVALIDITY**

A.   **Claim 2 of the '085 Patent Is Invalid as Anticipated Under 35 U.S.C. § 102(b)**

Claim 1 of the '085 patent is directed to a method of treating prostate cancer in a subject,

comprising:

(1) selecting a subject with a history of at least one cardiovascular (CV) event and prostate
cancer,

(2) administering degarelix to the subject,

(3) wherein the administration of degarelix to the subject decreases the frequency of an
additional cardiovascular event in the subject as compared to the frequency of an additional

CV event upon treatment with a GnRH agonist in a subject with a history of at least one CV event, and

(4) wherein the at least one CV event is chosen from myocardial infarction, ischemic heart disease, ischemic stroke, hemorrhagic stroke, and other arterial thrombotic/embolic events.

Claim 2 depends from claim 1 and requires administering degarelix at an initial dose of about 240 mg, and at a maintenance dose of about 80 mg every approximately 28 days thereafter.

Smith 2010 published in 2010, *i.e.*, more than one year prior to the earliest possible effective filing date of April 27, 2012 for the '085 patent. Smith 2010, therefore, is prior art to the '085 patent under 35 U.S.C. § 102(b). Smith 2010 describes the results of a phase III clinical trial comparing degarelix to leuprolide in the treatment of prostate cancer. Subjects included in the study were randomized to one of three treatment groups: (1) subjects receiving an initial dose of 240 mg degarelix followed by monthly doses (every 28 days) of 80 mg degarelix (202 subjects), (2) subjects receiving an initial dose of 240 mg degarelix followed by monthly doses (every 28 days) of 160 mg degarelix (207 subjects), or (3) subjects receiving monthly doses of 7.5 mg leuprolide (201 subjects) (*see* page 2314; *see also* Klotz, page 1532, "patients and methods"). Smith 2010 states that "[b]aseline demographics and clinical characteristics were similar among the 3 treatment groups" (page 2314, results). In particular, 54 patients in the degarelix 240/80 mg group, 54 patients in the degarelix 240/160 mg group, and 57 patients in the 7.5 mg leuprolide group had a history of ischemic heart disease (*see* Table 1).

Thus, Smith 2010 discloses that at least 54 subjects having prostate cancer and a history of at least one of the claimed CV events, *i.e.*, ischemic heart disease, were "selected" for treatment, and administered degarelix according to the dosing schedule required by claims 1–5 and 9 of the '085 patent. Smith 2010 states that "[t]he most frequently reported cardiac disorder was ischemic heart disease, occurring in 4% (18 of 409) of subjects in the pooled degarelix group and 10% (21 of 201) of those in the leuprolide group (table 6)." As a result, Smith 2010 teaches that the

167

frequency of an additional CV event is reduced in subjects (including in subjects with a history of at least one of the claimed CV events) treated with degarelix as compared to in subjects (including in subjects with a history of at least one of the claimed CV events) treated with the GnRH agonist leuprolide, as required by claim 1. Therefore Smith 2010 discloses all of the limitations of claims 2 of the '085 patent. *See* Tanko Dep. Tr.

During prosecution of the '330 application (that issued as the '085 patent), the applicants overcame the Examiner's rejection of the pending claims as anticipated by Smith 2010. The Examiner did not fully appreciate the scope of the disclosure of Smith 2010 in allowing the claims. For the reasons discussed below, Applicants' arguments regarding Smith 2010 fail to demonstrate that Smith 2010 does not anticipate the claims of the '085 patent.

In particular, Applicants argued that Smith 2010 does not disclose the "claimed comparison," *i.e.*, a comparison of CV adverse events in only patients with a history of CV events taking degarelix versus patients with a history of CV events taking leuprolide (*see, e.g*., Response to Office Action dated December 2, 2013, pages 5–6). In particular, Applicants argued, "just because a quarter of the subjects had a history of ischemic heart disease does not make clear that the recited comparison is necessarily present." (Response to Office Action dated December 2, 2013, page 7). According to Applicants, "[b]ecause Smith [2010] included the total population with and without cardiovascular events, Smith [2010] does [not] provide for the comparison recited in the claims" (Response to Office Action dated December 2, 2013, page 7).

As an initial matter, the claims do not require any particular "comparison" step to be carried out. Making a "comparison" is not part of the claimed method of treatment. What the claims ***do*** require is a method of treating a particular type of subject, *i.e.*, a subject with a history of a certain CV event, with degarelix, wherein administering degarelix to that subject provides a "decreased

frequency" of an additional CV event relative to another particular type of subject, *i.e.*, a subject with a history of a certain CV event, being treated with leuprolide. The claimed "decreased frequency" of CV events "as compared to" a subject treated with leuprolide is inherent in the treatment of a subject with a history of one of the claimed CV events in the manner set forth in the claims. This inherent property was confirmed by the inventor, Dr. Tanko, who confirmed that the decrease in CV event frequency is based on the lack of using a GnRH agonist, not on the particular dosing regimen or other feature of claim 2 of the '085 patent. Tanko Dep. Tr.

More specifically, and as described in detail above, Smith 2010 (and its underlying reference, Klotz) discloses the selection and treatment of subjects having prostate cancer and a history of a certain CV event (i.e., ischemic heart disease) as required by the claims. Smith 2010 also discloses that the subjects receive degarelix according to the dosing schedule required by the claims. These subjects, upon treatment with degarelix according to the claimed schedule, will necessarily experience a "decreased frequency" of an additional CV event as compared to the frequency of an additional CV event in a subject with a history of a certain CV event and treated with a GnRH agonist.[3] *See Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003) ("In general, a limitation or the entire invention is inherent and in the public domain if it is the 'natural result flowing from' the explicit disclosure of the prior art."). That additional subjects,

---

[3] Claim 1 of the '085 patent does not require anything other than "administering degarelix" to a subject having prostate cancer and a history of at least one of the claimed CV events to result in the claimed "decreased frequency" of an additional CV event relative to treatment with a GnRH agonist. Nor does the specification teach that anything other than the administration of degarelix is required to reduce the frequency of additional CV events in this subgroup of patients. Thus, subjects with a history of ischemic heart disease who received degarelix as recited by the claims (and as described in Smith), must have necessarily experienced the claimed "decreased frequency" of additional CV events. Otherwise, the specification of the '085 patent does not teach a person of ordinary skill in the art how to achieve the claimed "decreased frequency" without undue experimentation, such that the claims are invalid under 35 U.S.C. § 112, first paragraph, for lack of enablement. *See* Section IV.C below.

not having the required CV history, also were selected for inclusion in the clinical trial described in Smith 2010 does not change the inherent result (i.e., a "decreased frequency" of an additional CV event) with respect to the subjects included in the study that *did* have the claimed CV history. Indeed, claim 1 is directed to the treatment of "a subject" having a history of at least one of the recited CV events. Claim 1 is not directed to any broader population, nor does claim 1 somehow exclude the treatment of any other subject.

Applicants also argued that Smith 2010 does not anticipate the claims because Smith 2010 reports that there were "no significant differences" in CV events for antagonist and agonist treatment groups (Response to Office Action dated December 2, 2013, page 7). However, the specific data included in Table 6 of Smith 2010 illustrates that while only 4% of subjects in the pooled degarelix treatment group experienced ischemic heart disease as an adverse event, 10% of subjects in the leuprolide treatment group experienced ischemic heart disease as an adverse event. This data would have illustrated to a person of ordinary skill in the art that treatment with degarelix reduces the frequency of ischemic heart disease as an adverse event relative to treatment with leuprolide. In any event, however, inherent anticipation does not require that a person of ordinary skill in the art would have recognized the inherent subject matter. *Schering*, 339 F.3d at 1377 ("this court rejects the contention that inherent anticipation requires recognition in the prior art"). Thus, even if Smith 2010 did not report the frequency of ischemic heart disease resulting from treatment with degarelix as compared to treatment with leuprolide, Smith 2010 would nonetheless anticipate the claims of the '085 patent. It is irrelevant that Smith 2010 does not "report" a specific comparison of CV adverse events only in subjects with a history of CV events (*see* Response to Office Action dated December 2, 2013, page 6). Despite their arguments to the contrary, Applicants did not claim a "new use for [a] prior art composition." (*See* Response to Office Action

dated November 19, 2014, pages 9–10). Instead, Applicants merely claimed the inherent result of treating a certain type of subject, which subject had already been treated as described in Smith 2010.

Applicants further argued that "claim 1 includes a step where the subject is selected based upon dual criteria, namely, having prostate cancer and having a history of at least one cardiovascular event" (Response to Office Action dated November 30, 2015, page 10). According to Applicants, Smith 2010 fails to teach this selection step:

> While Smith [2010] administers degarelix to some patients with a history of cardiovascular event[s], this does not in any manner disclose or suggest the claimed dual selection step because Smith [2010] does not select a prostate cancer patient with a history of at least one cardiovascular event. Rather, it administers degarelix to *all* patients regardless of their cardiovascular history.

(Response to Office Action dated November 30, 2015, pages 10–11) (emphasis in original).

Regardless of whether Smith 2010 *also* "selected" other subjects for treatment, *e.g.*, subjects without a history of at least one CV event, Smith 2010 selected the claimed subjects for treatment according to the claimed method. Indeed, more than one-quarter of all subjects treated with degarelix according to the claimed dosing schedule had a history of at least one of the claimed CV events, *i.e.*, ischemic heart disease (Smith 2010, Table 1). More specifically, Smith 2010 describes the "selection" of 54 subjects with a history of ischemic heart disease who received an initial dose of 240 mg degarelix followed by monthly maintenance doses of 80 mg degarelix, and the selection of 54 additional subjects with a history of ischemic heart disease who received an initial dose of 240 mg degarelix followed by monthly maintenance doses of 160 mg degarelix

171

(Table 1). [4] It was known that each of these 108 subjects had a history of ischemic heart disease at the time they were selected for inclusion in the clinical trial described in Smith 2010. Nothing more is required by the claimed "selection" step.[5] The claims do not require any particular method of "selection," nor do they require the exclusion of any other types of subjects.

In view of the foregoing, Smith 2010 anticipates the subject matter of claims 1–6 and 8–9, such that claims 1–6 and 8–9 are invalid under 35 U.S.C. § 102(b).

---

[4] That Applicants tried to amend the claims of the '330 application to remove "ischemic heart disease" as one of the claimed CV events evidences Applicants' recognition that Smith discloses the "selection" of subjects with prostate cancer and a history of ischemic heart disease for treatment with degarelix (*see* Response to Office Action dated November 19, 2014, pages 10–11). Applicants proposed claim amendment, however, was rejected as not supported by the specification (*see* Office Action dated June 30, 2015; Response to Office Action dated November 30, 2015). The issued claims of the '085 patent (which include ischemic heart disease as one of the claimed CV events) are directed to subject matter that is necessarily present in Smith, *i.e.*, the selection of a subject with prostate cancer and a history of at least one CV event (i.e., ischemic heart disease) for treatment with degarelix (*see* Response to Office Action dated November 19, 2014, page 11).

[5] During prosecution of related U.S. Patent Application No. 15/205,108 ("the '108 application"), the claims of which recently issued as U.S. Patent No. 10,695,398, Applicants argued that Smith 2010 describes a "randomized controlled trial of leuprolide acetate vs degarelix," and that "randomization precludes selection based on any factor including the claimed factor of 'a history of at least one cardiovascular event'" (Response to Office Action dated April 24, 2019, page 8). That subjects were randomized to one of three treatment groups does not negate the selection of subjects with prostate cancer and a history of at least one of the claimed CV events for treatment with degarelix. Indeed, randomization means that the treatment groups will have a similar makeup of patients. At the time subjects were selected for treatment according to the clinical trial described in Smith 2010, it was known that approximately one-quarter of the subjects had a history of ischemic heart disease. Accordingly, approximately one-quarter of the subjects randomized to the degarelix treatment groups also would have a history of ischemic heart disease. Such subjects—those with prostate cancer and a history of ischemic heart disease—were selected for treatment with degarelix as described in Smith 2010. In addition, and as discussed in detail below (*see* Section IV.C), the specification of the '085 patent does not describe ***any*** particular method of "selecting" subjects, let alone a selection method that somehow excludes a randomized trial. Applicants' arguments in the '108 application fail to establish that Smith does not anticipate the claims of the '085 patent.

**B.      Claim 2 of the '085 Patent Is Invalid as Obvious Under 35 U.S.C. § 103**

Claim 2 of the '085 patent is invalid as obvious under 35 U.S.C. § 103 in view of one or more of the prior art references listed in Section III above, alone, in combination, and/or with the knowledge and creativity of a person of ordinary skill in the art at the time of the alleged inventions. Fresenius Kabi's contentions below that the references in various combinations render the asserted claim obvious under 35 U.S.C. § 103, however, should in no way be construed as an admission or suggestion that the references do not independently anticipate or render obvious the asserted claim.

The subject matter of claim 2 of the '085 patent would have been obvious to a person of ordinary skill in the art at the time of the invention. A determination of obviousness under 35 U.S.C. § 103 involves ascertaining (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) objective evidence of nonobviousness.

**1.      Scope and Content of the Prior Art**

The Firmagon Label was approved by the FDA and publicly available as of December, 2008, *i.e.*, more than one year prior to the earliest possible effective filing date of April 27, 2012 for the '085 patent. The Firmagon Label, therefore, is prior art to the '085 patent under 35 U.S.C. § 102(b).

Klotz published in 2008, *i.e.*, more than one year prior to the earliest possible effective filing date of April 27, 2012 for the '085 patent. Klotz, therefore, is prior art to the '085 patent under 35 U.S.C. § 102(b). Klotz is mentioned in the specification of the '085 patent, but was not cited by Applicants in an Information Disclosure Statement (IDS) or by the Examiner during prosecution.

Levine published in 2010, *i.e.*, more than one year prior to the earliest possible effective filing date of April 27, 2012 for the '085 patent. Levine, therefore, is prior art to the '085 patent under 35 U.S.C. § 102(b). Levine is mentioned in the specification of the '085 patent, but was not cited by Applicants in an Information Disclosure Statement (IDS) or by the Examiner during prosecution.

Shahani published in 2008, *i.e.*, more than one year prior to the earliest possible effective filing date of April 27, 2012 for the '085 patent. Shahani, therefore, is prior art to the '085 patent under 35 U.S.C. § 102(b). Shahani was not cited by Applicants in an IDS or by the Examiner during prosecution.

Smith 2010 published in 2010, *i.e.*, more than one year prior to the earliest possible effective filing date of April 27, 2012 for the '085 patent. Smith 2010, therefore, is prior art to the '085 patent under 35 U.S.C. § 102(b).

Smith 2011 published in November of 2011, *i.e.*, before the earliest possible effective filing date of April 27, 2012 for the '085 patent, and is not authored by an inventor of the '085 patent. Smith 2011, therefore, is prior art to the '085 patent under 35 U.S.C. § 102(a).

Tanriverdi published in 2004, *i.e.*, more than one year before the earliest possible effective filing date of April 27, 2012 for the '085 patent. Tanriverdi, therefore, is prior art to the '085 patent under 35 U.S.C. § 102(b).

Van Poppel 2008 was published in 2008, *i.e.*, more than one year prior to the earliest possible effective filing date of April 27, 2012 for the '085 patent. Van Poppel 2008, therefore, is prior art to the '085 patent under 35 U.S.C. § 102(b).

The prior art established that the use of GnRH agonist therapy for prostate cancer resulted in a higher risk of CV events, as compared to orchiectomy. Levine studied the CV risk associated

174

with ADT using GnRH agonists in prostate cancer subjects, "to generate suggestions regarding the evaluation and management of patients, both with and without known cardiac disease, in whom ADT is being initiated" (page 833). Levine describes the classification of subjects into subgroups based upon whether they have experienced cardiac risk factors or cardiac disease prior to ADT (*see, e.g.*, page 835). After reviewing the results of various studies, Levine concludes that an increased risk of CV events resulting from ADT may exist "primarily in those with existing, overt coronary artery disease" (page 835). Thus, Levine teaches that prescribing physicians should weigh the benefits of ADT for treating prostate cancer against the risks of CV adverse events, "particularly [for subjects] with cardiovascular disease" (page 837), and that clinical trials should assess CV risk factors before beginning ADT (page 838).

Shahani also identified the increased risk of CV events in subjects treated with GnRH agonists, as compared to subjects having undergone an orchiectomy (page 2046). Shahani teaches that it is important for caregivers to be aware of adverse CV events associated with ADT with GnRH agonists, noting specifically that "men undergoing ADT have a 25% higher risk of incident coronary artery disease compared with non-ADT men" (page 2048). Shahani therefore suggests that men planning to undergo ADT could benefit from screening for various CV risk factors, and that men with a personal history of CV disease in particular may benefit from a cardiology consultation before starting ADT (page 2048).

The mechanism of action was not known conclusively, but it had been theorized that GnRH receptors in T-cells present in atherosclerotic plaque could be stimulated by the use of GnRH agonists. *See* Tanriverdi at 587; Tanko Dep. Tr.. For these reasons, a POSA would have expected a higher rate of CV events in subjects being treated for prostate cancer with an agonist, as compared to treatment for prostate cancer with an antagonist. Moreover, even setting aside the mechanism

of action, a POSA would have expected treatment with a GnRH antagonist, like degarelix, to result in fewer CV events than treatment with a GnRH agonist because the effects of using a GnRH antagonist more closely mimic the effects of orchiectomy. Tanko Dep. Tr. Specifically, a GnRH antagonist rapidly stops the production of testosterone, like an orchiectomy, and unlike a GnRH agonist, which first increases testosterone production before down regulating testosterone production.

Finally, the publicly available data for degarelix confirmed the expectation that treatment with degarelix for prostate cancer results in a decreased risk of CV events, particularly in subjects with previous CV events, as compared with subjects treated with a GnrH agonist. Smith 2010 and Klotz describe a one-year phase III clinical trial in subjects with prostate cancer, which evaluated the safety and efficacy of degarelix, a GnRH antagonist, versus leuprolide, a GnRH agonist, for achieving and maintaining testosterone (T) suppression. In particular, 610 patients (about 25% of which had a history of ischemic heart disease) were randomized into one of three treatment groups: (1) subcutaneous starting dose of 240 mg degarelix followed by subcutaneous monthly maintenance doses of 80 mg degarelix, (2) subcutaneous starting dose of 240 mg degarelix followed by subcutaneous monthly maintenance doses of 80 mg degarelix, or (3) intramuscular monthly doses of 7.5 mg leuprolide (Klotz, page 1531; Smith 2010, page 2314). Cardiovascular (CV) side effects were reported by 13% of subjects in the leuprolide group and 9% of the subjects in the degarelix groups (Klotz, page 1535), and ischemic heart disease was reported as an adverse event by 10% of subjects in the leuprolide group and 4% of subjects in the degarelix groups (Smith 2010, Table 6). Smith 2010 cautions that, "[g]iven the metabolic effects of ADT [androgen deprivation therapy]," it is important to monitor and quantify the incidence of CV events in the treatment of prostate cancer with ADT (page 2317). Van Poppel 2008 suggests that treatment with

GnRH antagonists like degarelix can avoid life-threatening risks of death from, *inter alia*, cardiovascular events caused by the testosterone flare associated with GnRH agonists. (Van Poppel 2008 at 1003). Smith 2011 states that "degarelix, like orchiectomy, is not associated with CVD." (Smith 2011 at 5).

### 2.     Level of Ordinary Skill in the Art

A person of ordinary skill in the art pertaining to the subject matter of the '085 patent, as of the earliest possible effective filing date of April 27, 2013, is a person with a medical degree and at least 2–3 years of experience treating cancer patients, such as, for example, patients with prostate cancer.

### 3.     Differences Between the Claimed Invention and the Prior Art

As of the priority date of the '085 patent, hormone therapy had been commonly and widely used in the treatment of prostate cancer (Mongiat-Artus at Abstract). Further, degarelix was a well-known GnHR antagonist in the art before the priority date (*see* Broqua; Iverson; Jadhav at 632; Olesen Dep. Tr.; Jensen Dep. Tr.; Tanko Dep. Tr.).

Smith 2010 discloses all of the elements of each of claim 2 of the '085 patent and, therefore, anticipates the claim. However, the subject matter of the claims of the '085 patent would also have been obvious over Smith 2010 and Klotz in view of Levine, and optionally in further view of Shahani. More specifically, and for the reasons discussed below, a person of ordinary skill in the art would have selected a subgroup of prostate cancer patients having a history of at least one of the claimed CV events, such as a history of ischemic heart disease in particular, and would have compared the occurrence of CV adverse events in patients in that subgroup who were treated with degarelix to patients in that subgroup who were treated with leuprolide. In view of the results described in Levine, a person of ordinary skill in the art would have had a reasonable expectation

that the frequency of CV adverse events would depend upon the subject's history of CV events. Moreover, in view of Smith 2010, Smith 2011, and/or Van Poppel 2008, a person of ordinary skill in the art would have reasonably expected that treatment with degarelix could reduce CV adverse events as compared to treatment with leuprolide, including in a subject with a history of CV events, particularly in light of the prior art comparing treatment with orchiectomy with GnRH agonist treatment. *See* Tanko Dep. Tr.

Smith 2010 is specifically directed to comparing the cardiovascular profile of degarelix to that of leuprolide in prostate cancer patients. Smith 2010 recognizes that "[t]here is limited information about the CV safety of degarelix and other GnRH antagonists, although the observed effects on serum testosterone levels suggest a CV safety profile similar to that of other GnRH agonists" (page 2314). Approximately one-quarter of the subjects treated according to the clinical trial described in Smith 2010 (regardless of their treatment group) had a history of ischemic heart disease (*see* Table 1), and 26 subjects with a history of ischemic heart disease were treated with degarelix according to the dosing schedule required by claims 1–5 and 9 (*see* Table 1). In particular, 26 subjects with a history of ischemic heart disease were included in the degarelix 240/80 mg treatment group, which received an initial dose of 240 mg degarelix followed by monthly (every 28 days) doses of 80 mg degarelix (*see* Smith 2010, Table 1; Klotz, page 1532; *see also* Firmagon Label at 1 (instructing that treatment with degarelix is started with a dose of 240 mg given as two injections of 120 mg each followed by maintenance doses of 80 mg administered as a single injection every 28 days); Iverson; Sorbera at pages764–65). In addition, subjects treated according to the clinical trial reported in Smith 2010 satisfied the risk factor requirements of claims 6 and 7, and the prostate disease cancer requirements of claim 8 (*see* Smith 2010, Table 1; Klotz, Table 2). Smith 2010 draws attention to the fact that "[t]he most frequently

reported cardiac disorder [experienced during treatment] was ischemic heart disease," although it was reported by only 4% of the subjects receiving degarelix as compared to 10% of the subject receiving leuprolide (page 2316; *see also* Table 6). Overall, however, Smith 2010 reports that "the incidence of [CV] events was relatively low," and that "the numerical data suggest a comparable safety profile for the 2 drugs" (page 2318). Smith 2010 teaches the treatment of subjects with prostate cancer and a history of ischemic heart disease according to the claimed degarelix dosing schedule and would have suggested to a person of ordinary skill in the art that degarelix was not only safe and effective in those subjects, but may reduce the incidence of CV adverse events in those subjects relative to treatment with leuprolide. Van Poppel 2008 suggests that treatment with GnRH antagonists like degarelix can avoid life-threatening risks of death from, *inter alia*, cardiovascular events caused by the testosterone flare associated with GnRH agonists. (Van Poppel 2008 at 1003; *see also* Van Poppel Euro 2008 at 812; Debruyne at S30 ("Importantly, medical castration with abarelix was not associated with a testosterone surge, as seen in most patients treated with LHRH agonists"); Tanko Dep. Tr.). Smith 2011 states that "degarelix, like orchiectomy, is not associated with CVD." (Smith 2011 at 5).

Like Smith 2010, Levine set out to "evaluate the data regarding a possible relationship between ADT [androgen deprivation therapy] and cardiovascular events in patients with prostate cancer, and to generate suggestions regarding the evaluation and management of patients, both **with and without known cardiac disease**, in whom ADT is being initiated (page 833) (emphasis added). To that end, Levine reports as follows with respect to a "recent retrospective analysis of 5077 men treated with brachytherapy," some of whom also were treated with ADT:

> Overall, ADT treatment was not associated with an increased risk of all-cause mortality. In subgroup analysis, ADT treatment was not associated with an increased risk of all-cause mortality in the subgroup of patients without cardiac risk factors or known cardiac disease or in the subgroup of patients with 1 cardiac risk

factor. All-cause mortality was greater in the ***subgroup of patients with coronary artery disease-induced congestive heart failure or myocardial infarction***, occurring in 25 of 95 ADT-treated patients (26.3%) and 18 of 161 non-ADT-treated patients (11.2%, adjusted HR 1.96, 95% CI 1.04 to 3.71, P = 0.04).

(page 835) (emphasis added). Levine further discloses that "any increased risk" of CV adverse events resulting from ADT may occur "primarily in those with existing, overt coronary artery disease" (page 835). *See* Tanko Dep. Tr.

Thus, Levine teaches a person of ordinary skill in the art the importance of subgroup analysis in the understanding of CV adverse events associated with ADT. Because each of degarelix and leuprolide are administered to provide ADT, a person of ordinary skill in the art would have had a reason to consider the teachings of Levine when analyzing the cardiovascular safety profile of degarelix as compared to leuprolide, as described in Smith 2010 (*see* Smith 2010 page 2314; Klotz, pages 1531–1532). More specifically, Levine teaches the importance of the analysis of a subgroup of patients with a history of certain CV events, and provides a person of ordinary skill in the art with a reasonable expectation that the occurrence of CV adverse events during ADT may be dependent upon the subject's history of CV events.

Shahani similarly teaches that men undergoing ADT have a 25% higher risk of incident coronary artery disease as compared to men not undergoing ADT. Shahani suggests baseline screening for cardiovascular risk factors in men receiving ADT, and that "[m]en with personal or family history of cardiovascular disease may even benefit from cardiology consultation before starting ADT" (pages 2042 and 2048).

As a result, a person of ordinary skill in the art would have been motivated to compare the occurrence of CV adverse events in subjects with a history of CV events that receive degarelix and subjects with a history of CV adverse events that receive leuprolide. This is especially true considering that Smith 2010 states that "[t]here is limited information about the CV safety of

degarelix" (page 2314). Smith 2010's report that the incidence of ischemic heart disease as an adverse event was lower for subjects receiving degarelix as compared to subjects receiving leuprolide would have suggested to a person of ordinary skill in the art that degarelix may reduce CV adverse events in patients with a specific history of CV events. Thus, a person of ordinary skill in the art would have had a reasonable expectation that treatment with degarelix would reduce the occurrence of cardiac adverse events in the subgroup of patients with a history of ischemic heart disease, relative to treatment with leuprolide in this subgroup of patients.

Regardless of the expectation of a person of ordinary skill in the art, however, a person of ordinary skill in the art would have concluded that, as required by the '085 patent claims, the frequency of an additional CV event is decreased in a subject with a history of at least one of the claimed CV events receiving degarelix, as compared to the frequency of an additional CV event in a subject with a history of at least one of the claimed CV events receiving leuprolide. Indeed, this result is inherent in the administration of degarelix according to the claimed dosing schedule to a subject having prostate cancer and a history of at least one of the claimed CV events. *See, e.g., Santarus, Inc. v. Par Pharmaceutical, Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012) ("an obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the resulting serum concentrations," because "[t]o hold otherwise would allow any formulation—no matter how obvious—to become patentable merely by testing and claiming an inherent property"). Moreover, the "wherein" clause of claim 1 requiring that the "administration of degarelix to the subject decreases the frequency of an additional cardiovascular event in the subject as compared to the frequency of an additional cardiovascular event upon treatment with a gonadotrophin releasing hormone (GnRH) agonist in a subject with a history of at least one cardiovascular event" only states the result of the limitations in the claim, adding nothing to the patentability or substance

of the claim. *Minton v. Nat'l Ass'n of Securities Dealers, Inc.*, 336 F.3d 1373, 1381 (Fed. Cir. 2003) (citing *Texas Instruments Inc. v. ITC*, 988 F.2d 1165, 1172 (Fed. Cir. 1993) ("A 'whereby' clause that merely states the result of the limitations in the claim adds nothing to the patentability or substance of the claim.")); *see Prometheus Labs. Inc. v. Roxane Labs., Inc.*, No. 2013 U.S. Dist. LEXIS 135284, 2013 WL 5333033 *5-*6 (D.N.J. Sep. 23, 2013) (ruling that the claim phrase "wherein said female IBS patient experiences improvement in stool consistency, bowel movement frequency and the proportion of days with urgency while being treated with alosetron" is "merely laudatory and describe[s] desired results"). To the extent that the "wherein" language is given patentable weight, then, the patient outcomes recited in these limitations are an inherent and necessary effect of administering a degarelix to a patient with a history of at least one cardiovascular event.

Thus, the claims of the '085 patent would have been obvious to a person of ordinary skill in the art over Smith 2010 and Klotz in view of Levine, and optionally in further view of Shahani and Tanriverdi.

### 4.    Objective Evidence of Non-Obviousness

Fresenius Kabi is not aware of any objective evidence of non-obviousness attributable to the subject matter of the claims of the '085 patent. For example:

- *Unexpected Results:* Fresenius Kabi is not aware of any evidence of unexpected results that may be reflective of the non-obviousness of the '085 patent. When assessing whether there are unexpected results, a court should consider "what properties were expected." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1371 (Fed. Cir. 2007). Based on the prior art cited herein, no showing by the patentee has established unexpected results in comparison to the closest prior art. *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991). Accordingly, Fresenius Kabi is not aware of any evidence of unexpected results that would tend to show non-obviousness of the subject matter claimed by the '085 patent.

- *Market acceptance/Industry recognition:* Fresenius Kabi is not aware of any recognition in the industry as to the subject matter claimed by the '085 patent that would support a claim of non-obviousness. The approval of ORGOVYX—a different GnRH antagonist, relugolix—does not evidence market acceptance or industry acceptance of degarelix, much

less for the method claimed in this patent. Given that Firmagon was already on the market and Ferring was sponsoring articles touting its apparent superiority to the standard of care (leuprolide) in observed CV events, it only makes sense that the clinical trials for relugolix would also investigate the relative rate of CV events compared to leuprolide. There is no nexus whatsoever between the relugolix clinical trials and any purported invention of this patent. Additionally, objective meta-analyses indicates that degarelix is not cost-effective as opposed to agonist and antiandrogen therapy, indicating a lack of industry and market acceptance. Lu, "Cost-effectiveness analysis of degarelix for advanced hormone-dependent prostate cancer," 109 *BJU Int'l* 1183, 1190-91 (2011).

Plaintiffs have not asserted or offered any evidence to support the reliance on any other objective indicia of non-obviousness, such as long-felt need, failure of others, skepticism, licensing, commercial success, acquiescence, or copying. Plaintiffs bear the burden of production on these issues, and so may not assert them in the future. Fresenius Kabi is not aware of any evidence that would support the assertion of these considerations. Moreover

Furthermore, there is no evidence of a nexus between the allegedly novel features of the claims and any of these asserted (or unasserted) secondary considerations. The patentee must prove the required nexus before relying on any secondary considerations of non-obviousness. *See Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 668 (Fed. Cir. 2000) (quoting *Simmons Fastener Corp. v. Ill. Tool Works, Inc.*, 739 F.2d 1573, 1575 (Fed. Cir. 1984)) ("A nexus between the merits of the claimed invention and evidence of secondary considerations is required in order for the evidence to be given substantial weight in an obviousness decision."); *see also Tokai Corp. v. Easton Enters.*, Inc., 632 F.3d 1358, 1369-70 (Fed. Cir. 2011); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999) (stating that the patentee "bears the burden of showing that a nexus exists between the claimed features of the invention and the objective evidence offered to show non-obviousness"). This nexus must also connect the secondary considerations to "the patentably distinct feature of the invention." *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1340 (Fed. Cir. 2010); *see also Tokai*, 632 F.3d at 1369-70 (declining to find non-obviousness based on secondary considerations when success of the invention was attributable to

a known prior art element). "Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (citing *Tokai*, 632 F.3d at 1369) ("If commercial success is due to an element in the prior art, no nexus exists."). Plaintiffs' alleged secondary considerations of unexpected results and market acceptance/industry recognition are, at best, attributable to the degarelix molecule. Therefore Plaintiffs have failed to establish the required nexus, and thus cannot rely on any secondary considerations of non-obviousness.

Moreover, in view of the minor differences between the prior art and the subject matter of the claims of the '085 patent, the prior art creates such a strong case of obviousness that, even in light of evidence of secondary considerations of non-obviousness, the claimed subject matter would have been obvious to one of ordinary skill in the art. *See, e.g., Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1364–65, 1364 n. 5 (Fed. Cir. 2012) ("This case presents a strong case of obviousness based on the prior art references of record," such that "even in light of the secondary considerations," the claim at issue would have been obvious) (citing *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litigation*, 676 F.3d 1063, 1077 (Fed. Cir. 2012)); *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1368 (Fed. Cir. 2008) ("Secondary considerations of nonobviousness—considered here by the district court—simply cannot overcome this strong *prima facie* case of obviousness.") (citations omitted); *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008) ("In this case, the objective evidence of nonobviousness simply cannot overcome such a strong *prima facie* case of obviousness."); *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1484 (Fed. Cir. 1997) ("The unexpected results and commercial success of the claimed invention, although supported by

substantial evidence, do not overcome the clear and convincing evidence that the subject matter sought to be patented is obvious."). In addition, the existence of Ferring's '730 patent claiming the degarelix compound would have blocked competitors from making or using degarelix until after the priority date of the '085 patent. *See Hospira, Inc. v. Amneal Pharms., LLC*, 285 F. Supp. 3d 776, 796–98 (D. Del. 2017); *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740–41 (Fed. Cir. 2013); *see also Hospira, Inc. v. Fresenius Kabi USA*, LLC, 343 F. Supp. 3d 823, 857–58 (N.D. Ill. 2018). Therefore, evidence of secondary considerations such as commercial success, recognition in the industry, acquiescence, and/or copying are of minimal probative value and should be discounted.

### 5.    Consideration of the *Graham* Factors

A consideration of the *Graham* factors together reveals that the following would have been obvious in view of the prior art identified above:

- the selection of a subject with prostate cancer and a history of at least one CV event, such as ischemic heart disease in particular, for treatment with degarelix;

- the administration of degarelix to the subject, with a starting dose of about 240 mg and a monthly maintenance dose of about 80 mg or about 160 mg,

- the quantification of additional CV adverse events in the subject as compared to a subject with a history of at least one CV event, such as ischemic heart disease in particular, who is treated with a GnRH agonist such as leuprolide, and

- the result that the subject treated with degarelix has a "decreased frequency" of an additional CV adverse event as compared to the subject treated with leuprolide.

In sum, the subject matter of claim 2 of the '085 patent would have been obvious in view of the prior art and, thus, the claims are invalid under 35 U.S.C. § 103(a).

### C.    Claim 2 of the '085 Patent are Invalid Under 35 U.S.C. § 112

Claim 1 of the '085 patent (and dependent claim 2) requires a method of treating prostate cancer comprising, *inter alia*, "selecting a subject with a history of at least one cardiovascular event and prostate cancer" and "administering degarelix to the subject." To satisfy the written

E.    **Claims 2 and 8 of the '398 Patent Are Invalid as Anticipated Under 35 U.S.C.
§ 102(b)**

Claim 1 of the '398 patent is directed to a method for treating a subject that has prostate

cancer with a GnRH antagonist, comprising:

> (1) selecting a subject that has a history of at least one cardiovascular
> (CV) event,
>
> (2) administering degarelix to the subject having a history of at least
> one CV event,
>
> (3) wherein a risk of developing or experiencing an additional CV
> event upon treatment with degarelix is diminished compared to a
> risk of developing or experiencing an additional CV event upon
> treatment with a GnRH agonist, and
>
> (4) wherein the at least one CV event is chosen from myocardial
> infarction, ischemic heart disease, ischemic stroke, hemorrhagic
> stroke, and other arterial thrombotic/embolic events.

Claim 2 depends from claim 1 and requires administering degarelix at an initial dose of

about 240 mg, and at a maintenance dose of about 80 mg every approximately 28 days thereafter.

Claim 8 depends from claim 1 and defines the prostate cancer as selected from "localized prostate

cancer, locally advanced prostate cancer, metastatic prostate cancer, and non-classifiable prostate

cancer."

Smith 2010 describes the results of a phase III clinical trial comparing degarelix to

leuprolide in the treatment of prostate cancer. Subjects included in the study were randomized to

one of three treatment groups: (1) subjects receiving an initial dose of 240 mg degarelix followed

by monthly doses (every 28 days) of 80 mg degarelix (202 subjects), (2) subjects receiving an

initial dose of 240 mg degarelix followed by monthly doses (every 28 days) of 160 mg degarelix

(207 subjects), or (3) subjects receiving monthly doses of 7.5 mg leuprolide (201 subjects) (*see*

page 2314; *see also* Klotz, page 1532, "patients and methods"). Smith 2010 states that "[b]aseline

demographics and clinical characteristics were similar among the 3 treatment groups" (page 2314,

results). In particular, 54 patients in the degarelix 240/80 mg group, 54 patients in the degarelix 240/160 mg group, and 57 patients in the 7.5 mg leuprolide group had a history of ischemic heart disease (*see* Table 1).

Thus, Smith 2010 discloses that at least 54 subjects having prostate cancer and a history of at least one of the claimed CV events, *i.e.*, ischemic heart disease, were "selected" for treatment, and administered degarelix according to the dosing schedule required by claims 1–5 of the '398 patent.[7] Smith 2010 states that "[t]he most frequently reported cardiac disorder was ischemic heart disease, occurring in 4% (18 of 409) of subjects in the pooled degarelix group and 10% (21 of 201) of those in the leuprolide group (table 6)." As a result, Smith 2010 teaches that the frequency of an additional CV event is reduced in subjects (including in subjects with a history of at least one of the claimed CV events) treated with degarelix as compared to in subjects (including in subjects with a history of at least one of the claimed CV events) treated with the GnRH agonist leuprolide, as required by claim 1. Therefore, Smith 2010 discloses all of the limitations of claims 2 and 8of the '398 patent.

During prosecution of the '108 application (that issued as the '398 patent), Applicants overcame the Examiner's rejection of the pending claims as anticipated by Smith 2010. However, the Examiner did not fully appreciate the scope of the disclosure of Smith 2010 in allowing the claims. For the reasons discussed below, Applicants' arguments regarding Smith 2010 fail to demonstrate that Smith 2010 does not anticipate the claims of the '398 patent.

In particular, Applicants argued that "[w]hile Smith [2010] may have administered degarelix to some patients with at least one cardiovascular event … Smith [2010] does not

---

[7] All 108 subjects treated with degarelix as described in Smith meet the dosing schedule requirements of claims 4–5.

recognize cardiovascular history as a predictor of success for treatment with degarelix. Rather, Smith [2010] administers degarelix to *all* patients regardless of their cardiovascular history" (Response to Office Action dated September 25, 2018, page 7) (emphasis in original).

However, and as described in detail above, Smith 2010 (and its underlying reference, Klotz) discloses the selection and treatment of subjects having prostate cancer and a history of a certain CV event (*i.e.*, ischemic heart disease) as required by the claims. Smith 2010 also discloses that the subjects receive degarelix according to the dosing schedule required by the claims. These subjects, upon treatment with degarelix according to the claimed schedule, will necessarily experience a "diminished risk" of an additional CV event as compared to the risk upon treatment with a GnRH agonist.[8] *See Schering Corp.*, 339 F.3d at 1379 ("In general, a limitation or the entire invention is inherent and in the public domain if it is the 'natural result flowing from' the explicit disclosure of the prior art."). That additional subjects, not having the required CV history, also were selected for inclusion in the clinical trial described in Smith 2010 does not change the inherent result (*i.e.*, a "diminished risk" of an additional CV event) with respect to the subjects included in the study that did have the claimed CV history. Indeed, claim 1 is directed to the treatment of "a subject" having a history of at least one of the recited CV events. Claim 1 is not directed to any broader population, nor does claim 1 somehow exclude the treatment of any other subject.

---

[8] Claim 1 of the '398 patent does not require anything other than "administering degarelix" to a subject having prostate cancer and a history of at least one of the claimed CV events to result in the claimed "diminished" risk of an additional CV event relative to treatment with a GnRH agonist. Nor does the specification teach that anything other than the administration of degarelix is required to diminish the risk of additional CV events in this subgroup of patients. Thus, subjects with a history of ischemic heart disease who received degarelix as recited by the claims (and as described in Smith 2010), must have necessarily experienced the claimed "diminished" risk of additional CV events. Otherwise, the specification of the '398 patent does not teach a person of ordinary skill in the art how to achieve the claimed "diminished" risk without undue experimentation, such that the claims should be held invalid under 35 U.S.C. § 112, first paragraph, for lack of enablement.

More specifically, regardless of whether Smith 2010 also "selected" other subjects for treatment, *e.g.*, subjects without a history of at least one CV event, Smith 2010 selected the claimed subjects for treatment according to the claimed method. Indeed, more than one-quarter of all subjects treated with degarelix according to the claimed dosing schedule had a history of at least one of the claimed CV events, *i.e.*, ischemic heart disease (Smith 2010, Table 1). More specifically, Smith 2010 describes the "selection" of 54 subjects with a history of ischemic heart disease who received an initial dose of 240 mg degarelix followed by monthly maintenance doses of 80 mg degarelix, and the selection of 54 additional subjects with a history of ischemic heart disease who received an initial dose of 240 mg degarelix followed by monthly maintenance doses of 160 mg degarelix (Table 1). It was known that each of these 108 subjects had a history of ischemic heart disease at the time they were selected for inclusion in the clinical trial described in Smith 2010. Nothing more is required by the claimed "selection" step. The claims do not require any particular method of "selection," nor do they require the exclusion of any other types of subjects.

Applicants also argued that Smith 2010 describes a "randomized controlled trial of leuprolide acetate vs degarelix," and that "randomization precludes selection based on any factor including the claimed factor of 'a history of at least one cardiovascular event'" (Response to Office Action dated April 24, 2019, page 8). That subjects were randomized to one of three treatment groups does not negate the selection of subjects with prostate cancer and a history of at least one of the claimed CV events for treatment with degarelix. Indeed, randomization means that the treatment groups will have a similar makeup of patients. At the time subjects were selected for treatment according to the clinical trial described in Smith 2010, it was known that approximately one-quarter of the subjects had a history of ischemic heart disease. Accordingly, approximately one-quarter of the subjects randomized to the degarelix treatment groups also would have a history

of ischemic heart disease. Such subjects—those with prostate cancer and a history of ischemic heart disease—were selected for treatment with degarelix as described in Smith 2010. In addition, and as discussed in detail below (*see* Section IV.H below), the specification of the '398 patent does not describe any particular method of "selecting" subjects, let alone a selection method that somehow excludes a randomized trial. Indeed, during prosecution, the Patent Office pointed out that "the specification does not disclose 'selection' of [a] patient for treatment based on the CV risk" (Office Action dated January 2, 2019, page 4).

Applicants also argued that Smith 2010 does not anticipate the claims because Smith 2010 reports that there were "no significant differences" in CV events for antagonist and agonist treatment groups (Response to Office Action dated September 25, 2018, page 7). However, the specific data included in Table 6 of Smith 2010 illustrates that while only 4% of subjects in the pooled degarelix treatment group experienced ischemic heart disease as an adverse event, 10% of subjects in the leuprolide treatment group experienced ischemic heart disease as an adverse event. This data would have illustrated to a person of ordinary skill in the art that treatment with degarelix reduces the frequency of ischemic heart disease as an adverse event relative to treatment with leuprolide. In any event, however, inherent anticipation does not require that a person of ordinary skill in the art would have recognized the inherent subject matter. *Schering Corp.*, 339 F.3d at 1377 ("this court rejects the contention that inherent anticipation requires recognition in the prior art"). Thus, even if Smith 2010 did not report the frequency of ischemic heart disease resulting from treatment with degarelix as compared to treatment with leuprolide, Smith 2010 would nonetheless anticipate the claims of the '398 patent. Applicants merely claimed the inherent result of treating a certain type of subject, which subject had already been treated as described in Smith

2010. Thus, Applicants' arguments fail to establish that Smith 2010 does not anticipate the claims of the '398 patent.

In view of the foregoing, Smith 2010 anticipates the subject matter of claims 2 and 8  such that these claims are invalid under 35 U.S.C. § 102(b).

### F.     All Claims of the '398 Patent are Invalid as Obvious Under 35 U.S.C. § 103

#### 1.     Scope and Content of the Prior Art

The Firmagon Label was approved by the FDA and publicly available as of December, 2008, *i.e.*, more than one year prior to the earliest possible effective filing date of April 27, 2012 for the '398 patent. The Firmagon Label, therefore, is prior art to the '398 patent under 35 U.S.C. § 102(b).

Klotz published in 2008, *i.e.*, more than one year prior to the earliest possible effective filing date of April 27, 2012 for the '398 patent. Klotz, therefore, is prior art to the '398 patent under 35 U.S.C. § 102(b). Klotz is mentioned in the specification of the '398 patent, but was not cited by Applicants in an Information Disclosure Statement (IDS) or by the Examiner during prosecution.

Levine published in 2010, *i.e.*, more than one year prior to the earliest possible effective filing date of April 27, 2012 for the '398 patent. Levine, therefore, is prior art to the '398 patent under 35 U.S.C. § 102(b). Levine is mentioned in the specification of the '398 patent, but was not cited by Applicants in an Information Disclosure Statement (IDS) or by the Examiner during prosecution.

Shahani published in 2008, *i.e.*, more than one year prior to the earliest possible effective filing date of April 27, 2012 for the '398 patent. Shahani, therefore, is prior art to the '398 patent under 35 U.S.C. § 102(b). Shahani was not cited by Applicants in an IDS or by the Examiner during prosecution.

Smith 2010 published in 2010, *i.e.*, more than one year prior to the earliest possible effective filing date of April 27, 2012 for the '398 patent. Smith 2010, therefore, is prior art to the '398 patent under 35 U.S.C. § 102(b).

Smith 2011 published in November of 2011, *i.e.*, before the earliest possible effective filing date of April 27, 2012 for the '398 patent, and is not authored by an inventor of the '398 patent. Smith 2011, therefore, is prior art to the '398 patent under 35 U.S.C. § 102(a).

Tanriverdi published in 2004, *i.e.*, more than one year before the earliest possible effective filing date of April 27, 2012 for the '085 patent. Tanriverdi, therefore, is prior art to the '085 patent under 35 U.S.C. § 102(b).

Van Poppel 2008 was published in 2008, *i.e.*, more than one year prior to the earliest possible effective filing date of April 27, 2012 for the '398 patent. Van Poppel 2008, therefore, is prior art to the '398 patent under 35 U.S.C. § 102(b).

The prior art established that the use of GnRH agonist therapy for prostate cancer resulted in a higher risk of CV events, as compared to orchiectomy. Levine studied the CV risk associated with ADT in prostate cancer subjects, "to generate suggestions regarding the evaluation and management of patients, both with and without known cardiac disease, in whom ADT is being initiated" (page 833). Levine describes the classification of subjects into subgroups based upon whether they have experienced cardiac risk factors or cardiac disease prior to ADT (*see, e.g*., page 835). After reviewing the results of various studies, Levine concludes that an increased risk of CV events resulting from ADT may exist "primarily in those with existing, overt coronary artery disease" (page 835). Thus, Levine teaches that prescribing physicians should weigh the benefits of ADT for treating prostate cancer against the risks of CV adverse events, "particularly [for

subjects] with cardiovascular disease" (page 837), and that clinical trials should assess CV risk factors before beginning ADT (page 838).

Shahani also identified the increased risk of CV events in subjects treated with GnRH agonists, as compared to subjects having undergone an orchiectomy (page 2046). Shahani teaches that it is important for caregivers to be aware of adverse CV events associated with ADT, noting specifically that "men undergoing ADT have a 25% higher risk of incident coronary artery disease compared with non-ADT men" (page 2048). Shahani therefore suggests that men planning to undergo ADT could benefit from screening for various CV risk factors, and that men with a personal history of CV disease in particular may benefit from a cardiology consultation before starting ADT (page 2048).

The mechanism of action was not known conclusively, but it had been theorized that GnRH receptors in T-cells present in atherosclerotic plaque could be stimulated by the use of GnRH agonists. *See* Tanriverdi at 587; Tanko Dep. Tr.. For these reasons, a POSA would have expected a higher rate of CV events in subjects being treated for prostate cancer with an agonist, as compared to treatment for prostate cancer with an antagonist. Moreover, even setting aside the mechanism of action, a POSA would have expected treatment with a GnRH antagonist, like degarelix, to result in fewer CV events than treatment with a GnRH agonist because the effects of using a GnRH antagonist more closely mimic the effects of orchiectomy. Tanko Dep. Tr. Specifically, a GnRH antagonist rapidly stops the production of testosterone, like an orchiectomy, and unlike a GnRH agonist, which first increases testosterone production before down regulating testosterone production.

Finally, the publicly available data for degarelix confirmed the expectation that treatment with degarelix for prostate cancer results in a decreased risk of CV events, particularly in subjects

with previous CV events, as compared with subjects treated with a GnrH agonist. Smith 2010 and Klotz describe a one-year phase III clinical trial in subjects with prostate cancer, which evaluated the safety and efficacy of degarelix, a GnRH antagonist, versus leuprolide, a GnRH agonist, for achieving and maintaining testosterone (T) suppression. In particular, 610 patients (about 25% of which had a history of ischemic heart disease) were randomized into one of three treatment groups: (1) subcutaneous starting dose of 240 mg degarelix followed by subcutaneous monthly maintenance doses of 80 mg degarelix, (2) subcutaneous starting dose of 240 mg degarelix followed by subcutaneous monthly maintenance doses of 80 mg degarelix, or (3) intramuscular monthly doses of 7.5 mg leuprolide (Klotz, page 1531; Smith 2010, page 2314). Cardiovascular (CV) side effects were reported by 13% of subjects in the leuprolide group and 9% of the subjects in the degarelix groups (Klotz, page 1535), and ischemic heart disease was reported as an adverse event by 10% of subjects in the leuprolide group and 4% of subjects in the degarelix groups (Smith 2010, Table 6). Smith 2010 cautions that, "[g]iven the metabolic effects of ADT [androgen deprivation therapy]," it is important to monitor and quantify the incidence of CV events in the treatment of prostate cancer with ADT (page 2317). Van Poppel 2008 suggests that treatment with GnRH antagonists like degarelix can avoid life-threatening risks of death from, *inter alia*, cardiovascular events caused by the testosterone flare associated with GnRH agonists. (Van Poppel 2008 at 1003). Smith 2011 states that "degarelix, like orchiectomy, is not associated with CVD." (Smith 2011 at 5).

## 2. Level of Ordinary Skill in the Art

A person of ordinary skill in the art pertaining to the subject matter of the '398 patent, as of the earliest possible effective filing date of April 27, 2013, is a person with a medical degree

and at least 2–3 years of experience treating cancer patients, such as, for example, patients with prostate cancer.

### 3. Differences Between the Claimed Invention and the Prior Art

As discussed in detail above (*see* Section IV.E), Smith 2010 discloses all of the elements of each of claims 2 and 8 of the '398 patent and, therefore, anticipates claims 2 and 8 of the '398 patent. However, the subject matter of these claims of the '398 patent would have been obvious over Smith and Klotz in view of Levine, and optionally in further view of Shahani.

More specifically, and for the reasons discussed below, a person of ordinary skill in the art would have selected a subgroup of prostate cancer patients having a history of at least one of the claimed CV events, such as a history of ischemic heart disease in particular, and would have administered degarelix to those patients according to the claimed dosage schedule. In view of the results described in Levine, a person of ordinary skill in the art would have had a reasonable expectation that the risk of CV adverse events would depend upon the subject's history of CV events. Moreover, in view of Smith 2010, a person of ordinary skill in the art would have reasonably expected that treatment with degarelix could reduce the risk of developing or experiencing a CV adverse event as compared to treatment with leuprolide, including in a subject with a history of CV events, particularly in light of the prior art comparing treatment with orchiectomy with GnRH agonist treatment. *See* Tanko Dep. Tr..

Smith 2010 is specifically directed to comparing the cardiovascular profile of degarelix to that of leuprolide in prostate cancer patients. Smith 2010 recognizes that "[t]here is limited information about the CV safety of degarelix and other GnRH antagonists, although the observed effects on serum testosterone levels suggest a CV safety profile similar to that of other GnRH agonists" (page 2314). Approximately one-quarter of the subjects treated according to the clinical

trial described in Smith 2010 (regardless of their treatment group) had a history of ischemic heart disease (*see* Table 1), and 26 subjects with a history of ischemic heart disease were treated with degarelix according to the dosing schedule required by claims 2 and 8 (*see* Table 1). In particular, 26 subjects with a history of ischemic heart disease were included in the degarelix 240/80 mg treatment group, which received an initial dose of 240 mg degarelix followed by monthly (every 28 days) doses of 80 mg degarelix (*see* Smith 2010, Table 1; Klotz, page 1532). In addition, subjects treated according to the clinical trial reported in Smith 2010 satisfied the prostate disease cancer requirements of claim 8 (*see* Smith 2010, Table 1; Klotz, Table 2). Smith 2010 draws attention to the fact that "[t]he most frequently reported cardiac disorder [experienced during treatment] was ischemic heart disease," although it was reported by only 4% of the subjects receiving degarelix as compared to 10% of the subject receiving leuprolide (page 2316; *see also* Table 6). Overall, however, Smith 2010 reports that "the incidence of [CV] events was relatively low," and that "the numerical data suggest a comparable safety profile for the 2 drugs" (page 2318). Smith 2010 teaches the treatment of subjects with prostate cancer and a history of ischemic heart disease according to the claimed degarelix dosing schedule and would have suggested to a person of ordinary skill in the art that degarelix was not only safe and effective in those subjects, but may reduce the incidence of CV adverse events in those subjects relative to treatment with leuprolide. *See* Tanko Dep. Tr.

Like Smith 2010, Levine set out to "evaluate the data regarding a possible relationship between ADT [androgen deprivation therapy] and cardiovascular events in patients with prostate cancer, and to generate suggestions regarding the evaluation and management of patients, both ***with and without known cardiac disease***, in whom ADT is being initiated (page 833) (emphasis

added). To that end, Levine reports as follows with respect to a "recent retrospective analysis of 5077 men treated with brachytherapy," some of whom also were treated with ADT:

> Overall, ADT treatment was not associated with an increased risk of all-cause mortality. In subgroup analysis, ADT treatment was not associated with an increased risk of all-cause mortality in the subgroup of patients without cardiac risk factors or known cardiac disease or in the subgroup of patients with 1 cardiac risk factor. All-cause mortality was greater in the ***subgroup of patients with coronary artery disease-induced congestive heart failure or myocardial infarction***, occurring in 25 of 95 ADT-treated patients (26.3%) and 18 of 161 non-ADT-treated patients (11.2%, adjusted HR 1.96, 95% CI 1.04 to 3.71, P = 0.04).

(page 835) (emphasis added). Levine further discloses that "any increased risk" of CV adverse events resulting from ADT may occur "primarily in those with existing, overt coronary artery disease" (page 835).

Thus, Levine teaches a person of ordinary skill in the art the importance of subgroup analysis in the understanding of CV adverse events associated with ADT. Because each of degarelix and leuprolide are administered to provide ADT, a person of ordinary skill in the art would have had a reason to consider the teachings of Levine when analyzing the cardiovascular safety profile of degarelix as compared to leuprolide, as described in Smith 2010 (*see* Smith 2010 page 2314; Klotz, pages 1531–1532). More specifically, Levine teaches the importance of the analysis of a subgroup of patients with a history of certain CV events, and provides a person of ordinary skill in the art with a reasonable expectation that the occurrence of CV adverse events during ADT may be dependent upon the subject's history of CV events.

Shahani similarly teaches that men undergoing ADT have a 25% higher risk of incident coronary artery disease as compared to men not undergoing ADT. Shahani suggests baseline screening for cardiovascular risk factors in men receiving ADT, and that "[m]en with personal or

family history of cardiovascular disease may even benefit from cardiology consultation before starting ADT" (pages 2042 and 2048).

As a result, a person of ordinary skill in the art would have been motivated to compare the occurrence of CV adverse events in subjects with a history of CV events that receive degarelix and subjects with a history of CV adverse events that receive leuprolide. This is especially true considering that Smith 2010 states that "[t]here is limited information about the CV safety of degarelix" (page 2314). Thus, Smith 2010's report that the incidence of ischemic heart disease as an adverse event was lower for subjects receiving degarelix as compared to subjects receiving leuprolide would have suggested to a person of ordinary skill in the art that degarelix may reduce the risk of CV adverse events in patients with a specific history of CV events. Thus, a person of ordinary skill in the art would have had a reasonable expectation that treatment with degarelix would reduce the risk of cardiac adverse events in the subgroup of patients with a history of ischemic heart disease, relative to treatment with leuprolide in this subgroup of patients.

Regardless of the expectation of a person of ordinary skill in the art, however, a person of ordinary skill in the art would have concluded that, as required by the '398 patent claims, the risk of developing or experiencing an additional CV event is decreased in a subject with a history of at least one of the claimed CV events receiving degarelix, as compared to the risk of an additional CV event in a subject with a history of at least one of the claimed CV events receiving leuprolide. Indeed, this result is inherent in the administration of degarelix according to the claimed dosing schedule to a subject having prostate cancer and a history of at least one of the claimed CV events. *See, e.g., Santarus, Inc. v. Par Pharmaceutical, Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012) ("an obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the resulting serum concentrations," because "[t]o hold otherwise would allow any

formulation – no matter how obvious – to become patentable merely by testing and claiming an inherent property").

Thus, claims 2 and 8 of the '398 patent would have been obvious to a person of ordinary skill in the art over Smith and Klotz in view of Levine, and optionally in further view of Shahani and Tanriverdi.

### 4. Objective Evidence of Non-Obviousness

Fresenius Kabi is not aware of any objective evidence of non-obviousness attributable to the subject matter of the asserted claims of the '398 patent. For example:

- *Unexpected Results:* Fresenius Kabi is not aware of any evidence of unexpected results that may be reflective of the non-obviousness of the '398 patent. When assessing whether there are unexpected results, a court should consider "what properties were expected." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1371 (Fed. Cir. 2007). Based on the prior art cited herein, no showing by the patentee has established unexpected results in comparison to the closest prior art. *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991). Accordingly, Fresenius Kabi is not aware of any evidence of unexpected results that would tend to show non-obviousness of the subject matter claimed by the '398 patent.

- *Market acceptance/Industry recognition:* Fresenius Kabi is not aware of any recognition in the industry as to the subject matter claimed by the '398 patent that would support a claim of non-obviousness. The approval of ORGOVYX---a different GnRH antagonist, relugolix---does not evidence market acceptance or industry acceptance of degarelix, much less for the method claimed in this patent. Given that Firmagon was already on the market and Ferring was sponsoring articles touting its apparent superiority to the standard of care (leuprolide) in observed CV events, it only makes sense that the clinical trials for relugolix would also investigate the relative rate of CV events compared to leuprolide. There is no nexus whatsoever between the relugolix clinical trials and any purported invention of this patent. Additionally, objective meta-analyses indicates that degarelix is not cost-effective as opposed to agonist and antiandrogen therapy, indicating a lack of industry and market acceptance. Lu, "Cost-effectiveness analysis of degarelix for advanced hormone-dependent prostate cancer," 109 *BJU Int'l* 1183, 1190-91 (2011).

Plaintiffs have not asserted or offered any evidence to support the reliance on any other objective indicia of non-obviousness, such as long-felt need, failure of others, skepticism, licensing, commercial success, acquiescence, or copying. Plaintiffs bear the burden of production on these issues, and so may not assert them in the future. Fresenius Kabi is not aware of any

evidence that would support the assertion of these considerations. Furthermore, there is no evidence of a nexus between the allegedly novel features of the claims and any of these asserted (or unasserted) secondary considerations. The patentee must prove the required nexus before relying on any secondary considerations of non-obviousness. *See Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 668 (Fed. Cir. 2000) (quoting *Simmons Fastener Corp. v. Ill. Tool Works, Inc.*, 739 F.2d 1573, 1575 (Fed. Cir. 1984)) ("A nexus between the merits of the claimed invention and evidence of secondary considerations is required in order for the evidence to be given substantial weight in an obviousness decision."); *see also Tokai Corp. v. Easton Enters.*, Inc., 632 F.3d 1358, 1369-70 (Fed. Cir. 2011); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999) (stating that the patentee "bears the burden of showing that a nexus exists between the claimed features of the invention and the objective evidence offered to show non-obviousness"). This nexus must also connect the secondary considerations to "the patentably distinct feature of the invention." *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1340 (Fed. Cir. 2010); *see also Tokai*, 632 F.3d at 1369-70 (declining to find non-obviousness based on secondary considerations when success of the invention was attributable to a known prior art element). "Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (citing *Tokai*, 632 F.3d at 1369) ("If commercial success is due to an element in the prior art, no nexus exists."). Plaintiffs' alleged secondary considerations of unexpected results and market acceptance/industry recognition are, at best, attributable to the degarelix molecule. Therefore Plaintiffs have failed to establish the required nexus, and thus cannot rely on any secondary considerations of non-obviousness.

Moreover, in view of the minor differences between the prior art and the subject matter of the claims of the '398 patent, the prior art creates such a strong case of obviousness that, even in light of evidence of secondary considerations of non-obviousness, the claimed subject matter would have been obvious to one of ordinary skill in the art. *See, e.g., Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1364–65, 1364 n. 5 (Fed. Cir. 2012) ("This case presents a strong case of obviousness based on the prior art references of record," such that "even in light of the secondary considerations," the claim at issue would have been obvious) (citing *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litigation*, 676 F.3d 1063, 1077 (Fed. Cir. 2012)); *Sundance, Inc. v. DeMonte Fabricating Ltd*., 550 F.3d 1356, 1368 (Fed. Cir. 2008) ("Secondary considerations of nonobviousness—considered here by the district court—simply cannot overcome this strong *prima facie* case of obviousness.") (citations omitted); *Agrizap, Inc. v. Woodstream Corp*., 520 F.3d 1337, 1344 (Fed. Cir. 2008) ("In this case, the objective evidence of nonobviousness simply cannot overcome such a strong *prima facie* case of obviousness."); *Richardson-Vicks Inc. v. Upjohn Co*., 122 F.3d 1476, 1484 (Fed. Cir. 1997) ("The unexpected results and commercial success of the claimed invention, although supported by substantial evidence, do not overcome the clear and convincing evidence that the subject matter sought to be patented is obvious."). In addition, the existence of Ferring's '730 patent claiming the degarelix compound would have blocked competitors from making or using degarelix until after the priority date of the '398 patent. *See Hospira, Inc. v. Amneal Pharms., LLC*, 285 F. Supp. 3d 776, 796–98 (D. Del. 2017); *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740–41 (Fed. Cir. 2013); *see also Hospira, Inc. v. Fresenius Kabi USA*, LLC, 343 F. Supp. 3d 823, 857–58 (N.D. Ill. 2018). Therefore, evidence of secondary considerations such as commercial success,

recognition in the industry, acquiescence, and/or copying are of minimal probative value and should be discounted.

### G.    Claims 2 and 8 of the '398 Patent are Invalid Under 35 U.S.C. § 112

Claim 1 of the '398 patent (and each of dependent claims 2 and 8) requires a method of treating prostate cancer comprising, *inter alia*, "selecting a subject with a history of at least one cardiovascular event" and "administering degarelix to the subject." To satisfy the written description requirement of 35 U.S.C. § 112, first paragraph, the disclosure of the application must reasonably convey to a person of ordinary skill in the art that the inventor had possession of the claimed subject matter as of the filing date of the application. *See, e.g.*, *Ariad Pharms., Inc. v. Eli Lilly and Co*., 598 F.3d 1336, 1351 (Fed. Cir. 2010) (citations omitted). The '398 patent, however, does not describe the "selection" of any patients for treatment with degarelix, but simply provides a generic description of the treatment of patients with degarelix (*see, e.g*., 4:34–54). Indeed, the words "select" and "selection" are not used with reference to treated subjects anywhere in the specification of the '398 patent.

Thus, the specification of the '398 patent illustrates that Applicants did not possess any method of "selecting" subjects for treatment with degarelix. In particular, the '398 patent describes a study that "utilized available data" from a database of 2328 prostate cancer patients "who participated in randomized clinical trials and received treatment with either degarelix or a GnRH agonist for up to 12 months (13 treatment months)" 50:64–51:1). While approximately one-third of the subjects in the analysis described by the specification had a "[h]istory of CV events," two thirds of the subjects did not have a history of CV events (*see, e.g.*, 52:1–3 and Table 24). Applicants did not describe the "selection" of certain subjects in view of this data analysis. At most, Applicants described a method of analyzing existing data, collected from subjects with or without a history of CV events. It is insufficient "that the disclosure, when combined with the

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| FERRING PHARMACEUTICALS INC., | ) | |
| FERRING INTERNATIONAL CENTER S.A., | ) | |
| FERRING B.V., and | ) | |
| POLYPEPTIDE LABORATORIES A/S | ) | C.A. No. 20-431 (MN) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CONTAINS CONFIDENTIAL |
| | ) | INFORMATION – SUBJECT TO |
| FRESENIUS KABI USA, LLC | ) | PROTECTIVE ORDER |
| | ) | |
| Defendant. | ) | |

**OPENING EXPERT REPORT OF EDWARD J. YUN, M.D.**

scale, long term studies involving hundreds of subjects and multiple test sites. The scope of this experimentation would be costly and intensive. Further complicating the analysis, is that according to the claims, the maintenance doses may be administered anywhere from every 20 days to 36 days after the previous dose of degarelix. A person of skill in the art would be skeptical that the lower doses, given 36 days apart, would be capable of maintaining castrate levels of testosterone in subjects. Moreover, there is strong evidence that at least some combinations of doses, i.e., 160 mg/60 mg would not be capable of achieving the successful treatment of prostate cancer required by the claims. A person of skill in the art would not consider the claims directed to the broad dosing ranges to be enabled across the full scope of the claims.

## XI.    CARDIOVASCULAR EVENT PATENTS

509.    Plaintiffs have asserted that Fresenius Kabi's ANDA product will infringe claims of the '085 patent and the '398 patent. These two patents are related, which I understand to mean that they descend from the same original patent application. I understand that these two patents share a common specification and the same effective filing date of April 27, 2012.

510.    The '085 and '398 patents generally are directed to the treatment of prostate cancer using degarelix to reduce the risk of cardiovascular events caused by GnRH agonist treatment.

### A.    U.S. Patent No. 9,415,085 ("the '085 Patent")

511.    The '085 patent, entitled "Method of Treating Prostate Cancer with GnRH Antagonist," issued on August 16, 2016 from U.S. Patent Application No. 13/458,330 ("the '330 application"), filed April 27, 2012. The cover of the '085 patent cites foreign priority to EP Application 08250703, filed February 29, 2008. However there is a Certificate of Correction

appended to the end of the patent deleting that reference. I understand that the effective filing date of this patent is April 27, 2012.

512.    The '085 patent names as inventors Egbert A. van der Meulen, and László Balázs Tankó, and is assigned on its face to Ferring B.V.

## 1.    Asserted Claims of the '085 Patent

513.    Plaintiffs have identified that they are asserting infringement of claim 2 of the '085 patent. Claim 2 is presented below:

> 2. The method of claim 1, wherein administering degarelix to the subject comprises administering an initial [dose] of about 240 mg of degarelix; and administering a maintenance [dose] of about 80 mg degarelix, once every approximately 28 days thereafter.

Claim 2 depends from claim 1. Claim 1 of the '085 patent is reproduced below:

> 1. A method of treating prostate cancer in a subject, comprising:
>
> selecting a subject with a history of at least one cardiovascular event and prostate cancer;
>
> administering degarelix to the subject, wherein administration of degarelix to the subject decreases the frequency of an additional cardiovascular event in the subject as compared to the frequency of an additional cardiovascular event upon treatment with a gonadotrophin releasing hormone (GnRH) agonist in a subject with a history of at least one cardiovascular event,
>
> wherein the at least one cardiovascular event is chosen from myocardial infarction, ischemic heart disease, ischemic stroke, hemorrhagic stroke, and other arterial thrombotic/embolic events.

514.    I understand that because claim 2 depends from claim 1, all limitations of claim 1 are present in claim 2 of the '085 patent.

## 2.    Level of Skill in the Art

515.    I understand that the priority date for the '085 patent is April 27, 2012.

516.    I have reviewed the '085 patent and applied the standards described above regarding determining the level of ordinary skill in the art for this patent.

517.    In my opinion, a person of ordinary skill in the art for the '085 patent is a person with a medical degree and at least 2–3 years of experience in the field of urology or treating cancer patients, such as, for example, patients with prostate cancer.

### 3.    Claim 2 of the '085 Patent is Anticipated by Smith 2010

518.    All limitations of claim 2 of the '085 patent are disclosed by the Smith 2010 publication. Smith 2010 was published more than one year before the effective filing date of the '085 patent of April 2012.

519.    Because claim 2 incorporates the limitations of claim 1, I will address each of the limitations of claim 1 before addressing the additional limitation of claim 2.

520.    Smith 2010 generally addresses the comparative cardiovascular side effect profiles of degarelix as compared to leuprolide. More specifically, Smith 2010 investigates the data from the phase III degarelix study comparing administration of degarelix with administration of the GnRH agonist leuprolide.

### a.    "1. A method of treating prostate cancer in a subject"

521.    Degarelix had been FDA approved by 2010, and so it was well understood that degarelix could be used to treat prostate cancer. Smith 2010 confirms this fact: "Degarelix is a new GnRH antagonist approved for the treatment of prostate cancer." Smith 2010 at 2. This limitation is present in Smith 2010.

### b.    "selecting a subject with a history of at least one cardiovascular event and prostate cancer"

522.    Smith 2010 discloses that all subjects produced their medical history of relevant adverse events. These baseline factors included, "medical history of cardiac or vascular

121

disorders, diastolic and systolic blood pressure, and pretrial medications for CV disorders, diabetes or cholesterol." Smith 2010 at 3.

523.    As a phase III study for prostate cancer, all subjects were required to have prostate cancer. Smith 2010 describes the study to evaluate the efficacy and safety of degarelix for treatment of prostate cancer. Smith 2010 at 2-3.

524.    The data in Smith 2010 confirms that among the subjects tested, a number had a history of at least one cardiovascular event. In particular, claim 1 later defines "cardiovascular event" to include "ischemic heart disease". Table 1 of the Smith 2010 states that 54 subjects, comprising 26% of the pool, had previously experienced ischemic heart disease. As such, the study disclosed in Smith 2010 selected subjects with a history of at least one cardiovascular event and prostate cancer.

        c.    **"administering degarelix to the subject, wherein administration of degarelix to the subject decreases the frequency of an additional cardiovascular event in the subject as compared to the frequency of an additional cardiovascular event upon treatment with a gonadotrophin releasing hormone (GnRH) agonist in a subject with a history of at least one cardiovascular event"**

525.    Smith 2010 discloses all elements of this claim limitation. First, Smith 2010 discloses that subjects were administered degarelix with an initial dose of 240 mg degarelix, and then maintenance doses of either 80 mg or 160 mg degarelix. Smith 2010 at 2.

526.    Additionally, Smith 2010 reports that, overall, subjects that received degarelix had a decreased frequency of cardiovascular events, as compared to subjects receiving the GnRH agonist leuprolide. Smith 2010 reports that in the treatment arms, ischemic heart disease occurred in 4% of the degarelix group, but in 10% of the leuprolide group. Smith 2010 at 4, 14 (Table 6). Additionally, Smith 2010 reports that subjects in the leuprolide group were twice as likely to suffer from myocardial ischemia or myocardial infarction, as compared to the degarelix

group. *Id.* Additionally, cardiac failure occurred in less than 1% of the subjects receiving

degarelix, but in 2% of the subjects receiving leuprolide. *Id.*

527.    Taken as a whole, a person of ordinary skill in the art would understand that the

treatment with degarelix would decrease the frequency of cardiovascular events, as compared to

subjects receiving leuprolide.

> d.    **"wherein the at least one cardiovascular event is chosen from myocardial infarction, ischemic heart disease, ischemic stroke, hemorrhagic stroke, and other arterial thrombotic/embolic events."**

528.    As discussed above, this claim limitation defines the term "cardiovascular event"

for the remainder of the claim. Smith 2010 discloses that subjects were selected that had

ischemic heart disease. Smith 2010 also discloses additional cardiovascular events such as

cardiac failure. This limitation is disclosed in Smith 2010.

> e.    **"2. The method of claim 1, wherein administering degarelix to the subject comprises administering an initial [dose] of about 240 mg of degarelix; and administering a maintenance [dose] of about 80 mg degarelix, once every approximately 28 days thereafter."**

529.    Claim 2 narrows claim 1 by defining the dosing regimen of degarelix. However,

these specific parameters are also disclosed in Smith 2010.

530.    As described above, Smith 2010 is further data analysis of the phase III clinical

trial for degarelix. Smith 2010 discloses that the dosing regimens tested included an initial dose

of 240 mg of degarelix and a maintenance dose of 80 mg of degarelix. Smith 2010 at 2.

Additionally, Smith 2010 incorporates by reference the Klotz 2008 paper reporting the results of

that study:  "The trial design and subject population have been described for the original study

that evaluated the efficacy and safety of degarelix 240/80 mg, degarelix 240/160 mg and

leuprolide 7.5 mg." *Id.* (citing Klotz, et al., "The efficacy and safety of degarelix: a 12-month,

123

comparative, randomized, open-label, parallel-group phase III study in patients with prostate cancer," BJU Int 102, 1531 (2008)).

531.    I understand that when a reference specifically incorporates a discussion from another reference, it can still be considered as part of the anticipation analysis. Klotz 2008 provides more details on the design of the degarelix study, including confirming the dosing regimen, and that the maintenance doses were administered every 28 days. Klotz 2008 at 1532.

532.    Taken together, Smith 2010 discloses each element of claim 2 of the '085 patent.

### 4.    Claim 2 of the '085 Patent Would Have Been Obvious Over Smith 2010 in View of van Poppel and Shahani or Levine

533.    To the extent that Smith 2010 does not anticipate claim 2 of the '085 patent, the subject matter of claim 2 would have been obvious to a person of ordinary skill in the art as of April 2012. In particular, the prior art taught that subjects treated with a GnRH agonist experienced a greater risk of cardiovascular side effects, as compared to subjects treated with orchiectomy. The prior art presented multiple theories regarding why this increase occurred, but these theories were generally related to an effect tied to the initial stimulation of GnRH or testosterone by agonists.

534.    As a result, a person of ordinary skill in the art in April 2012 would have found it obvious that the treatment of subjects with degarelix would reduce the frequency and risk of additional cardiovascular events in subjects at a higher risk of an additional cardiovascular event because of a previous event, as opposed to treatment with a GnRH agonist.

### a.    "1. A method of treating prostate cancer in a subject"

535.    Degarelix had been FDA approved by 2010, and so it was well understood that degarelix could be used to treat prostate cancer. Smith 2010 confirms this fact: "Degarelix is a

new GnRH antagonist approved for the treatment of prostate cancer." Smith 2010 at 2. This limitation is present in Smith 2010.

                          **b.**     **"selecting a subject with a history of at least one cardiovascular event and prostate cancer"**

536.    Smith 2010 discloses that all subjects produced their medical history of relevant adverse events. These baseline factors included, "medical history of cardiac or vascular disorders, diastolic and systolic blood pressure, and pretrial medications for CV disorders, diabetes or cholesterol." Smith 2010 at 3.

537.    As a phase III study for prostate cancer, all subjects were required to have prostate cancer. Smith 2010 describes the study to evaluate the efficacy and safety of degarelix for treatment of prostate cancer. Smith 2010 at 2-3.

538.    The data in Smith 2010 confirms that among the subjects tested, a number had a history of at least one cardiovascular event. In particular, claim 1 later defines "cardiovascular event" to include "ischemic heart disease". Table 1 of the Smith 2010 states that 54 subjects, comprising 26% of the pool, had previously experienced ischemic heart disease. As such, the study disclosed in Smith 2010 selected subjects with a history of at least one cardiovascular event and prostate cancer.

539.    Even if not disclosed in Smith 2010 the prior art made selecting a patient with a history of at least on cardiovascular event obvious. In particular, it is well understood that a prior cardiovascular event increases the risk of additional events because of the presence of an underlying issue, such as arterial plaques. Additionally, a person of skill in the art in April 2012 would have understood that the literature disclosed an increased risk of cardiovascular events associated with GnRH agonist therapy as compared with orchiectomy. As such, treating

physicians were cautioned to take more care with prostate cancer patients that had a history of cardiovascular events.

540.    Levine reported that as of 2010 there was an increased interest in the effect of GnRH agonists therapy on the risk of cardiovascular events. Levine at 833. Levine examined multiple large scale analyses of cardiovascular event data and found that the studies produced mixed results. However, for example, in the retrospective study of a study with brachytherapy, the greatest risk factor for all-cause mortality was greater in the subpopulation of subjects with a previous cardiovascular event. *Id.* at 835. Levine posits that "It may also be that any increased risk occurs primarily in those with existing, overt coronary artery disease." *Id.*

541.    Separately, Shahani investigates the negative side effects associated with GnRH agonist therapy, particularly related to metabolic disorders. Shahani at 2042. Shahani reports that data was emerging that cardiovascular disease is one of the leading causes of death of men with prostate cancer. Shahani at 2043. Thus, Shahani explores the potential that agonist therapy "may trigger the development of metabolic complications, which in turn may accelerate the atherosclerotic process and lead to increased cardiovascular disease." *Id.*  As part of the meta analysis, Shahani summarized data presented about the links between agonist therapy and cardiovascular death. Shahani noted that studies showed an increased risk of cardiovascular events morbidity among men treated with agonist therapy as opposed to those treated with orchiectomy. *Id.* at 2048. These cardiovascular deaths were more likely to occur in the first six months, indicating that they were not related to long-term androgen deprivation. *Id.* Shahani also reports that agonist therapy is associated with "increase[d] vascular stiffness." *Id.* As a result of the analysis, Shahani recommends that men with a personal history of cardiovascular disease should consult with a cardiologist before beginning GnRH agonist therapy.

542.     Relatedly, van Poppel explores the larger negative effects of the repeated testosterone surges associated with agonist therapy. Among the effects of testosterone surge, van Poppel reports that "[v]arious studies have reported the incidence of cardiovascular events shortly after initiation of GnRH agonist therapy." van Poppel at 1002. The review by van Poppel also reports that randomized studies showed that orchiectomy is considered superior to GnRH agonist treatment, particularly in terms of all-cause mortality. *Id.* at 1003. Van Poppel also reports that "[i]ncreased bone pain and cardiovascular effects are also of concern during the first weeks of therapy with GnRH agonists, as reflected in the prescribing instructions for these agents." *Id.* at 1005.  Van Poppel ultimately recommended the use of degarelix to avoid the identified side effects associated with agonist therapy, including the reduction of cardiovascular events. *Id.*

543.     Taken together a person of skill in the art would have been motivated to select a subject with a history of a cardiovascular event for treatment with degarelix based on the publicly available data regarding the increased risk of cardiovascular events associated with GnRH agonist therapy.

c.     **"administering degarelix to the subject, wherein administration of degarelix to the subject decreases the frequency of an additional cardiovascular event in the subject as compared to the frequency of an additional cardiovascular event upon treatment with a gonadotrophin releasing hormone (GnRH) agonist in a subject with a history of at least one cardiovascular event"**

544.     Smith 2010 discloses elements of this claim limitation. First, Smith 2010 discloses that subjects were administered degarelix with an initial dose of 240 mg degarelix, and then maintenance doses of either 80 mg or 160 mg degarelix. Smith 2010 at 2.

545.     Additionally, Smith 2010 reports that, overall, subjects that received degarelix had a decreased frequency of cardiovascular events, as compared to subjects receiving the GnRH

agonist leuprolide. Smith 2010 reports that in the treatment arms, ischemic heart disease occurred in 4% of the degarelix group, but in 10% of the leuprolide group. Smith 2010 at 4, 14 (Table 6). Additionally, Smith 2010 reports that subjects in the leuprolide group were twice as likely to suffer from myocardial ischemia or myocardial infarction, as compared to the degarelix group. *Id.* Additionally, cardiac failure occurred in less than 1% of the subjects receiving degarelix, but in 2% of the subjects receiving leuprolide. *Id.*

546.     As discussed above, a person of ordinary skill in the art would understand that the treatment with degarelix would decrease the frequency of cardiovascular events, as compared to subjects receiving leuprolide. The art taught that agonist therapy increases the risk of cardiovascular events in subjects, particularly for subjects that had experienced previous cardiovascular events. Levine at 835; Shahani at 2048; van Poppel at 1005. Additionally, both Smith 2010 and van Poppel suggest that administration of degarelix would reduce the risk of additional cardiovascular events in prostate cancer subjects. Van Poppel suggests that the increased risk of cardiovascular events is related to the testosterone surge. As such, a person of skill in the art would understand that administration of degarelix would avoid that surge, and as a result, necessarily reduce the risk of cardiovascular events. van Poppel at 1005.

        **d.**    **"wherein the at least one cardiovascular event is chosen from myocardial infarction, ischemic heart disease, ischemic stroke, hemorrhagic stroke, and other arterial thrombotic/embolic events"**

547.     As discussed above, this claim limitation defines the term "cardiovascular event" for the remainder of the claim. Smith 2010 discloses that subjects were selected that had ischemic heart disease. Smith 2010 also discloses additional cardiovascular events such as cardiac failure. This limitation is disclosed in Smith 2010.

      e.     **"2. The method of claim 1, wherein administering degarelix to the subject comprises administering an initial [dose] of about 240 mg of degarelix; and administering a maintenance [dose] of about 80 mg degarelix, once every approximately 28 days thereafter."**

548.    Claim 2 narrows claim 1 by defining the dosing regimen of degarelix. However, these specific parameters are also disclosed in Smith 2010.

549.    As described above, Smith 2010 is further data analysis of the phase III clinical trial for degarelix. Smith 2010 discloses that the dosing regimens tested included an initial dose of 240 mg of degarelix and a maintenance dose of 80 mg of degarelix. Smith 2010 at 2. Additionally, Smith 2010 incorporates by reference the Klotz 2008 paper reporting the results of that study: "The trial design and subject population have been described for the original study that evaluated the efficacy and safety of degarelix 240/80 mg, degarelix 240/160 mg and leuprolide 7.5 mg." *Id.* (citing Klotz, et al., "The efficacy and safety of degarelix: a 12-month, comparative, randomized, open-label, parallel-group phase III study in patients with prostate cancer," BJU Int 102, 1531 (2008)).

550.    I understand that when a reference specifically incorporates a discussion from another reference, it can still be considered as part of the obviousness analysis. Klotz provides more details on the design of the degarelix study, including confirming the dosing regimen, and that the maintenance doses were administered every 28 days. Klotz at 1532.

551.    Additionally, van Poppel also discloses dosing regimens of degarelix, including clinical trials using an initiation dose of 240 mg of degarelix, and maintenance doses of 80 mg of degarelix administered monthly. van Poppel at 1005.

552.    Taken as a whole claim 2 of the '085 patent would have been obvious to a person of skill in the art over Smith 2010 in view of van Poppel, and Shahani or Levine.

###### 5. Claim 2 of the '085 Patent Would Have Been Obvious Over Smith 2010 in View of Tanriverdi, Gotsman, and Shanani or Levine

553.     Alternatively, the subject matter of claim 2 would have been obvious to a person of ordinary skill in the art as of April 2012 in view of other combinations of prior art. In particular, the prior art taught that subjects treated with a GnRH agonist experienced a greater risk of cardiovascular side effects, as compared to subjects treated with orchiectomy. Alternatively, the prior art disclosed that lymphocytes associated with atherosclerosis contain GnRH receptors, thus creating an alternative pathway that could be avoided by treating prostate cancer patients with a GnRH antagonist.

554.     As a result, a person of ordinary skill in the art in April 2012 would have found it obvious that the treatment of subjects with degarelix would reduce the frequency and risk of additional cardiovascular events in subjects at a higher risk of an additional cardiovascular event because of a previous event, as opposed to treatment with a GnRH agonist.

###### a. "1. A method of treating prostate cancer in a subject"

555.     Degarelix had been FDA approved by 2010, and so it was well understood that degarelix could be used to treat prostate cancer. Smith 2010 confirms this fact:  "Degarelix is a new GnRH antagonist approved for the treatment of prostate cancer." Smith 2010 at 2. This limitation is present in Smith 2010.

###### b. "selecting a subject with a history of at least one cardiovascular event and prostate cancer"

556.     Smith 2010 discloses that all subjects produced their medical history of relevant adverse events. These baseline factors included, "medical history of cardiac or vascular disorders, diastolic and systolic blood pressure, and pretrial medications for CV disorders, diabetes or cholesterol." Smith 2010 at 3.

557.     As a phase III study for prostate cancer, all subjects were required to have prostate cancer. Smith 2010 describes the study to evaluate the efficacy and safety of degarelix for treatment of prostate cancer. Smith 2010 at 2-3.

558.     The data in Smith 2010 confirms that among the subjects tested, a number had a history of at least one cardiovascular event. In particular, claim 1 later defines "cardiovascular event" to include "ischemic heart disease". Table 1 of the Smith 2010 states that 54 subjects, comprising 26% of the pool, had previously experienced ischemic heart disease. As such, the study disclosed in Smith 2010 selected subjects with a history of at least one cardiovascular event and prostate cancer.

559.     Even if not disclosed in Smith 2010 the prior art made selecting a patient with a history of at least on cardiovascular event obvious. In particular, it is well understood that a prior cardiovascular event increases the risk of additional events because of the presence of an underlying issue, such as arterial plaques. Additionally, a person of skill in the art in April 2012 would have understood that the literature disclosed an increased risk of cardiovascular events associated with GnRH agonist therapy as compared with orchiectomy. As such, treating physicians were cautioned to take more care with prostate cancer patients that had a history of cardiovascular events.

560.     Levine reported that as of 2010 there was an increased interest in the effect of GnRH agonists therapy on the risk of cardiovascular events. Levine at 833. Levine examined multiple large scale analyses of cardiovascular event data and found that the studies produced mixed results. However, for example, in the retrospective study of a study with brachytherapy, the greatest risk factor for all-cause mortality was greater in the subpopulation of subjects with a

previous cardiovascular event. *Id.* at 835. Levine posits that "It may also be that any increased risk occurs primarily in those with existing, overt coronary artery disease." *Id.*

561.    Separately, Shahani investigates the negative side effects associated with GnRH agonist therapy, particularly related to metabolic disorders. Shahani at 2042. Shahani reports that data was emerging that cardiovascular disease is one of the leading causes of death of men with prostate cancer. Shahani at 2043. Thus, Shahani explores the potential that agonist therapy "may trigger the development of metabolic complications, which in turn may accelerate the atherosclerotic process and lead to increased cardiovascular disease." *Id.*  As part of the meta analysis, Shahani summarized data presented about the links between agonist therapy and cardiovascular death. Shahani noted that studies showed an increased risk of cardiovascular events morbidity among men treated with agonist therapy as opposed to those treated with orchiectomy. *Id.* at 2048. These cardiovascular deaths were more likely to occur in the first six months, indicating that they were not related to long-term androgen deprivation. *Id.* Shahani also reports that agonist therapy is associated with "increase[d] vascular stiffness." *Id.* As a result of the analysis, Shahani recommends that men with a personal history of cardiovascular disease should consult with a cardiologist before beginning GnRH agonist therapy.

562.    Given the large effect of GnRH agonists on cardiovascular side effects, a person of skill in the art would have been motivated to review art related to the underlying causes of cardiovascular events. Years before the effective filing date, the prior art taught that lymphocytes enhance inflammation in atherosclerotic plaques and contribute to lesions. Gotsman, et al., T-Cell Costimulation and Coinhibition in Atherosclerosis, CIRCULATION RES., 103:1220-1231, at 1220 (Nov. 21, 2008). Gotsman reports that the link between atherosclerosis and inflammation in

the immune system had become widely accepted. *Id.* Additionally, Gotsman suggests that stimulation of T-cells can result in atherosclerosis and destabilization of lesions. *Id.* at 1228-29.

563.     Relatedly, Tanriverdi reported in 2004 that although GnRH is primarily associated with the reproductive system, it had been discovered that GnRH binding sites had been found throughout the body, including in the immune system. Tanriverdi, et al., Expression of Gonadotropin-Releasing Hormone Type-I (GnRH-I) and Type-II (GnRH-II) in Human Peripheral Blood Mononuclear Cells (PBMCs) and Regulation of B-Lymphoblastoid Cell Proliferation by GnRH-I and GnRH-II, EXP. CLIN. ENDOCRINOL. DIABETES, 112:587-594, at 587 (2004). Tanriverdi further reported that GnRH receptors had been discovered in human T-cells and in cells similar to T lymphocytes. *Id.* Tanriverdi suggests that the discovery of GnRH receptors in the immune system "might have clinical relevance" because of their unknown "potential immunological activities." *Id.* at 588. Importantly, Tanriverdi also disclosed that when exposed to the GnRH antagonist cetrorelix, the expression in T cells was unaffected, confirming that GnRH antagonist therapy could avoid the effects of GnRH receptor stimulation outside the hypothalamic-pituitary-gonadal axis. *Id.* at 593.

564.     Taken together, a person of skill in the art would have understood that there was a potential link between the use of GnRH agonists and stimulation of T cells and leukocytes in the immune system, and inflammation of atherosclerotic plaques identified in Gotsman. The data that this stimulation can be avoided by GnRH antagonist therapy would have confirmed to a person of skill in the art that treatment of a subject with an increased risk of a cardiovascular event with degarelix would decrease the risk of an event, as compared to treatment with a GnRH agonist, like leuprolide.

565.    Taken together a person of skill in the art would have been motivated to select a subject with a history of a cardiovascular event for treatment with degarelix based on the publicly available data regarding the increased risk of cardiovascular events associated with GnRH agonist therapy.

        c.      **"administering degarelix to the subject, wherein administration of degarelix to the subject decreases the frequency of an additional cardiovascular event in the subject as compared to the frequency of an additional cardiovascular event upon treatment with a gonadotrophin releasing hormone (GnRH) agonist in a subject with a history of at least one cardiovascular event"**

566.    Smith 2010 discloses elements of this claim limitation. First, Smith 2010 discloses that subjects were administered degarelix with an initial dose of 240 mg degarelix, and then maintenance doses of either 80 mg or 160 mg degarelix. Smith 2010 at 2.

567.    Additionally, Smith 2010 reports that, overall, subjects that received degarelix had a decreased frequency of cardiovascular events, as compared to subjects receiving the GnRH agonist leuprolide. Smith 2010 reports that in the treatment arms, ischemic heart disease occurred in 4% of the degarelix group, but in 10% of the leuprolide group. Smith 2010 at 4, 14 (Table 6). Additionally, Smith 2010 reports that subjects in the leuprolide group were twice as likely to suffer from myocardial ischemia or myocardial infarction, as compared to the degarelix group. *Id.* Additionally, cardiac failure occurred in less than 1% of the subjects receiving degarelix, but in 2% of the subjects receiving leuprolide. *Id.*

568.    As discussed above, a person of ordinary skill in the art would understand that the treatment with degarelix would decrease the frequency of cardiovascular events, as compared to subjects receiving leuprolide. The art taught that agonist therapy increases the risk of cardiovascular events in subjects, particularly for subjects that had experienced previous cardiovascular events. Levine at 835; Shahani at 2048; van Poppel at 1005. Additionally, given

the potential that treatment with a GnRH agonist could affect inflammation in arterial plaques, a

person of skill in the art would have been motivated to use a GnRH antagonist, like degarelix, to

reduce the risk of additional cardiovascular events in prostate cancer subjects.

> **d.    "wherein the at least one cardiovascular event is chosen from myocardial infarction, ischemic heart disease, ischemic stroke, hemorrhagic stroke, and other arterial thrombotic/embolic events"**

569.    As discussed above, this claim limitation defines the term "cardiovascular event"

for the remainder of the claim. Smith 2010 discloses that subjects were selected that had

ischemic heart disease. Smith 2010 also discloses additional cardiovascular events such as

cardiac failure. This limitation is disclosed in Smith 2010.

> **e.    "2. The method of claim 1, wherein administering degarelix to the subject comprises administering an initial [dose] of about 240 mg of degarelix; and administering a maintenance [dose] of about 80 mg degarelix, once every approximately 28 days thereafter."**

570.    Claim 2 narrows claim 1 by defining the dosing regimen of degarelix. However,

these specific parameters are also disclosed in Smith 2010.

571.    As described above, Smith 2010 is further data analysis of the phase III clinical

trial for degarelix. Smith 2010 discloses that the dosing regimens tested included an initial dose

of 240 mg of degarelix and a maintenance dose of 80 mg of degarelix. Smith 2010 at 2.

Additionally, Smith 2010 incorporates by reference the Klotz 2008 paper reporting the results of

that study:  "The trial design and subject population have been described for the original study

that evaluated the efficacy and safety of degarelix 240/80 mg, degarelix 240/160 mg and

leuprolide 7.5 mg." *Id.* (citing Klotz, et al., "The efficacy and safety of degarelix: a 12-month,

comparative, randomized, open-label, parallel-group phase III study in patients with prostate

cancer," BJU Int 102, 1531 (2008)).

572.     I understand that when a reference specifically incorporates a discussion from another reference, it can still be considered as part of the obviousness analysis. Klotz 2008 provides more details on the design of the degarelix study, including confirming the dosing regimen, and that the maintenance doses were administered every 28 days. Klotz 2008 at 1532.

573.     Additionally, van Poppel also discloses dosing regimens of degarelix, including clinical trials using an initiation dose of 240 mg of degarelix, and maintenance doses of 80 mg of degarelix administered monthly. van Poppel at 1005.

574.     Taken as a whole claim 2 of the '085 patent would have been obvious to a person of skill in the art over Smith 2010 in view of van Poppel, and Shahani or Levine.

**B.     U.S. Patent No. 10,695,398 ("the '398 Patent")**

575.     The '398 patent, entitled "Method of Treating Prostate Cancer with GnRH Antagonist," issued on June 30, 2020 from U.S. Patent Application No. 15/205,108 ("the '108 application"), filed July 8, 2016. The '108 application is a continuation of U.S. Application No. 13/458,330, filed April 27, 2012. I understand that the effective filing date of this patent is April 27, 2012.

576.     The '398 patent names as inventors Egbert A. van der Meulen, and László Balázs Tankó, and is assigned on its face to Ferring B.V.

**1.     Asserted Claims of the '398 Patent**

577.     Plaintiffs have asserted infringement of claims 2 and 8 of the '398 patent.

578.     Claim 2 is reproduced below:

> 2. The method of claim 1, wherein administering degarelix to the subject comprises administering an initial dose of about 240 mg of degarelix; and administering a maintenance dose of about 80 mg degarelix, once every approximately 28 days thereafter.

Claim 2 depends from claim 1 of the '398 patent. Claim 1 is presented below:

1. A method for treating a subject that has prostate cancer with a gonadotrophin releasing hormone (GnRH) antagonist, the method comprising:

selecting a subject that has a history of at least one cardiovascular event; and

administering degarelix to the subject having a history of at least one cardiovascular event,

wherein a risk of developing or experiencing an additional cardiovascular event upon treatment with degarelix is diminished compared to a risk of developing or experiencing an additional cardiovascular event upon treatment with a GnRH agonist, and

wherein the at least one cardiovascular event is chosen from myocardial infarction, ischemic heart disease, ischemic stroke, hemorrhagic stroke, and other arterial thrombotic/embolic events.

579.   Claim 8 is presented below:

8. The method of claim 1, wherein the prostate cancer is chosen from localized prostate cancer, locally advanced prostate cancer, metastatic prostate cancer, and non-classifiable prostate cancer.

580.   I understand that because both claim 2 and claim 8 depend from claim 1 of the '398 patent, that each claim also includes all limitations of claim 1.

## 2.   Level of Skill in the Art

581.   I understand that the priority date for the '398 patent is April 27, 2012. I also understand that the '398 patent is in the same patent family as the '085 patent.

582.   I have reviewed the '398 patent and applied the standards described above regarding determining the level of ordinary skill in the art for this patent.

583.   In my opinion, a person of ordinary skill in the art for the '398 patent is a person with a medical degree and at least 2–3 years of experience in the field of urology or treating cancer patients, such as, for example, patients with prostate cancer.

### 3.     Claim 2 of the '398 Patent Would Have Been Obvious Over Smith 2010 in View of van Poppel and Shahani or Levine

584.    The subject matter of claim 2 would have been obvious to a person of ordinary skill in the art as of April 2012 over Smith 2010 in combination with prior art related to the cardiovascular risks of agonist therapy. In particular, the prior art taught that subjects treated with a GnRH agonist experienced a greater risk of cardiovascular side effects, as compared to subjects treated with orchiectomy. The prior art presented multiple theories regarding why this increase occurred, but these theories were generally related to an effect tied to the initial stimulation of GnRH or testosterone by agonists.

585.    As a result, a person of ordinary skill in the art in April 2012 would have found it obvious that the treatment of subjects with degarelix would reduce the frequency and risk of additional cardiovascular events in subjects at a higher risk of an additional cardiovascular event because of a previous event, as opposed to treatment with a GnRH agonist.

#### a.     "1. A method for treating a subject that has prostate cancer with a gonadotrophin releasing hormone (GnRH) antagonist"

586.    Degarelix had been FDA approved by 2010, and so it was well understood that degarelix could be used to treat prostate cancer. Smith 2010 confirms this fact: "Degarelix is a new GnRH antagonist approved for the treatment of prostate cancer." Smith 2010 at 2. This limitation is present in Smith 2010.

#### b.     "selecting a subject with a history of at least one cardiovascular event and prostate cancer"

587.    Smith 2010 discloses that all subjects produced their medical history of relevant adverse events. These baseline factors included, "medical history of cardiac or vascular disorders, diastolic and systolic blood pressure, and pretrial medications for CV disorders, diabetes or cholesterol." Smith 2010 at 3.

138

588.    As a phase III study for prostate cancer, all subjects were required to have prostate cancer. Smith 2010 describes the study to evaluate the efficacy and safety of degarelix for treatment of prostate cancer. Smith 2010 at 2-3.

589.    The data in Smith 2010 confirms that among the subjects tested, a number had a history of at least one cardiovascular event. In particular, claim 1 later defines "cardiovascular event" to include "ischemic heart disease". Table 1 of the Smith 2010 states that 54 subjects, comprising 26% of the pool, had previously experienced ischemic heart disease. As such, the study disclosed in Smith 2010 selected subjects with a history of at least one cardiovascular event and prostate cancer.

590.    Even if not disclosed in Smith 2010 the prior art made selecting a patient with a history of at least on cardiovascular event obvious. In particular, it is well understood that a prior cardiovascular event increases the risk of additional events because of the presence of an underlying issue, such as arterial plaques. Additionally, a person of skill in the art in April 2012 would have understood that the literature disclosed an increased risk of cardiovascular events associated with GnRH agonist therapy as compared with orchiectomy. As such, treating physicians were cautioned to take more care with prostate cancer patients that had a history of cardiovascular events.

591.    Levine reported that as of 2010 there was an increased interest in the effect of GnRH agonists therapy on the risk of cardiovascular events. Levine at 833. Levine examined multiple large scale analyses of cardiovascular event data and found that the studies produced mixed results. However, for example, in the retrospective study of a study with brachytherapy, the greatest risk factor for all-cause mortality was greater in the subpopulation of subjects with a

previous cardiovascular event. *Id.* at 835. Levine posits that "It may also be that any increased risk occurs primarily in those with existing, overt coronary artery disease." *Id.*

592.   Separately, Shahani investigates the negative side effects associated with GnRH agonist therapy, particularly related to metabolic disorders. Shahani at 2042. Shahani reports that data was emerging that cardiovascular disease is one of the leading causes of death of men with prostate cancer. Shahani at 2043. Thus, Shahani explores the potential that agonist therapy "may trigger the development of metabolic complications, which in turn may accelerate the atherosclerotic process and lead to increased cardiovascular disease." *Id.*  As part of the meta analysis, Shahani summarized data presented about the links between agonist therapy and cardiovascular death. Shahani noted that studies showed an increased risk of cardiovascular events morbidity among men treated with agonist therapy as opposed to those treated with orchiectomy. *Id.* at 2048. These cardiovascular deaths were more likely to occur in the first six months, indicating that they were not related to long-term androgen deprivation. *Id.* Shahani also reports that agonist therapy is associated with "increase[d] vascular stiffness." *Id.* As a result of the analysis, Shahani recommends that men with a personal history of cardiovascular disease should consult with a cardiologist before beginning GnRH agonist therapy.

593.   Relatedly, van Poppel explores the larger negative effects of the repeated testosterone surges associated with agonist therapy. Among the effects of testosterone surge, van Poppel reports that "[v]arious studies have reported the incidence of cardiovascular events shortly after initiation of GnRH agonist therapy." van Poppel at 1002. The review by van Poppel also reports that randomized studies showed that orchiectomy is considered superior to GnRH agonist treatment, particularly in terms of all-cause mortality. *Id.* at 1003. Van Poppel also reports that "[i]ncreased bone pain and cardiovascular effects are also of concern during the first

140

weeks of therapy with GnRH agonists, as reflected in the prescribing instructions for these agents." *Id.* at 1005.  Van Poppel ultimately recommended the use of degarelix to avoid the identified side effects associated with agonist therapy, including the reduction of cardiovascular events. *Id.*

594.     Taken together a person of skill in the art would have been motivated to select a subject with a history of a cardiovascular event for treatment with degarelix based on the publicly available data regarding the increased risk of cardiovascular events associated with GnRH agonist therapy.

> **c.     "administering degarelix to the subject having a history of at least one cardiovascular event"**

595.     Smith 2010 reports that degarelix was administered to subjects with a history of ischemic heart disease in both arms of the phase III study. Smith 2010 at 5 ("Approximately a quarter of the subjects (25% to 28%) had a history of ischemic heart disease."), 9 (Table 1).

> **d.     "wherein a risk of developing or experiencing an additional cardiovascular event upon treatment with degarelix is diminished compared to a risk of developing or experiencing an additional cardiovascular event upon treatment with a GnRH agonist"**

596.     Smith 2010 reports that, overall, subjects that received degarelix had a decreased frequency of cardiovascular events, as compared to subjects receiving the GnRH agonist leuprolide. Smith 2010 reports that in the treatment arms, ischemic heart disease occurred in 4% of the degarelix group, but in 10% of the leuprolide group. Smith 2010 at 4, 14 (Table 6). Additionally, Smith 2010 reports that subjects in the leuprolide group were twice as likely to suffer from myocardial ischemia or myocardial infarction, as compared to the degarelix group. *Id.* Additionally, cardiac failure occurred in less than 1% of the subjects receiving degarelix, but in 2% of the subjects receiving leuprolide. *Id.*

597.    As discussed above, a person of ordinary skill in the art would understand that the treatment with degarelix would decrease the frequency of cardiovascular events, as compared to subjects receiving leuprolide. The art taught that agonist therapy increases the risk of cardiovascular events in subjects, particularly for subjects that had experienced previous cardiovascular events. Levine at 835; Shahani at 2048; van Poppel at 1005. Additionally, both Smith 2010 and van Poppel suggest that administration of degarelix would reduce the risk of additional cardiovascular events in prostate cancer subjects. Van Poppel suggests that the increased risk of cardiovascular events is related to the testosterone surge. As such, a person of skill in the art would understand that administration of degarelix would avoid that surge, and as a result, necessarily reduce the risk of cardiovascular events. van Poppel at 1005.

> **e.    "wherein the at least one cardiovascular event is chosen from myocardial infarction, ischemic heart disease, ischemic stroke, hemorrhagic stroke, and other arterial thrombotic/embolic events"**

598.    As discussed above, this claim limitation defines the term "cardiovascular event" for the remainder of the claim. Smith 2010 discloses that subjects were selected that had ischemic heart disease. Smith 2010 also discloses additional cardiovascular events such as cardiac failure. This limitation is disclosed in Smith 2010.

> **f.    "8. The method of claim 1, wherein the prostate cancer is chosen from localized prostate cancer, locally advanced prostate cancer, metastatic prostate cancer, and non-classifiable prostate cancer."**

599.    Claim 8 narrows claim 1 by specifying that the prostate cancer is chosen from a list of prostate cancers. A person of ordinary skill in the art would understand this list to encompass all types of prostate cancer.

600.    Smith 2010 reports that degarelix is a GnRH antagonist approved for treatment of prostate cancer. A person of skill in the art in April 2012 would have known that degarelix was

approved for treatment of advanced prostate cancer, which is included in the list of claimed prostate cancers.

601.    Additionally, Smith 2010 incorporates by reference the Klotz 2008 paper reporting the results of that study:  "The trial design and subject population have been described for the original study that evaluated the efficacy and safety of degarelix 240/80 mg, degarelix 240/160 mg and leuprolide 7.5 mg." *Id.* (citing Klotz, et al., "The efficacy and safety of degarelix: a 12-month, comparative, randomized, open-label, parallel-group phase III study in patients with prostate cancer," BJU Int 102, 1531 (2008)). The Klotz 2008 paper teaches that the phase III trial included "Men aged ≥18 years with histologically confirmed adenocarcinoma of the prostate (all stages)." Klotz 2008 at 1532. This means that the Smith 2010 data includes administration of degarelix to subjects with prostate cancers that fall within the claimed list of prostate cancer stages.

### 4.    Claim 2 of the '398 Patent Would Have Been Obvious Over Smith 2010 in View of Tanriverdi, Gotsman, and Shanani or Levine

602.    Alternatively, the subject matter of claim 2 would have been obvious to a person of ordinary skill in the art as of April 2012 in view of other combinations of prior art. In particular, the prior art taught that subjects treated with a GnRH agonist experienced a greater risk of cardiovascular side effects, as compared to subjects treated with orchiectomy. Alternatively, the prior art disclosed that lymphocytes associated with atherosclerosis contain GnRH receptors, thus creating an alternative pathway that could be avoided by treating prostate cancer patients with a GnRH antagonist.

603.    As a result, a person of ordinary skill in the art in April 2012 would have found it obvious that the treatment of subjects with degarelix would reduce the frequency and risk of

143

additional cardiovascular events in subjects at a higher risk of an additional cardiovascular event because of a previous event, as opposed to treatment with a GnRH agonist.

### a. "1. A method for treating a subject that has prostate cancer with a gonadotrophin releasing hormone (GnRH) antagonist"

604.     Degarelix had been FDA approved by 2010, and so it was well understood that degarelix could be used to treat prostate cancer. Smith 2010 confirms this fact:  "Degarelix is a new GnRH antagonist approved for the treatment of prostate cancer." Smith 2010 at 2. This limitation is present in Smith 2010.

### b. "selecting a subject with a history of at least one cardiovascular event and prostate cancer"

605.     Smith 2010 discloses that all subjects produced their medical history of relevant adverse events. These baseline factors included, "medical history of cardiac or vascular disorders, diastolic and systolic blood pressure, and pretrial medications for CV disorders, diabetes or cholesterol." Smith 2010 at 3.

606.     As a phase III study for prostate cancer, all subjects were required to have prostate cancer. Smith 2010 describes the study to evaluate the efficacy and safety of degarelix for treatment of prostate cancer. Smith 2010 at 2-3.

607.     The data in Smith 2010 confirms that among the subjects tested, a number had a history of at least one cardiovascular event. In particular, claim 1 later defines "cardiovascular event" to include "ischemic heart disease". Table 1 of the Smith 2010 states that 54 subjects, comprising 26% of the pool, had previously experienced ischemic heart disease. As such, the study disclosed in Smith 2010 selected subjects with a history of at least one cardiovascular event and prostate cancer.

608.     Even if not disclosed in Smith 2010 the prior art made selecting a patient with a history of at least on cardiovascular event obvious. In particular, it is well understood that a prior

cardiovascular event increases the risk of additional events because of the presence of an underlying issue, such as arterial plaques. Additionally, a person of skill in the art in April 2012 would have understood that the literature disclosed an increased risk of cardiovascular events associated with GnRH agonist therapy as compared with orchiectomy. As such, treating physicians were cautioned to take more care with prostate cancer patients that had a history of cardiovascular events.

609.    Levine reported that as of 2010 there was an increased interest in the effect of GnRH agonists therapy on the risk of cardiovascular events. Levine at 833. Levine examined multiple large scale analyses of cardiovascular event data and found that the studies produced mixed results. However, for example, in the retrospective study of a study with brachytherapy, the greatest risk factor for all-cause mortality was greater in the subpopulation of subjects with a previous cardiovascular event. *Id.* at 835. Levine posits that "It may also be that any increased risk occurs primarily in those with existing, overt coronary artery disease." *Id.*

610.    Separately, Shahani investigates the negative side effects associated with GnRH agonist therapy, particularly related to metabolic disorders. Shahani at 2042. Shahani reports that data was emerging that cardiovascular disease is one of the leading causes of death of men with prostate cancer. Shahani at 2043. Thus, Shahani explores the potential that agonist therapy "may trigger the development of metabolic complications, which in turn may accelerate the atherosclerotic process and lead to increased cardiovascular disease." *Id.*  As part of the meta analysis, Shahani summarized data presented about the links between agonist therapy and cardiovascular death. Shahani noted that studies showed an increased risk of cardiovascular events morbidity among men treated with agonist therapy as opposed to those treated with orchiectomy. *Id.* at 2048. These cardiovascular deaths were more likely to occur in the first six

months, indicating that they were not related to long-term androgen deprivation. *Id.* Shahani also reports that agonist therapy is associated with "increased vascular stiffness." *Id.* As a result of the analysis, Shahani recommends that men with a personal history of cardiovascular disease should consult with a cardiologist before beginning GnRH agonist therapy.

611.    Given the large effect of GnRH agonists on cardiovascular side effects, a person of skill in the art would have been motivated to review art related to the underlying causes of cardiovascular events. Years before the effective filing date, the prior art taught that lymphocytes enhance inflammation in atherosclerotic plaques and contribute to lesions. Gotsman at 1220. Gotsman reports that the link between atherosclerosis and inflammation in the immune system had become widely accepted. *Id.* Additionally, Gotsman suggests that stimulation of T-cells can result in atherosclerosis and destabilization of lesions. *Id.* at 1228-29.

612.    Relatedly, Tanriverdi reported in 2004 that although GnRH is primarily associated with the reproductive system, it had been discovered that GnRH binding sites had been found throughout the body, including in the immune system. Tanriverdi at 587. Tanriverdi further reported that GnRH receptors had been discovered in human T-cells and in cells similar to T lymphocytes. *Id.* Tanriverdi suggests that the discovery of GnRH receptors in the immune system "might have clinical relevance" because of their unknown "potential immunological activities." *Id.* at 588. Importantly, Tanriverdi also disclosed that when exposed to the GnRH antagonist cetrorelix, the expression in T cells was unaffected, confirming that GnRH antagonist therapy could avoid the effects of GnRH receptor stimulation outside the hypothalamic-pituitary-gonadal axis. *Id.* at 593.

613.    A person of skill in the art would have understood that there was a potential link between the use of GnRH agonists and stimulation of T cells and leukocytes in the immune

system, and inflammation of atherosclerotic plaques identified in Gotsman. The data that this stimulation can be avoided by GnRH antagonist therapy would have confirmed to a person of skill in the art that treatment of a subject with an increased risk of a cardiovascular event with degarelix would decrease the risk of an event, as compared to treatment with a GnRH agonist, like leuprolide.

614.    Taken together a person of skill in the art would have been motivated to select a subject with a history of a cardiovascular event for treatment with degarelix based on the publicly available data regarding the increased risk of cardiovascular events associated with GnRH agonist therapy.

c.    **"administering degarelix to the subject having a history of at least one cardiovascular event"**

615.    Smith 2010 reports that degarelix was administered to subjects with a history of ischemic heart disease in both arms of the phase III study. Smith 2010 at 5 ("Approximately a quarter of the subjects (25% to 28%) had a history of ischemic heart disease."), 9 (Table 1).

d.    **"wherein a risk of developing or experiencing an additional cardiovascular event upon treatment with degarelix is diminished compared to a risk of developing or experiencing an additional cardiovascular event upon treatment with a GnRH agonist"**

616.    Smith 2010 reports that, overall, subjects that received degarelix had a decreased frequency of cardiovascular events, as compared to subjects receiving the GnRH agonist leuprolide. Smith 2010 reports that in the treatment arms, ischemic heart disease occurred in 4% of the degarelix group, but in 10% of the leuprolide group. Smith 2010 at 4, 14 (Table 6). Additionally, Smith 2010 reports that subjects in the leuprolide group were twice as likely to suffer from myocardial ischemia or myocardial infarction, as compared to the degarelix group.

*Id.* Additionally, cardiac failure occurred in less than 1% of the subjects receiving degarelix, but in 2% of the subjects receiving leuprolide. *Id.*

617.    As discussed above, a person of ordinary skill in the art would understand that the treatment with degarelix would decrease the frequency of cardiovascular events, as compared to subjects receiving leuprolide. The art taught that agonist therapy increases the risk of cardiovascular events in subjects, particularly for subjects that had experienced previous cardiovascular events. Levine at 835; Shahani at 2048; van Poppel at 1005. Additionally, given the potential that treatment with a GnRH agonist could affect inflammation in arterial plaques, a person of skill in the art would have been motivated to use a GnRH antagonist, like degarelix, to reduce the risk of additional cardiovascular events in prostate cancer subjects.

> **e.    "wherein the at least one cardiovascular event is chosen from myocardial infarction, ischemic heart disease, ischemic stroke, hemorrhagic stroke, and other arterial thrombotic/embolic events"**

618.    As discussed above, this claim limitation defines the term "cardiovascular event" for the remainder of the claim. Smith 2010 discloses that subjects were selected that had ischemic heart disease. Smith 2010 also discloses additional cardiovascular events such as cardiac failure. This limitation is disclosed in Smith 2010.

> **f.    "8. The method of claim 1, wherein the prostate cancer is chosen from localized prostate cancer, locally advanced prostate cancer, metastatic prostate cancer, and non-classifiable prostate cancer."**

619.    Claim 8 narrows claim 1 by specifying that the prostate cancer is chosen from a list of prostate cancers. A person of ordinary skill in the art would understand this list to encompass all types of prostate cancer.

620.    Smith 2010 reports that degarelix is a GnRH antagonist approved for treatment of prostate cancer. A person of skill in the art in April 2012 would have known that degarelix was

148

approved for treatment of advanced prostate cancer, which is included in the list of claimed prostate cancers.

Additionally, Smith 2010 incorporates by reference the Klotz 2008 paper reporting the results of that study: "The trial design and subject population have been described for the original study that evaluated the efficacy and safety of degarelix 240/80 mg, degarelix 240/160 mg and leuprolide 7.5 mg." *Id.* (citing Klotz, et al., "The efficacy and safety of degarelix: a 12-month, comparative, randomized, open-label, parallel-group phase III study in patients with prostate cancer," BJU Int'l 102, 1531 (2008)). The Klotz 2008 paper teaches that the phase III trial included "Men aged ≥18 years with histologically confirmed adenocarcinoma of the prostate (all stages)." Klotz 2008 at 1532. This means that the Smith 2010 data includes administration of degarelix to subjects with prostate cancers that fall within the claimed list of prostate cancer stages.

### 5.    Claim 8 of the '398 Patent Would Have Been Obvious Over Smith 2010 in View of van Poppel and Shahani or Levine

621.    The subject matter of claim 8 would have been obvious to a person of ordinary skill in the art as of April 2012 in view of combinations of prior art. In particular, the prior art taught that subjects treated with a GnRH agonist experienced a greater risk of cardiovascular side effects, as compared to subjects treated with orchiectomy.

622.    As a result, a person of ordinary skill in the art in April 2012 would have found it obvious that the treatment of subjects with degarelix would reduce the frequency and risk of additional cardiovascular events in subjects at a higher risk of an additional cardiovascular event because of a previous event, as opposed to treatment with a GnRH agonist.

### a.    "1. A method for treating a subject that has prostate cancer with a gonadotrophin releasing hormone (GnRH) antagonist"

623.    Degarelix had been FDA approved by 2010, and so it was well understood that degarelix could be used to treat prostate cancer. Smith 2010 confirms this fact:  "Degarelix is a new GnRH antagonist approved for the treatment of prostate cancer." Smith 2010 at 2. This limitation is present in Smith 2010.

### b.    "selecting a subject with a history of at least one cardiovascular event and prostate cancer"

624.    Smith 2010 discloses that all subjects produced their medical history of relevant adverse events. These baseline factors included, "medical history of cardiac or vascular disorders, diastolic and systolic blood pressure, and pretrial medications for CV disorders, diabetes or cholesterol." Smith 2010 at 3.

625.    As a phase III study for prostate cancer, all subjects were required to have prostate cancer. Smith 2010 describes the study to evaluate the efficacy and safety of degarelix for treatment of prostate cancer. Smith 2010 at 2-3.

626.    The data in Smith 2010 confirms that among the subjects tested, a number had a history of at least one cardiovascular event. In particular, claim 1 later defines "cardiovascular event" to include "ischemic heart disease". Table 1 of the Smith 2010 states that 54 subjects, comprising 26% of the pool, had previously experienced ischemic heart disease. As such, the study disclosed in Smith 2010 selected subjects with a history of at least one cardiovascular event and prostate cancer.

627.    Even if not disclosed in Smith 2010 the prior art made selecting a patient with a history of at least on cardiovascular event obvious. In particular, it is well understood that a prior cardiovascular event increases the risk of additional events because of the presence of an underlying issue, such as arterial plaques. Additionally, a person of skill in the art in April 2012

150

would have understood that the literature disclosed an increased risk of cardiovascular events associated with GnRH agonist therapy as compared with orchiectomy. As such, treating physicians were cautioned to take more care with prostate cancer patients that had a history of cardiovascular events.

628.     Levine reported that as of 2010 there was an increased interest in the effect of GnRH agonist therapy on the risk of cardiovascular events. Levine at 833. Levine examined multiple large scale analyses of cardiovascular event data and found that the studies produced mixed results. However, for example, in the retrospective study of a study with brachytherapy, the greatest risk factor for all-cause mortality was greater in the subpopulation of subjects with a previous cardiovascular event. *Id.* at 835. Levine posits that "It may also be that any increased risk occurs primarily in those with existing, overt coronary artery disease." *Id.*

629.     Separately, Shahani investigates the negative side effects associated with GnRH agonist therapy, particularly related to metabolic disorders. Shahani at 2042. Shahani reports that data was emerging that cardiovascular disease is one of the leading causes of death of men with prostate cancer. Shahani at 2043. Thus, Shahani explores the potential that agonist therapy "may trigger the development of metabolic complications, which in turn may accelerate the atherosclerotic process and lead to increased cardiovascular disease." *Id.*  As part of the meta analysis, Shahani summarized data presented about the links between agonist therapy and cardiovascular death. Shahani noted that studies showed an increased risk of cardiovascular events morbidity among men treated with agonist therapy as opposed to those treated with orchiectomy. *Id.* at 2048. These cardiovascular deaths were more likely to occur in the first six months, indicating that they were not related to long-term androgen deprivation. *Id.* Shahani also reports that agonist therapy is associated with "increased vascular stiffness." *Id.* As a result of the

analysis, Shahani recommends that men with a personal history of cardiovascular disease should consult with a cardiologist before beginning GnRH agonist therapy.

630.     Relatedly, van Poppel explores the larger negative effects of the repeated testosterone surges associated with agonist therapy. Among the effects of testosterone surge, van Poppel reports that "[v]arious studies have reported the incidence of cardiovascular events shortly after initiation of GnRH agonist therapy." van Poppel at 1002. The review by van Poppel also reports that randomized studies showed that orchiectomy is considered superior to GnRH agonist treatment, particularly in terms of all cause mortality. *Id.* at 1003. Van Poppel also reports that "[i]ncreased bone pain and cardiovascular effects are also of concern during the first weeks of therapy with GnRH agonists, as reflected in the prescribing instructions for these agents." *Id.* at 1005.  Van Poppel ultimately recommended the use of degarelix to avoid the identified side effects associated with agonist therapy, including the reduction of cardiovascular events. *Id.*

631.     Taken together a person of skill in the art would have been motivated to select a subject with a history of a cardiovascular event for treatment with degarelix based on the publicly available data regarding the increased risk of cardiovascular events associated with GnRH agonist therapy.

        c.       **"administering degarelix to the subject having a history of at least one cardiovascular event"**

632.     Smith 2010 reports that degarelix was administered to subjects with a history of ischemic heart disease in both arms of the phase III study. Smith 2010 at 5 ("Approximately a quarter of the subjects (25% to 28%) had a history of ischemic heart disease."), 9 (Table 1).

> **d.** **"wherein a risk of developing or experiencing an additional cardiovascular event upon treatment with degarelix is diminished compared to a risk of developing or experiencing an additional cardiovascular event upon treatment with a GnRH agonist"**

633.    Smith 2010 reports that, overall, subjects that received degarelix had a decreased frequency of cardiovascular events, as compared to subjects receiving the GnRH agonist leuprolide. Smith 2010 reports that in the treatment arms, ischemic heart disease occurred in 4% of the degarelix group, but in 10% of the leuprolide group. Smith 2010 at 4, 14 (Table 6). Additionally, Smith 2010 reports that subjects in the leuprolide group were twice as likely to suffer from myocardial ischemia or myocardial infarction, as compared to the degarelix group. *Id.* Additionally, cardiac failure occurred in less than 1% of the subjects receiving degarelix, but in 2% of the subjects receiving leuprolide. *Id.*

634.    As discussed above, a person of ordinary skill in the art would understand that the treatment with degarelix would decrease the frequency of cardiovascular events, as compared to subjects receiving leuprolide. The art taught that agonist therapy increases the risk of cardiovascular events in subjects, particularly for subjects that had experienced previous cardiovascular events. Levine at 835; Shahani at 2048; van Poppel at 1005. Additionally, both Smith 2010 and van Poppel suggest that administration of degarelix would reduce the risk of additional cardiovascular events in prostate cancer subjects. Van Poppel suggests that the increased risk of cardiovascular events is related to the testosterone surge. As such, a person of skill in the art would understand that administration of degarelix would avoid that surge, and as a result, necessarily reduce the risk of cardiovascular events. van Poppel at 1005.

> e.   **"wherein the at least one cardiovascular event is chosen from myocardial infarction, ischemic heart disease, ischemic stroke, hemorrhagic stroke, and other arterial thrombotic/embolic events"**

635.   As discussed above, this claim limitation defines the term "cardiovascular event" for the remainder of the claim. Smith 2010 discloses that subjects were selected that had ischemic heart disease. Smith 2010 also discloses additional cardiovascular events such as cardiac failure. This limitation is disclosed in Smith 2010.

> f.   **"8. The method of claim 1, wherein the prostate cancer is chosen from localized prostate cancer, locally advanced prostate cancer, metastatic prostate cancer, and non-classifiable prostate cancer."**

636.   Claim 8 narrows claim 1 by specifying that the prostate cancer is chosen from a list of prostate cancers. A person of ordinary skill in the art would understand this list to encompass all types of prostate cancer.

637.   Smith 2010 reports that degarelix is a GnRH antagonist approved for treatment of prostate cancer. A person of skill in the art in April 2012 would have known that degarelix was approved for treatment of advanced prostate cancer, which is included in the list of claimed prostate cancers.

638.   Additionally, Smith 2010 incorporates by reference the Klotz 2008 paper reporting the results of that study: "The trial design and subject population have been described for the original study that evaluated the efficacy and safety of degarelix 240/80 mg, degarelix 240/160 mg and leuprolide 7.5 mg." *Id.* (citing Klotz, et al., "The efficacy and safety of degarelix: a 12-month, comparative, randomized, open-label, parallel-group phase III study in patients with prostate cancer," BJU Int 102, 1531 (2008)). The Klotz 2008 paper teaches that the phase III trial included "Men aged ≥18 years with histologically confirmed adenocarcinoma of the prostate (all stages)." Klotz 2008 at 1532. This means that the Smith 2010 data includes

154

administration of degarelix to subjects with prostate cancers that fall within the claimed list of prostate cancer stages.

### 6. Claim 8 of the '398 Patent Would Have Been Obvious Over Smith 2010 in View of Tanriverdi, Gotsman, and Shanani or Levine

639. The subject matter of claim 8 would have been obvious to a person of ordinary skill in the art as of April 2012 in view of combinations of prior art. In particular, the prior art taught that subjects treated with a GnRH agonist experienced a greater risk of cardiovascular side effects, as compared to subjects treated with orchiectomy. Alternatively, the prior art disclosed that lymphocytes associated with atherosclerosis contain GnRH receptors, thus creating an alternative pathway that could be avoided by treating prostate cancer patients with a GnRH antagonist.

640. As a result, a person of ordinary skill in the art in April 2012 would have found it obvious that the treatment of subjects with degarelix would reduce the frequency and risk of additional cardiovascular events in subjects at a higher risk of an additional cardiovascular event because of a previous event, as opposed to treatment with a GnRH agonist.

### a. "1. A method for treating a subject that has prostate cancer with a gonadotrophin releasing hormone (GnRH) antagonist"

641. Degarelix had been FDA approved by 2010, and so it was well understood that degarelix could be used to treat prostate cancer. Smith 2010 confirms this fact: "Degarelix is a new GnRH antagonist approved for the treatment of prostate cancer." Smith 2010 at 2. This limitation is present in Smith 2010.

### b. "selecting a subject with a history of at least one cardiovascular event and prostate cancer"

642. Smith 2010 discloses that all subjects produced their medical history of relevant adverse events. These baseline factors included, "medical history of cardiac or vascular

disorders, diastolic and systolic blood pressure, and pretrial medications for CV disorders, diabetes or cholesterol." Smith 2010 at 3.

643.    As a phase III study for prostate cancer, all subjects were required to have prostate cancer. Smith 2010 describes the study to evaluate the efficacy and safety of degarelix for treatment of prostate cancer. Smith 2010 at 2-3.

644.    The data in Smith 2010 confirms that among the subjects tested, a number had a history of at least one cardiovascular event. In particular, claim 1 later defines "cardiovascular event" to include "ischemic heart disease". Table 1 of the Smith 2010 states that 54 subjects, comprising 26% of the pool, had previously experienced ischemic heart disease. As such, the study disclosed in Smith 2010 selected subjects with a history of at least one cardiovascular event and prostate cancer.

645.    Even if not disclosed in Smith 2010 the prior art made selecting a patient with a history of at least on cardiovascular event obvious. In particular, it is well understood that a prior cardiovascular event increases the risk of additional events because of the presence of an underlying issue, such as arterial plaques. Additionally, a person of skill in the art in April 2012 would have understood that the literature disclosed an increased risk of cardiovascular events associated with GnRH agonist therapy as compared with orchiectomy. As such, treating physicians were cautioned to take more care with prostate cancer patients that had a history of cardiovascular events.

646.    Levine reported that as of 2010 there was an increased interest in the effect of GnRH agonists therapy on the risk of cardiovascular events. Levine at 833. Levine examined multiple large scale analyses of cardiovascular event data and found that the studies produced mixed results. However, for example, in the retrospective study of a study with brachytherapy,

the greatest risk factor for all-cause mortality was greater in the subpopulation of subjects with a previous cardiovascular event. *Id.* at 835. Levine posits that "It may also be that any increased risk occurs primarily in those with existing, overt coronary artery disease." *Id.*

647.     Separately, Shahani investigates the negative side effects associated with GnRH agonist therapy, particularly related to metabolic disorders. Shahani at 2042. Shahani reports that data was emerging that cardiovascular disease is one of the leading causes of death of men with prostate cancer. Shahani at 2043. Thus, Shahani explores the potential that agonist therapy "may trigger the development of metabolic complications, which in turn may accelerate the atherosclerotic process and lead to increased cardiovascular disease." *Id.*  As part of the meta analysis, Shahani summarized data presented about the links between agonist therapy and cardiovascular death. Shahani noted that studies showed an increased risk of cardiovascular events morbidity among men treated with agonist therapy as opposed to those treated with orchiectomy. *Id.* at 2048. These cardiovascular deaths were more likely to occur in the first six months, indicating that they were not related to long-term androgen deprivation. *Id.* Shahani also reports that agonist therapy is associated with "increased vascular stiffness." *Id.* As a result of the analysis, Shahani recommends that men with a personal history of cardiovascular disease should consult with a cardiologist before beginning GnRH agonist therapy.

648.     Given the large effect of GnRH agonists on cardiovascular side effects, a person of skill in the art would have been motivated to review art related to the underlying causes of cardiovascular events. Years before the effective filing date, the prior art taught that lymphocytes enhance inflammation in atherosclerotic plaques and contribute to lesions. Gotsman at 1220. Gotsman reports that the link between artherosclorsis and inflammation in the immune system

157

had become widely accepted. *Id.* Additionally, Gotsman suggests that stimulation of T-cells can result in atherosclerosis and destabilization of lesions. *Id.* at 1228-29.

649.     Relatedly, Tanriverdi reported in 2004 that although GnRH is primarily associated with the reproductive system, it had been discovered that GnRH binding sites had been found throughout the body, including in the immune system. Tanriverdi at 587. Tanriverdi further reported that GnRH receptors had been discovered in human T-cells and in cells similar to T lymphocytes. *Id.* Tanriverdi suggests that the discovery of GnRH receptors in the immune system "might have clinical relevance" because of their unknown "potential immunological activities." *Id.* at 588. Importantly, Tanriverdi also disclosed that when exposed to the GnRH antagonist cetrorelix, the expression in T cells was unaffected, confirming that GnRH antagonist therapy could avoid the effects of GnRH receptor stimulation outside the hypothalamic-pituitary-gonadal axis. *Id.* at 593.

650.     A person of skill in the art would have understood that there was a potential link between the use of GnRH agonists and stimulation of T cells and leukocytes in the immune system, and inflammation of atherosclerotic plaques identified in Gotsman. The data that this stimulation can be avoided by GnRH antagonist therapy would have confirmed to a person of skill in the art that treatment of a subject with an increased risk of a cardiovascular event with degarelix would decrease the risk of an event, as compared to treatment with a GnRH agonist, like leuprolide.

651.     Taken together a person of skill in the art would have been motivated to select a subject with a history of a cardiovascular event for treatment with degarelix based on the publicly available data regarding the increased risk of cardiovascular events associated with GnRH agonist therapy.

      c.     **"administering degarelix to the subject having a history of at least one cardiovascular event"**

652.    Smith 2010 reports that degarelix was administered to subjects with a history of ischemic heart disease in both arms of the phase III study. Smith 2010 at 5 ("Approximately a quarter of the subjects (25% to 28%) had a history of ischemic heart disease."), 9 (Table 1).

      d.     **"wherein a risk of developing or experiencing an additional cardiovascular event upon treatment with degarelix is diminished compared to a risk of developing or experiencing an additional cardiovascular event upon treatment with a GnRH agonist"**

653.    Smith 2010 reports that, overall, subjects that received degarelix had a decreased frequency of cardiovascular events, as compared to subjects receiving the GnRH agonist leuprolide. Smith 2010 reports that in the treatment arms, ischemic heart disease occurred in 4% of the degarelix group, but in 10% of the leuprolide group. Smith 2010 at 4, 14 (Table 6). Additionally, Smith 2010 reports that subjects in the leuprolide group were twice as likely to suffer from myocardial ischemia or myocardial infarction, as compared to the degarelix group. *Id.* Additionally, cardiac failure occurred in less than 1% of the subjects receiving degarelix, but in 2% of the subjects receiving leuprolide. *Id.*

654.    As discussed above, a person of ordinary skill in the art would understand that the treatment with degarelix would decrease the frequency of cardiovascular events, as compared to subjects receiving leuprolide. The art taught that agonist therapy increases the risk of cardiovascular events in subjects, particularly for subjects that had experienced previous cardiovascular events. Levine at 835; Shahani at 2048; van Poppel at 1005. Additionally, given the potential that treatment with a GnRH agonist could affect inflammation in arterial plaques, a person of skill in the art would have been motivated to use a GnRH antagonist, like degarelix, to

reduce the risk of additional cardiovascular events in prostate cancer subjects. Gotsman at 1220; Tanriverdi at 587.

>   e.   **"wherein the at least one cardiovascular event is chosen from myocardial infarction, ischemic heart disease, ischemic stroke, hemorrhagic stroke, and other arterial thrombotic/embolic events"**

655.   As discussed above, this claim limitation defines the term "cardiovascular event" for the remainder of the claim. Smith 2010 discloses that subjects were selected that had ischemic heart disease. Smith 2010 also discloses additional cardiovascular events such as cardiac failure. This limitation is disclosed in Smith 2010.

>   f.   **"8. The method of claim 1, wherein the prostate cancer is chosen from localized prostate cancer, locally advanced prostate cancer, metastatic prostate cancer, and non-classifiable prostate cancer."**

656.   Claim 8 narrows claim 1 by specifying that the prostate cancer is chosen from a list of prostate cancers. A person of ordinary skill in the art would understand this list to encompass all types of prostate cancer.

657.   Smith 2010 reports that degarelix is a GnRH antagonist approved for treatment of prostate cancer. A person of skill in the art in April 2012 would have known that degarelix was approved for treatment of advanced prostate cancer, which is included in the list of claimed prostate cancers.

658.   Additionally, Smith 2010 incorporates by reference the Klotz 2008 paper reporting the results of that study: "The trial design and subject population have been described for the original study that evaluated the efficacy and safety of degarelix 240/80 mg, degarelix 240/160 mg and leuprolide 7.5 mg." *Id.* (citing Klotz, et al., "The efficacy and safety of degarelix: a 12-month, comparative, randomized, open-label, parallel-group phase III study in patients with prostate cancer," BJU Int 102, 1531 (2008)). The Klotz 2008 paper teaches that the

160

phase III trial included "Men aged ≥18 years with histologically confirmed adenocarcinoma of the prostate (all stages)." Klotz 2008 at 1532. This means that the Smith 2010 data includes administration of degarelix to subjects with prostate cancers that fall within the claimed list of prostate cancer stages.

C.   **The Asserted Claims Lack Secondary Considerations That Would Support Non-Obviousness**

659.   I understand that as part of my analysis of obviousness that I must consider so-called "secondary considerations" of non-obviousness. I have reviewed Plaintiffs alleged evidence of secondary considerations, and do not find them compelling enough to change my opinion that the asserted claims are obvious.

660.   I understand that Plaintiffs have only identified evidence of unexpected results and market acceptance/industry recognition as secondary considerations. I understand that Plaintiffs have not evidence related to any other secondary consideration of non-obviousness for the asserted claims of the '085 or '398 patents.

1.   **Unexpected Results**

661.   I understand that Plaintiffs have asserted that the asserted claims present unexpected results. I understand that to qualify as an unexpected result, there must be objective evidence of a contrary expectation in the art that were disproven by the data. I also understand that a difference in degree, but not a difference in kind of results, means that the identified evidence of secondary considerations is particularly weak.

662.   I have reviewed Plaintiffs' statements regarding unexpected results, and do not find them to be compelling.

# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FERRING PHARMACEUTICALS INC.,
FERRING INTERNATIONAL CENTER S.A.,
FERRING B.V., and
POLYPEPTIDE LABORATORIES A/S

        Plaintiffs,

        v.

FRESENIUS KABI USA, LLC,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 20-431 (MN)

CONTAINS CONFIDENTIAL
INFORMATION

## EDWARD J. YUN, M.D.'S REPLY EXPERT REPORT

59.     I have reviewed Dr. Keane's Responsive Report and the materials referenced in that report related to invalidity of the Cardiovascular Patents. I disagree with Dr. Keane's conclusions.

A.     **Claim 2 of the '085 Patent Is Anticipated by Smith 2010**

60.     As stated in my Opening Report, claim 2 of the '085 patent is invalid as anticipated by the Smith 2010 reference.

61.     Dr. Keane disagrees that Smith 2010 anticipates claim 2 of the '085 patent. Dr. Keane only identifies two limitations that are not present in Smith 2010:  (1) the selecting limitation and (2) the reduced cardiovascular risk limitation. I disagree with Dr. Keane's conclusions.

62.     First, the selecting limitation is present in Smith 2010 to the extent that it is disclosed and part of the specification. In particular, Dr. Keane notes that although Smith 2010 teaches that some patients had a history of cardiovascular events, this is not enough to anticipate the claim because the subjects were not pre-selected into the degarelix group because of this history. This presents an interesting situation because the data from the Smith 2010 paper—the CS21 study—are the same data that forms the basis for the validity of claim 2. In fact, none of the clinical data presented in the '085 patent are based on a study where the inclusion criteria is that a subject had a preexisting cardiovascular event. Instead, the data from the '085 patent are based on the same selection criteria as the Smith 2010 paper. To the extent this limitation is not disclosed in Smith 2010, then it is also not disclosed or supported by the specification of the '085 patent.

63.     The claim limitation is present in the disclosure of Smith 2010 because this history of cardiovascular events was collected as part of the routine screening of patients in that disclosure. Claim 2 of the '085 patent does not require that subjects are excluded from treatment

15

with degarelix if there is no history of cardiovascular events, only that subjects are identified as having this history before administration. To the extent "selecting" requires more than identifying the patient's history and confirming that they are otherwise eligible to receive degarelix, then Dr. Keane's opinions regarding infringement make no sense. Fresenius Kabi's prescribing information does not contain any instruction to select patients specifically because of preexisting cardiovascular events. To the extent that no specific instruction is necessary to prove infringement, but instead identification of the patient's history is required, then it is also not required in prior art to prove invalidity.

64.     Second, Dr. Keane states that the reduced risk limitation is not present in the prior art. As stated in my Opening Report, the data in Smith 2010 show a reduced risk of cardiovascular events in subjects receiving degarelix as compared to the population receiving leuprolide. Dr. Keane does not dispute these data. Instead, he denigrates the data in the study as being underpowered to draw a definitive conclusion. Keane Resp. ¶ 60. In my opinion, even if not statistically definitive, the data show a reduction in risk to patients receiving degarelix. This is what the claims require.

65.     Additionally, as detailed in my reports, the reduction of cardiovascular risk to patients receiving degarelix as opposed to leuprolide is an inherent property of the drug when dosed according to the regimen disclosed in the remaining claim limitation. Notably, Dr. Keane does not dispute that the exact dosing regimen that results in the reduced risk is anticipated by the Smith 2010 reference. Dr. Keane does not identify any other critical variables, other than the dosing regimen and history of cardiovascular events that would be necessary to result in the claimed reduced risk of additional CV events. This is an inherent property, and so is anticipated by the disclosure of Smith 2010.

16

**PROPOSED PRETRIAL ORDER**

**EXHIBIT 18-B**

**OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 2**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

FERRING PHARMACEUTICALS INC.,         )
FERRING INTERNATIONAL CENTER S.A.,    )
FERRING B.V., and                     )
POLYPEPTIDE LABORATORIES A/S          )
                                      )   C.A. No. 20-431 (MN)
            Plaintiffs,               )
                                      )
     v.                               )
                                      )
FRESENIUS KABI USA, LLC,              )
                                      )
            Defendant.                )

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION *IN LIMINE* NO. 2**

Defendant disagrees with Plaintiffs' Motion in Limine No. 2. Defendant asks the Court to deny the Motion in its entirety. Defendant's anticipation argument for claim 2 of U.S. Patent No. 10,695,398 ("the '398 patent") was not untimely disclosed in the Pre-Trial Order, and Plaintiffs are not prejudiced by the argument's inclusion.

Plaintiffs assert that Defendant's anticipation argument on claim 2 of the '398 patent was untimely disclosed. However, Plaintiffs' argument fails. The anticipation argument for claim 2 of the '398 patent was disclosed in Defendant's invalidity contentions, well before the Pre-Trial Order was drafted. Further, Plaintiff's reliance on the *Pennypack* factors is misplaced.

Plaintiffs argue that the Third Circuit's *Pennypack* factors favor preclusion of the anticipation argument for claim 2 of the '398 patent. (Pls.' Mot. in Limine No. 2 at 2.) However, cases that apply the *Pennypack* factors almost exclusively relate to infringement or invalidity theories that were not raised in the contentions. *See ViaTech Techs., Inc. v. Microsoft Corp.*, No. CV 17-570-RGA, 2021 WL 663057, at *2 (D. Del. Feb. 19, 2021) (granting motion to strike Doctrine of Equivalents theories raised for the first time in expert's report, after the close of fact discovery); *Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, No. CV 16-139-WCB,

1

2018 WL 2225113, at *4-7 (D. Del. May 15, 2018) (granting motion to strike plaintiff's

infringement theory, which was stated for the first time in a brief in support of plaintiff's motion

for summary judgment, and prevent plaintiff from using theory at trial). Here, the Court is

presented with an entirely different situation. The anticipation argument was first made in

Defendant's invalidity contentions. (Pls.' Mot. in Limine, Ex. 1(Def's Contentions) at 195-200.)

The fact that the argument was not addressed by Defendant's experts is irrelevant in a motion for

untimely disclosure because the anticipation argument was timely raised in Defendant's

contentions.

When an argument is included in a party's contentions, there is no prejudice to the other

party if that argument is not included in an expert's report. *HSM Portfolio LLC v. Elpida*

*Memory Inc.*, No. CV 11-770-RGA, 2016 WL 552543, at *3 (D. Del. Feb. 11, 2016) (denying a

motion to strike a Doctrine of Equivalents theory from use at trial because it was disclosed in the

party's contentions). The lack of prejudice to the party attempting to exclude an argument in a

party's contentions is bolstered if the argument is nearly identical to another in an expert's

report. *Id.* Arguments in a party's contentions are not new theories. *Id.*

Plaintiffs admit that the anticipation argument was in Defendant's contentions. (Pls.' MIL

No. 2 at 1.) Plaintiffs admit that Defendant has made a nearly identical anticipation argument for

the '085 patent using the same prior art, which was included in the contentions and in

Defendant's expert report. (Pls.' MIL No. 2 at 1, Ex. 1 (Def. Final Invalidity Contentions) at

166-172.) This nearly identical argument uses the same prior art, Smith MR et al.,

*Cardiovascular safety of degarelix: results from a 12-month, comparative, randomized, open*

*label, parallel group Phase III trial in patients with prostate cancer*, J UROL 184(6):2313-2319

(2010) ("Smith 2010"). (Pls.' MIL No. 2 at 1.) Thus, the inclusion of the anticipation argument

2

for claim 2 of the '398 patent in the Pre-Trial Order has not surprised or prejudiced Plaintiffs because they were made aware of the argument in Defendant's contentions and had the opportunity to respond to a nearly identical argument that was included in an expert report. Neither did Plaintiffs raise this "new" argument during expert discovery, when they had the opportunity to depose Dr. Yun regarding the invalidity contentions for the cardiovascular patents.

Additionally, Plaintiffs' Motion in Limine No. 2 is not properly raised as a motion in limine. Instead, Plaintiffs are really asking the court to "make a dispositive ruling on the merits of [the] invalidity contentions." *Automatic Equip. Mfg. Co. v. Danko Mfg.*, LLC, No. 8:19-CV-162, 2021 WL 4078282, at *5 (D. Neb. Sept. 8, 2021) (denying the motion to limit invalidity evidence because it should have been raised as a dispositive motion, and that deadline had passed). If a party is seeking to exclude evidence that was raised in a party's contentions, the party should have raised the issue prior to the dispositive motion deadline. *Id.* at *4. There is no prejudice to the party seeking exclusion because the party already had a chance to ask for clarification, but failed to do so. *Id.* Thus, Plaintiffs' argument that it is prejudiced fails.

Defendant has been more than accommodating on this issue by agreeing to not offer affirmative testimony from Dr. Yun on the issue. However, Plaintiffs cannot limit Fresenius Kabi from entering the argument through testimony of Plaintiffs' fact and expert witnesses.

Accordingly, Plaintiff's Motion in Limine No. 2 should be dismissed in its entirety.

Dated: December 8, 2021                  Respectfully submitted,


                                         Farnan LLP


                                         */s/      Brian E. Farnan*
                                         Brian E. Farnan (#4089)
                                         Michael J. Farnan (#5165)
                                         919 North Market Street, 12th Floor
                                         Wilmington, DE 19801
                                         (302) 777-0300
                                         bfarnan@farnanlaw.com
                                         mfarnan@farnanlaw.com

                                         OF COUNSEL:

                                         Imron T. Aly (admitted *pro hac vice*)
                                         Joel M. Wallace (admitted *pro hac vice*)
                                         Schiff Hardin LLP
                                         233 S. Wacker Drive, Suite 7100
                                         Chicago, IL 60606
                                         (312) 258-5500
                                         ialy@schiffhardin.com
                                         jwallace@schiffhardin.com

                                         John K. Hsu
                                         SCHIFF HARDIN LLP
                                         901 K Street NW
                                         Suite 700
                                         Washington, DC 20001
                                         202.778.6400 (tel.)
                                         202.778.6460 (fax)
                                         jhsu@schiffhardin.com

                                         *Attorneys for Defendant*
                                         *Fresenius Kabi USA, LLC*

**PROPOSED PRETRIAL ORDER**

**EXHIBIT 18-C**

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION *IN LIMINE* NO. 2**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| FERRING PHARMACEUTICALS INC., FERRING INTERNATIONAL CENTER, S.A., FERRING B.V., and POLYPEPTIDE LABORATORIES A/S | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) C.A. No. 20-cv-431 (MN)<br>) |
| v. | )<br>) |
| FRESENIUS KABI USA, LLC, | )<br>) |
| Defendant. | )<br>) |

## PLAINTIFFS' REPLY IN FURTHER SUPPORT OF
## PLAINTIFFS' MOTION *IN LIMINE* NO. 2

Joshua P. Davis
811 Main Street
Suite 3130
Houston, TX 77002

WOMBLE BOND DICKINSON (US) LLP
Mary W. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
John B. Bourke (#6534)
1313 North Market Street, Suite 1200
Wilmington, DE 19801
(302) 252-4320

*Of Counsel*

*Counsel for Plaintiffs*

Dated: December 13, 2021

Tellingly, Fresenius's response does not address the prejudice that Plaintiffs will suffer if Fresenius is permitted to advance an anticipation argument on claim 2 of the '398 patent. In addition, Fresenius provides no explanation as to why Dr. Yun opined that claim 2 of the '085 patent is anticipated, but failed to provide a similar opinion with respect to claim 2 of the '398 patent, despite Fresenius making that argument earlier in its invalidity contentions. Apparently, Fresenius made a decision not to advance certain theories during expert discovery and is now attempting to revive them on the eve of trial to Plaintiffs' prejudice.

First, Fresenius asserts that it "has been more than accomodating on this issue by agreeing to not offer affirmative testimony from Dr. Yun on this issue." (Fresenius Resp. at 3.) Fresenius is not "accomodating" anyone—its expert never provided an opinion on this issue and is thus barred by the Federal Rules from now opining that claim 2 of the '085 patent is anticipated. Second, Fresenius asserts that it can "enter[] the argument through the testimony of Plaintiffs' fact and expert witnesses." (Fresenius Resp. at 3.) But Fresenius should not be permitted to rely on testimony from Plaintiffs' expert on one patent to backdoor in evidence on that issue on another patent where it bears the burden of proof. Third, Fresenius argues that this motion "is not properly raised as a motion in limine," citing to a case from the District of Nebraska. (Fresenius Resp. at 3.) In that case, the defendant moved *in limine* to limit Plaintiffs' invalidity evidence to the scope of its invalidity contentions. *Automatic Equip. Mfg. Co. v. Danko Mfg., LLC*, No. 8:19-CV-162, 2021 WL 4078282, at *4 (D. Neb. Sept. 8, 2021). Here, Plaintiffs are moving to preclude Fresenius from making an argument it dropped during expert discovery. Lastly, as explained in Plaintiffs' opening, Plaintiffs will be prejudiced if Fresenius is permitted to argue inherent anticipation of claim 2 of the '398 patent instead of being confined to the obviousness opinions directed to that claim and disclosed in expert discovery.

Dated: December 13, 2021

Of Counsel:

Joshua P. Davis
811 Main Street
Suite 3130
Houston, TX 77002

Respectfully submitted,

*/s/ Mary W. Bourke*
Mary W. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
John B. Bourke (#6534)
Womble Bond Dickinson (US) LLP
1313 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 252-4320
Mary.Bourke@wbd-us.com
Dana.Severance@wbd-us.com
Daniel.Attaway@wbd-us.com
Ben.Bourke@wbd-us.com

*Counsel for Plaintiffs*