**PROPOSED PRETRIAL ORDER**

**EXHIBIT 20-A**

**<u>FRESENIUS'S MOTION *IN LIMINE*</u>**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

FERRING PHARMACEUTICALS INC., )
FERRING INTERNATIONAL CENTER S.A., )
FERRING B.V., and )
POLYPEPTIDE LABORATORIES A/S )
) C.A. No. 20-431 (MN)
Plaintiffs, )
)
v. )
)
FRESENIUS KABI USA, LLC, )
)
Defendant. )

**DEFENDANT'S MOTION *IN LIMINE*
TO EXCLUDE EXPERT'S CLAIM CONSTRUCTION**

Defendant moves in limine to exclude Plaintiffs and their experts from testifying at trial about new claim constructions inconsistent with the claim construction entered by this Court. On June 14, 2021, the Court entered a claim construction order construing "undesirable side effect" in the '359 and '739 patents as having its "plain and ordinary meaning." D.I. 141 at 2. This was accepting the Plaintiffs' own construction, over Defendants' objection and arguments regarding indefiniteness. Even so, Plaintiffs' expert Dr. Neal Shore now purports to provide opinions at trial using a different claim construction.

Expert opinions that are inconsistent with the court's claim construction order are inadmissible at trial. *See Intuitive Surgical, Inc. v. Auris Health, Inc.*, --- F. Supp. 3d ---, 2021 WL 3033396, at *3 (D. Del. July 19, 2021) (excluding expert opinion testimony that relitigated the court's claim construction); *M2M Sols. LLC v. Sierra Wireless Am., Inc.*, 14-cv-1102, 2020 WL 7767639, at *19 (D. Del. Dec. 4, 2020) (recommending to the court that expert's testimony be excluded because expert's claim construction improperly expanded the court's construction); *Integra Lifesciences Corp. v. HyperBranch Med. Tech., Inc.*, No. 15-cv-819, 2018 WL 1785033,

1

at *4 (D. Del. Apr. 4, 2018) (excluding expert testimony that improperly narrowed the court's claim construction).

During claim construction proceedings, Fresenius Kabi asserted that the phrase "decreased likelihood of developing or experiencing an undesirable side effect" was indefinite because the term "undesirable side effect" was not sufficiently defined in the specification. D.I. 77 at 18. In its Opening Brief, Plaintiffs stated that the phrase "undesirable side effects" "means exactly what the claims say—a subject with prostate cancer who is administered degarelix according to the prescribed dosing schedule will have a decreased likelihood of developing or experiencing *a testosterone spike or other GnRH agonist side-effect* compared to treatment with leuprolide." *Id.* at 17 (emphasis added). They borrowed these terms from independent claim 1 in the '359 and '739 patents.  Plaintiffs went on to argue, in the reply brief, that "the word 'undesirable' in the context of these claims is not a subjective assessment, but a 'matter of objective science, not a decision left to the subjective tastes of a [POSITA].' Indeed, a POSITA would understand *it simply means an adverse event*." *Id.* at 19-20 (citations omitted) (emphasis added). Plaintiffs' expert Dr. Shore even submitted a declaration during claim construction proceedings, and opined that that term "undesirable side effect" refers to "an adverse event".  *Id.* ¶ 43. The Court agreed with Plaintiffs and Dr. Shore, and entered the Order that the term has its "plain and ordinary meaning." D.I. 141 at 2.

At trial, however, the same Dr. Shore is purportedly going to change course, and make a new argument that contradicts not only his and Plaintiffs' position during claim construction, but the Court's actual construction.  In particular, Dr. Shore intends now to testify that "undesirable side effects" does not refer to "an adverse event," but only to a subjective subset of adverse

events by picking and choosing certain side effects listed in the specification. At his deposition,

Dr. Shore testified as follows:

> Q. Now, your opinion is that the phrase "undesirable side effects" refers only to the musculoskeletal, connective tissue, renal and urinary disorders, and the reproductive system and breast disorders, and cardiac disorders; correct?
>
> A. Yes.
>
> Q. And that the phrase "undesirable side effects" does not refer to the testosterone spike side effects; correct?
>
> A. Correct.

Ex. 1, Shore Dep. Tr. 139:23-140:7 (Oct. 19, 2021).  Dr. Shore's new proposed understanding of the claim term plainly contradicts the Court's "plain and ordinary meaning" construction.  The new understanding also contradicts Plaintiffs' arguments in support of the claim construction—as noted above and upon which the Court entered Plaintiffs' requested construction—namely that "undesirable side effects" means "testosterone spike or other GnRH agonist side-effect" and "it simply means an adverse event."

Fresenius Kabi relied upon the claim construction that the Court entered, and the arguments that Plaintiffs already made, in preparing and pursuing fact depositions, expert reports, and expert depositions.  Now, on the eve of trial, Plaintiffs and Dr. Shore ask for a "do over" because they see the risks of invalidity posed in view of the claim construction that they themselves successfully requested.  Because Dr. Shore did not apply the Court's claim construction when analyzing the validity of the asserted claims of the '359 and '739 patents, Dr. Shore's opinions and testimony should be excluded from trial.

Dated: December 1, 2021                          Respectfully submitted,

Farnan LLP


*/s/        Michael J. Farnan*
Brian E. Farnan (#4089)
Michael J. Farnan (#5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

OF COUNSEL:

Imron T. Aly (admitted *pro hac vice*)
Joel M. Wallace (admitted *pro hac vice*)
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
(312) 258-5500
ialy@schiffhardin.com
jwallace@schiffhardin.com
trammer@schiffhardin.com

John K. Hsu
SCHIFF HARDIN LLP
901 K Street NW
Suite 700
Washington, DC 20001
202.778.6400 (tel.)
202.778.6460 (fax)
jhsu@schiffhardin.com

*Attorneys for Defendant*
*Fresenius Kabi USA, LLC*

# Exhibit 1



# Transcript of Neal Shore, M.D.

**Date:** October 19, 2021
**Case:** Ferring Pharm., Inc. -v- Fresenius Kabi USA, LLC

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

1    IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF DELAWARE
3   ----------------------------x
4   FERRING PHARMACEUTICALS,      :
5   INC., FERRING                 :
6   INTERNATIONAL CENTER S.A.,    :
7   FERRING B.V., and             :
8   POLYPEPTIDE LABORATORIES      :  C.A. No.
9   A/S,                          :  1:20-CV-00431-MN
10              Plaintiffs,       :
11      v.                        :
12  FRESENIUS KABI USA, LLC,      :
13              Defendant.        :
14  ----------------------------x
15
16    Videotaped Virtual Deposition of NEAL SHORE, M.D.
17           Tuesday, October 19, 2021
18                9:07 a.m. CST
19
20
21
22
23  Job No.:  406525
24  Pages:  1 - 187
25  Reported by:  Tiffany M. Pietrzyk, CSR RPR CRR

**2**

1       Videotaped virtual deposition of NEAL SHORE,
2   M.D., pursuant to notice, before Tiffany M.
3   Pietrzyk, a Certified Shorthand Reporter, Registered
4   Professional Reporter, Certified Realtime Reporter,
5   and a Notary Public in and for the State of
6   Illinois.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1            A P P E A R A N C E S
2   ON BEHALF OF THE FERRING PLAINTIFFS:
3       MARY W. BOURKE, ESQUIRE
4       DANA K. SEVERANCE, ESQUIRE
5       BEN BOURKE, ESQUIRE
6       WOMBLE BOND DICKINSON (US), LLP
7       1313 North Market Street
8       Suite 1200
9       Wilmington, Delaware 19801
10      302.252.4320
11
12  ON BEHALF OF THE DEFENDANT:
13      JOEL M. WALLACE, ESQUIRE
14      SCHIFF HARDIN LLP
15      233 South Wacker Drive
16      Suite 7100
17      Chicago, Illinois 60606
18      312.258.5500
19
20  ALSO PRESENT:
21      Cindy Cheng, Esquire
22      Alex Sussman, Planet Depos Technician
23      Adam Nudelman, Planet Depos Videographer
24
25

**4**

1            C O N T E N T S
2   EXAMINATION OF NEAL SHORE, M.D.          PAGE
3     By Mr. Wallace                            6
4
5            E X H I B I T S
6         (Attached to transcript.)
7   DEPOSITION EXHIBITS                      PAGE

8   Exhibit 1   Opening report regarding       41
9               infringement
10  Exhibit 2   Opening report regarding       42
11              secondary considerations
12  Exhibit 3   Opposing expert report         43
13              addressing the issue of
14              validity
15  Exhibit 4   Reply report                   45
16  Exhibit 5   Email dated 9/20/2004 from    123
17              Raj Dave
18  Exhibit 6   Declaration                   142
19  Exhibit 7   International patent          156
20              publication number
21              WO 03/006049 A1
22
23
24
25

5

1    P R O C E E D I N G S
2        THE VIDEOGRAPHER:  Here begins tape number 1
3    in the videotaped deposition of Neal Shore, M.D., in
4    the matter of Ferring Pharmaceutical versus
5    Fresenius Kabi U.S.A. LLC in the U.S. District Court
6    for the District of Delaware, Case Number
7    20-CV-431-MN.
8        Today's date, October 19, 2021.  The time on
9    the video monitor is 9:07 a.m.
10       The videographer today is Adam Nudelman,
11   representing Planet Depos.
12       This video deposition is taking place
13   remotely.
14       Would counsel please voice identify
15   themselves, state whom they represent.
16       MR. WALLACE:  Joel Wallace from the law firm
17   of Schiff Hardin LLP, on behalf of Fresenius Kabi
18   U.S.A.
19       MS. BOURKE:  Mary Bourke from Womble Bond
20   Dickinson, representing the Ferring plaintiffs.  I
21   have with me Dana Severance, Ben Bourke, and I see
22   that Cindy Cheng, in-house counsel for Ferring, has
23   also joined.
24       THE VIDEOGRAPHER:  The court reporter today
25   is Tiffany Pietrzyk with Planet Depos.  Would the

6

1    reporter please swear in the witness.
2            (Witness sworn.)
3    WHEREUPON:
4        NEAL SHORE, M.D.,
5    called as a witness herein, having been first duly
6    sworn, was examined and testified as follows:
7            EXAMINATION
8    BY MR. WALLACE:
9        Q.  Good morning, Dr. Shore.
10       A.  Good morning.
11       Q.  My name is Joel Wallace.  As you heard, I
12   represent Fresenius Kabi U.S.A., and I want to start
13   by thanking you for taking the time to speak with us
14   today.  Dr. Shore, have you been deposed before?
15       A.  Yes.
16       Q.  Okay.  About how many times have you been
17   deposed?
18       A.  Maybe eight to ten times.
19       Q.  And when was the most recent time that you
20   were deposed?
21       A.  It's been a few years.
22       Q.  Okay.  Well, since you've been deposed
23   before, but it's been a while, we'll go over a few
24   of the ground rules so hopefully we're on the same
25   page today.  Is that fair, Dr. Shore?

7

1        A.  Yes.
2        Q.  Now, as you know, your testimony today is
3    being recorded by a court reporter.  You understand
4    that, Dr. Shore?
5        A.  Yes.
6        Q.  Okay.  And the court reporter can only take
7    down questions and responses that are stated.  Do
8    you understand that, Dr. Shore?
9        A.  Yes.
10       Q.  Okay.  So I would ask that, in responding,
11   please give verbal responses, "yes," "no," "I don't
12   know," for example, as opposed to "mm-hmm," "uh-uh,"
13   things like that where the court reporter can't
14   accurately take down your response.  Is that fair,
15   Dr. Shore?
16       A.  Yes.
17       Q.  Okay.  Also, because this is being
18   transcribed, it's important that we take turns
19   speaking so that the court reporter can take down
20   everything that is being stated.
21       Do you understand that, Dr. Shore?
22       A.  Yes.
23       Q.  Okay.  I will do my best to wait until
24   you've finished your answer completely before asking
25   a question, and I would ask that you wait until I've

8

1    completed my question before responding.
2        Do you understand that, Dr. Shore?
3        A.  Yes.
4        Q.  Okay.  Now, Dr. Shore, if I ask you a
5    question, you have the right to ask for
6    clarification for any part of my question.
7        Do you understand that?
8        A.  Yes.
9        Q.  And if I ask a question and you don't ask
10   for clarification and you proceed with an answer,
11   I'm going to assume that you understood the question
12   as asked.  Is that fair, Dr. Shore?
13       A.  Yes.
14       Q.  Okay.  Now, Dr. Shore, where do you
15   currently work?
16       A.  My practice is in Myrtle Beach,
17   South Carolina.
18       Q.  And is this a private practice?
19       A.  Yes.
20       Q.  Okay.  And is it affiliated with a hospital,
21   or is it a separate clinic that you own and operate?
22       A.  It is affiliated with GenesisCare U.S., but
23   it's not affiliated with a hospital, but, of course,
24   we have hospital privileges.
25       Q.  And at what hospitals do you have

137

1 a testosterone spike and that the use of GnRH
2 antagonists avoids this spike and the related side
3 effects?
4    A. I do think that -- you know, I think it's
5 fair and reasonable that the testosterone spike was
6 well characterized.
7    Q. So you don't disagree with that statement of
8 Dr. Yun.
9       What you disagree with is whether --
10    A. The unexpected --
11    Q. -- the patent is limited to the testosterone
12 spike?
13    A. Yeah. Is achieving the -- basically the
14 unexpected and undesirable side effects.
15    Q. Okay. And so your opinion, if we go to the
16 end of paragraph 31, you state "The patent office
17 would never have allowed claims directed to those
18 side effects which were known."
19       Do you see that, Dr. Shore?
20    A. Yes, I do.
21    Q. And so it's your opinion that there are no
22 claims in the side effect patents that are directed
23 to the testosterone spike side effects; correct?
24    A. Correct.
25    Q. Okay.

138

1    A. The testosterone spike.
2    Q. Okay. Okay. I want to turn, now, to what
3 would be Exhibit 3, the binder 3 for you, exhibit
4 binder 3, which is your responsive report. I don't
5 remember if the binder is entitled "Responsive
6 Report" or "Rebuttal Report."
7    A. It's 21/09/17 response Shore response report
8 and exhibits.
9    Q. Yes. Do you have that report in front of
10 you, Dr. Shore?
11    A. I do.
12    Q. Okay. And this is the report containing
13 your opinions related to the validity of the '359,
14 '739, and '870 patents; correct?
15    A. Correct.
16    Q. Okay. And the first thing I want to turn to
17 is your opinions regarding the -- I guess we'll look
18 at the obviousness of the claims of the '359 and the
19 '739 patent. It's section -- it's roman numeral III
20 of your report. It begins on page 13 of Exhibit 3.
21 And it begins with a chart sort of pointing out the
22 language of the claims. I just want to make sure
23 we're in the same place.
24    A. Yes.
25    Q. Okay. Now, just to be clear, do you recall

139

1 that Dr. Yun provided a description of all of the
2 claim elements -- a comparison of the prior art to
3 all of the claim elements of claim 3 of the '359
4 patent and claims 3 and 16 of the '739 patent;
5 correct?
6    A. Yes.
7    Q. And you have identified that you believe
8 there are two claim limitations that are not present
9 in the Doehn reference; correct?
10    A. Yes.
11    Q. And those two limitations are the
12 identifying -- or the -- I'm sorry -- the "decreased
13 likelihood" claim limitation led to the undesirable
14 side effects; correct?
15    A. Correct.
16    Q. And then the second is the two subcutaneous
17 injections of the initiation dose; correct?
18    A. Yes.
19    Q. Okay. So, first, I want to talk about the
20 undesirable side effect limitation. Is that okay,
21 Dr. Shore?
22    A. Yes.
23    Q. Okay. Now, your opinion is that the phrase
24 "undesirable side effects" refers only to the
25 musculoskeletal, connective tissue, renal and

140

1 urinary disorders, and the reproductive system and
2 breast disorders, and cardiac disorders; correct?
3    A. Yes.
4    Q. And that the phrase "undesirable side
5 effects" does not refer to the testosterone spike
6 side effects; correct?
7    A. Correct.
8    Q. Okay. Would you agree with the statement
9 that the phrase "undesirable side effect" refers to
10 adverse events experienced by a subject when
11 administered degarelix?
12    A. It's not accurate, so I guess I couldn't
13 agree with that.
14    Q. Now, Dr. Shore, you recall that you
15 were involved in the claim construction proceedings
16 for these same patents; correct?
17    A. Yes.
18    Q. Okay. And you recall that you submitted a
19 declaration regarding the meaning of the term of the
20 phrase "The treated subject has a decreased
21 likelihood of developing or experiencing an
22 undesirable side effect during the treatment
23 compared to treatment with the
24 gonadotropin-releasing hormone (GnRH) agonist
25 leuprolide."

**PROPOSED PRETRIAL ORDER**

**EXHIBIT 20-B**

**OPPOSITION TO FRESENIUS'S MOTION _IN LIMINE_**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FERRING PHARMACEUTICALS INC.,<br>FERRING INTERNATIONAL CENTER,<br>S.A., FERRING B.V., and<br>POLYPEPTIDE LABORATORIES A/S<br><br>Plaintiffs,<br><br>v.<br><br>FRESENIUS KABI USA, LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)   C.A. No. 20-cv-431 (MN)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT'S CLAIM CONSTRUCTION

Joshua P. Davis
811 Main Street
Suite 3130
Houston, TX 77002

Kenneth Mueller
Independence Wharf
470 Atlantic Avenue, Suite 600
Boston, MA 02110

*Of Counsel*


Dated: December 8, 2021

WOMBLE BOND DICKINSON (US) LLP
Mary W. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
John B. Bourke (#6534)
1313 North Market Street, Suite 1200
Wilmington, DE 19801
(302) 252-4320

*Counsel for Plaintiffs*

1

Fresenius's motion *in limine* ("MIL") to exclude Plaintiffs' expert Dr. Neal Shore from providing his understanding of the plain and ordinary meaning of the term "undesirable side effect" as claimed in claim 3 of the '359 patent and claim 16 of the '739 patent should be denied. While Fresenius argued during claim construction that the term "the subject has a decreased likelihood of developing or experiencing an undesirable side effect during treatment compared to treatment with [the] gonadotrophin releasing hormone (GnRH) agonist leuprolide" ("Term No. 2") was indefinite (and did not provide an alternative construction) (D.I. 77 at §§ III.B.2, III.B.4), it now seeks to broadly read the term "undesirable side effect" in Term No. 2 to mean "any adverse event," relying on cherry-picked, out of context statements from Plaintiffs and Dr. Shore (MIL at 2).

Fresenius incorrectly characterizes this dispute as one where "on the eve of trial, Plaintiffs and Dr. Shore ask for a 'do over'" (*id.* at 3) and that, at trial, Dr. Shore is "going to change course, and make a new argument that contradicts not only his and Plaintiffs' position during claim construction, but the Court's actual construction" (*id.* at 2). Preliminarily, the Court did not construe the term "undesirable side effect"; instead the Court gave Term No. 2 its plain and ordinary meaning. (D.I. 141 at 2.) Dr. Shore's opinion are not contrary to the Court's "actual construction." Instead, at trial Dr. Shore will provide his understanding of the plain and ordinary meaning of Term No. 2 (including the term "undesirable side effects" within Term No. 2) when read in light of the specification consistent with the opinions he has provided both during claim construction and expert discovery.

Despite Fresenius's arguments to the contrary, Plaintiffs and Dr. Shore repeatedly made clear both during claim construction and expert discovery that the plain and ordinary meaning of the terms "other GnRH side effects" ('359 patent, claim 1; '739 patent, claim 14) and

"undesirable side effect[s]" ('359 patent, claim 3; '739 patent, claim 16) read in the context of the claims as a whole and in light of the specification refers to the comparative adverse events described in the specification that demonstrated a reduced incidence of occurrence with treatment with degarelix compared to treatment with leuprolide—specifically, musculoskeletal and connective tissue disorders such as arthralgia, renal and urinary disorders, reproductive system and breast disorders, and cardiac disorders. (*See, e.g.*, D.I. 79 at ¶¶ 33-35, 43; *see* Ex. 1 at 58-63; Ex. 2 at ¶ 100; Ex. 3 at ¶¶ 27-34; Ex. 4 at ¶ 41-54, 99-115; Ex. 5 at ¶¶ 22-23.) This is not a new argument, and it is disingenuous for Fresenius to characterize it as an issue that only came to light during the deposition of Dr. Shore.

Further, by relying on plucked statements made during claim construction that are divorced from the entirety of the claim construction record, Fresenius is attempting to force a construction of the term "undesirable side effects" that it knows is nonsensical in the context of the invention described and claimed. In the context of the claims as a whole (*i.e.*, in the context of the phrase "the subject has a decreased likelihood of developing or experiencing an undesirable side effect during treatment compared to treatment with [the] gonadotrophin releasing hormone (GnRH) agonist leuprolide"), the term "undesirable side effect" cannot simply mean "any adverse event." Such a broad reading is divorced from the claim and the specification and would encompass adverse events where there was an *increased* incidence of occurrence with treatment with degarelix compared to leuprolide. Fresenius and Fresenius's expert Dr. Edward Yun have both agreed this cannot be correct. For instance, at the *Markman* hearing, Fresenius's counsel argued that "we know that 'undesirable side effect' does not mean all side effects." (Ex. 1 at 57:25-58:1.) Similarly, Fresenius's expert Dr. Edward Yun admitted at his deposition that

the claimed "undesirable side effect[s]" does not include side effects that had a higher incidence

for degarelix relative to leuprolide:

> Q [Y]ou understand that the claims -- they're claiming the reduced likelihood of having the undesirable side effect of the GnRH agonist when you administered degarelix; right?
>
> A Yes, I believe so.
>
> Q So those that had a higher incidence for degarelix relative to leuprolide would not be the ones that the patentee is claiming; right?
>
> A Well, that -- that does make sense to me.

(Ex. 6 at 43:9-17.)

The real issue here is not one of surprise or preclusion—Plaintiffs' position has been

consistent throughout claim construction and fact and expert discovery. Instead the parties have a

fundamental dispute over the plain and ordinary meaning of the term "undesirable side effect."

Despite arguing that "undesirable side effect" is indefinite, for purposes of its obviousness

argument, Fresenius's position is that the term means "any adverse event" and includes the

testosterone spike side effects. (Ex. 7 at ¶¶ 12-20; Ex. 6 at 25:7-18.) Prior to the parties' pretrial

exchanges, Plaintiffs raised this dispute with Fresenius and suggested that the parties alert the

Court that there was a potential claim construction issue over the "undesirable side effect" term

in the pretrial order. Fresenius refused and instead filed the present motion. Fresenius's motion

should be denied, and instead expert testimony should be presented at trial as to a POSA's

understanding of the term "undesirable side effect" in light of the teachings of the specification.

Alternatively, should the Court determine it is necessary, it may resolve the dispute prior to trial.

*See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.,* 521 F.3d 1351, 1362 (Fed. Cir.

2008).

Dated: December 8, 2021                    Respectfully submitted,

Of Counsel:                                /s/ Mary W. Bourke
                                           Mary W. Bourke (#2356)
Joshua P. Davis                            Dana K. Severance (#4869)
811 Main Street                            Daniel M. Attaway (#5130)
Suite 3130                                 John B. Bourke (#6534)
Houston, TX 77002                          WOMBLE BOND DICKINSON (US) LLP
                                           1313 North Market Street, Suite 1200
Kenneth Mueller                            Wilmington, DE 19801
Independence Wharf                         Telephone: (302) 252-4320
470 Atlantic Avenue, Suite 600             Mary.Bourke@wbd-us.com
Boston, MA 02110                           Dana.Severance@wbd-us.com
                                           Daniel.Attaway@wbd-us.com
                                           Ben.Bourke@wbd-us.com

                                           Counsel for Plaintiffs

# EXHIBIT 1

1

13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

FERRING PHARMACEUTICALS, INC., )
et al., )
                                )
            Plaintiffs, )
                                ) C.A. No. 20-431(MN)
v.                              )
                                )
FRESENIUS KABI USA, LLC, )
et al., )
                                )
            Defendants. )

                Wednesday, May 5, 2021
                10:00 a.m.
                Markman Hearing (Remote)

                844 King Street
                Wilmington, Delaware

BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge

APPEARANCES:

        WOMBLE BOND DICKINSON
        BY:  MARY W. BOURKE, ESQ.
        BY:  DANA K. SEVERANCE, ESQ.
        BY:  BEN BOURKE, ESQ.

                Counsel for the Plaintiffs

---

2

1   APPEARANCES CONTINUED:

2

3        FARNAN LLP
         BY:  MICHAEL J. FARNAN, ESQ.

4           -and-

5        SCHIFF HARDIN LLP
6        BY:  IMRON T. ALY, ESQ.
         BY:  JOHN K. HSU, ESQ.
7        BY:  JOEL M. WALLACE, ESQ.
         BY:  THOMAS A. RAMMER, II, ESQ.

8                Counsel for the Defendants

9

10       – – – – – – – – – –
09:49:43  11
09:58:16  12       THE COURT:  Good morning, counsel.  Who is
09:58:21  13   there, please?
10:00:57  14       MS. BOURKE:  Good morning, Your Honor.  This is
10:01:00  15   Mary Bourke from Womble, Bond & Dickinson representing the
10:01:05  16   Ferring plaintiffs.  And with me I have Dana Severance and
10:01:09  17   Ben Bourke.
10:01:10  18       THE COURT:  All right.  Good morning to all of
10:01:12  19   you.
10:01:13  20       MR. FARNAN:  Good morning, Your Honor.  It's
10:01:14  21   Michael Farnan for the defendant.  With me are Imron Aly,
10:01:18  22   John Hsu, Joel Wallace and Tom Rammer from Schiff Hardin.
10:01:23  23       THE COURT:  All right.  Good morning to all of
10:01:25  24   you as well.  So we're here -- anyone else?
10:01:41  25       We're here for the argument on claim

---

3

10:01:43   1   construction.  We're doing this by Zoom.  That presents a
10:01:46   2   few challenges, but I'm sure we can make it work.  I have
10:01:49   3   the patents in front of me as well as the briefs and
10:01:51   4   appendix and declarations.  I also have the slides submitted
10:01:55   5   and I ask that you identify a slide by number when you refer
10:01:59   6   to them.  I know that you may show them to me on the screen,
10:02:02   7   but it's also helpful for the record if you make clear what
10:02:05   8   we're looking at.  With the patents or the brief or anything
10:02:08   9   else that you refer me to that's not in the slide, just give
10:02:11  10   me a minute or two to get to the correct page so I can
10:02:14  11   follow your arguments.
10:02:16  12       I am on the phone and there is often a delay
10:02:19  13   when I start to ask a question such that the person talking
10:02:22  14   doesn't hear me and keeps talking.  So I'll just ask that
10:02:26  15   you take a breath or pause every so often so that if I do
10:02:29  16   have a question, I can jump in and ask.
10:02:32  17       And finally, I will remind everyone on the phone
10:02:34  18   that recording or broadcasting these proceedings is
10:02:37  19   prohibited.  Anything else before we begin?
10:02:42  20       So I would like to go term by term in the order
10:02:45  21   that we previously asked to have the terms presented.  So
10:02:50  22   let me hear first from the plaintiff.  And the first term
10:02:57  23   that I want to hear on is term 8 in the original briefing.
10:03:07  24   And I have to say, I don't understand why there is a dispute
10:03:11  25   here.  So I need you to explain that to me.  I understand

---

4

10:03:15   1   some of the confusion issues if we're talking about a jury
10:03:18   2   issue, but I don't understand what the problem is and why we
10:03:21   3   can't get an agreement.  So let's start with that.
10:03:28   4       MS. BOURKE:  Your Honor, certainly, Your Honor.
10:03:30   5   Mary Bourke on behalf of the plaintiffs.  Your Honor is
10:03:32   6   correct, there is no dispute as to the meaning or scope of
10:03:36   7   the claim term at issue here.  The parties agree that the
10:03:45   8   use of the term *comprising* is an open-ended term.  And if
10:03:50   9   you have our slides in front of you, I am referring to slide
10:03:55  10   3 of our presentation.
10:04:00  11       THE COURT:  Okay.
10:04:01  12       MS. BOURKE:  That sets forth that both parties
10:04:09  13   agree that *comprising* is a commonly used term in patent
10:04:13  14   claims and it generally means that the claimed method can
10:04:15  15   include additional steps.  So if you turn to slide 1 of our
10:04:20  16   presentation --
10:04:17  17       THE COURT:  But you're not answering the
10:04:22  18   question.  I want to know why we're wasting time dealing
10:04:29  19   with this issue.  I mean, it seems like everyone agrees that
10:04:30  20   there is no exclusion of further modification.  It seems
10:04:35  21   like plaintiff just says plain and ordinary meaning.  I
10:04:40  22   guess that just means the words of the claim term.  Usually
10:04:44  23   I say tell me what it is if there is a dispute, but I'm
10:04:44  24   going to go with just the word.  But, I mean you don't
10:04:51  25   disagree that it doesn't exclude further modification, so

57

| 11:29:10 | 1 | effect that doesn't have any clarity at all, it is one of |
| 11:29:13 | 2 | those subjective terms that makes the claim pretty much |
| 11:29:16 | 3 | automatically indefinite because they're not defined and we |
| 11:29:20 | 4 | don't know what they are.  And Dr. Shore's expert |
| 11:29:23 | 5 | declaration tries to say side effects are always |
| 11:29:26 | 6 | undesirable, so undesirable side effect just means side |
| 11:29:29 | 7 | effect. |
| 11:29:30 | 8 | A couple of problems with that.  One, the patent |
| 11:29:32 | 9 | specification doesn't have that distinction or grouping.  In |
| 11:29:35 | 10 | fact, it talks separately about undesirable side effect is a |
| 11:29:39 | 11 | general category of things that could be included.  And |
| 11:29:42 | 12 | second, it really is making that word meaningless and we are |
| 11:29:45 | 13 | not supposed to have words in the claims that are |
| 11:29:48 | 14 | meaningless or superfluous as the case law calls them. |
| 11:29:54 | 15 | Slide 54, as we wrap up, Your Honor, is |
| 11:29:57 | 16 | explaining the distinction or lack thereof between the |
| 11:29:59 | 17 | different groups of side effects, whether they're |
| 11:30:02 | 18 | undesirable or not undesirable.  They're basically all the |
| 11:30:05 | 19 | side effects and there is not a separate subset.  When I was |
| 11:30:09 | 20 | mentioning the side effects that there is use of the word |
| 11:30:12 | 21 | *undesirable*, that's shown on the top box here on slide 54, |
| 11:30:16 | 22 | specification from column 3, we're looking at the bottom, |
| 11:30:19 | 23 | undesirable side effect associated with androgen deprivation |
| 11:30:25 | 24 | therapy such as a cardiac disorder, arthralgia and/or |
| 11:30:31 | 25 | urinary tract infection.  Here we know that undesirable side |

58

| 11:30:35 | 1 | effect does not mean all side effects because it also just |
| 11:30:38 | 2 | said that, but we also note that it doesn't just mean these |
| 11:30:41 | 3 | three because those are the such as, so it's not clear what |
| 11:30:44 | 4 | the claims cover and don't.  That's a specification issue. |
| 11:30:48 | 5 | It's not going to change and the claim terms don't explain |
| 11:30:51 | 6 | or define what that term is. |
| 11:30:52 | 7 | So for these reasons, Your Honor, we believe the |
| 11:30:55 | 8 | term is indefinite and, therefore, should be found |
| 11:30:58 | 9 | indefinite now as to claims found in claim 1, 2 and 9. |
| 11:31:06 | 10 | THE COURT:  All right.  Thank you. |
| 11:31:09 | 11 | MS. BOURKE:  Your Honor, I would just start off |
| 11:31:12 | 12 | with the proposition that again, we have competing expert |
| 11:31:19 | 13 | declarations on this issue, neither of which have been |
| 11:31:23 | 14 | subject to cross-examination. |
| 11:31:26 | 15 | To start with -- perhaps the best way to do this |
| 11:31:31 | 16 | is to sort of explain what is in the specification and to |
| 11:31:37 | 17 | clarify certain things that Mr. Aly stated. |
| 11:31:42 | 18 | Number one, with the terms 3 and 4, those came |
| 11:31:45 | 19 | from the cardiovascular, what we term the cardiovascular |
| 11:31:51 | 20 | event patents.  And the data supporting those claims came |
| 11:31:57 | 21 | from example 2 which was the meta analysis that I pointed |
| 11:32:03 | 22 | out before. |
| 11:32:04 | 23 | These claims come from what we have termed the |
| 11:32:09 | 24 | testosterone spike patents, and they have the same |
| 11:32:12 | 25 | specification but the data comes from example 1.  Example 1 |

59

| 11:32:17 | 1 | -- |
| 11:32:17 | 2 | THE COURT:  But give me some responses to the -- |
| 11:32:22 | 3 | I mean, I understood your argument better on the other |
| 11:32:25 | 4 | terms.  These terms, you know, other side effects or just |
| 11:32:31 | 5 | generally reduce the likelihood of developing or |
| 11:32:43 | 6 | experiencing undesirable side effects, these terms are more |
| 11:32:46 | 7 | difficult for me.  Respond to the arguments that we have. |
| 11:32:49 | 8 | What are we talking about here as the other gonadotropin |
| 11:33:00 | 9 | releasing hormone side effect and where is that supported, |
| 11:33:04 | 10 | and the decreased likelihood of developing an undesirable |
| 11:33:07 | 11 | side effect, how in the world do you know that?  If it |
| 11:33:11 | 12 | increases the probability of death but it decreases the |
| 11:33:14 | 13 | probability of getting chills, is that okay?  I mean, I just |
| 11:33:21 | 14 | don't -- how is it that these meet the definiteness |
| 11:33:28 | 15 | requirement? |
| 11:33:36 | 16 | MS. BOURKE:  The undesirable side effects are |
| 11:33:40 | 17 | the ones described in table 6 and 7.  That is the adverse |
| 11:33:43 | 18 | events that were discerned for the first time -- |
| 11:33:45 | 19 | THE COURT:  Let's put those up so we can see |
| 11:33:48 | 20 | what we're talking about. |
| 11:33:51 | 21 | MS. BOURKE:  So if we could have slide 36.  36, |
| 11:33:56 | 22 | please.  Here is Table 6. |
| 11:34:00 | 23 | THE COURT:  So you identify, you highlight some |
| 11:34:04 | 24 | here in yellow.  What about all the other ones?  Are they |
| 11:34:08 | 25 | all adverse side effects? |

60

| 11:34:11 | 1 | MS. BOURKE:  They're adverse events but there is |
| 11:34:14 | 2 | not a distinction between the agonist and the antagonist in |
| 11:34:18 | 3 | those.  What the specification which is on the left-hand |
| 11:34:22 | 4 | column of the page describes that while a lot of the adverse |
| 11:34:27 | 5 | -- |
| 11:34:27 | 6 | THE COURT:  Wait a second.  So you're saying |
| 11:34:29 | 7 | that general disorders and administration site conditions. |
| 11:34:37 | 8 | MS. BOURKE:  Correct. |
| 11:34:37 | 9 | THE COURT:  Where there is a much larger number |
| 11:34:40 | 10 | for degarelix than for the other compound, that's not a |
| 11:34:46 | 11 | difference, or that's just not a difference that is useful |
| 11:34:49 | 12 | to you? |
| 11:34:50 | 13 | MS. BOURKE:  No, that's not an undesirable side |
| 11:34:53 | 14 | effect associated with the agonist treatment because as you |
| 11:34:58 | 15 | point out, it is the -- it is greater with degarelix than |
| 11:35:03 | 16 | with the agonist.  And that's not surprising because |
| 11:35:07 | 17 | degarelix is administered by two subcutaneous injections |
| 11:35:12 | 18 | initially versus localized that is administered with one |
| 11:35:17 | 19 | intermuscular depo injection, so that was not unexpected. |
| 11:35:22 | 20 | What was unexpected and what were the unexpected results |
| 11:35:25 | 21 | from this clinical trial was that they saw a distinction in |
| 11:35:30 | 22 | the highlighted ones and the ones that are pointed out in |
| 11:35:33 | 23 | the specification.  The specification calls them out, the |
| 11:35:37 | 24 | cardiovascular disorders, the musculoskeletal and connective |
| 11:35:41 | 25 | tissue disorders, and the renal and urinary disorders, that |

61

| | |
|---|---|
| 11:35:45 1 | was an unexpected finding in this trial. |
| 11:35:47 2 | Remember, this trial was the first ever |
| 11:35:50 3 | comparator trial between a GNRH antagonist and a GNRH |
| 11:35:59 4 | agonist. What the intent was was to show that the primary |
| 11:36:03 5 | objective, which is set forth in the specification, was to |
| 11:36:07 6 | look at the testosterone spike undesirable effect that you |
| 11:36:11 7 | see with the agonist. Then they look at other adverse |
| 11:36:17 8 | events. And these are what are described in Table 6 and in |
| 11:36:23 9 | Table 7. If you go further to slide 37, it takes the data |
| 11:36:30 10 | and defines it more specifically in terms of the specific |
| 11:36:36 11 | symptoms like urinary tract infections and arthralgia. |
| 11:36:43 12 | Those are what are claimed in the '870 Patent very |
| 11:36:48 13 | specifically. The arthralgia is in one of the dependent |
| 11:36:52 14 | claims and the musculoskeletal connective tissue disorders |
| 11:36:57 15 | in broader categories are in the independent claim. |
| 11:37:00 16 | What was surprising out of this trial was that |
| 11:37:02 17 | there was a distinction between the agonists and the |
| 11:37:05 18 | antagonists and these side effects, and these adverse events |
| 11:37:11 19 | which Dr. Shore has said he understands an undesirable side |
| 11:37:15 20 | effect to be an adverse event which is what is measured in |
| 11:37:21 21 | the clinical trial. That is what is claimed. |
| 11:37:32 22 | So going back to some of the other arguments |
| 11:37:35 23 | that -- and the specification is clear and we have that on |
| 11:37:40 24 | page 37 as well, it particularly points out what were the |
| 11:37:48 25 | surprising undesirable side effects that were ascertained as |

62

| | |
|---|---|
| 11:37:53 1 | a result of this clinical trial. |
| 11:37:57 2 | In terms of the reduced likelihood, that is |
| 11:38:00 3 | language that is commonly used I think also in the clinical |
| 11:38:05 4 | field. That's what Dr. Shore says. That is not surprising. |
| 11:38:14 5 | And some of the other arguments are common as between what |
| 11:38:19 6 | we looked at before. |
| 11:38:25 7 | I want to make sure I have hit all of their |
| 11:38:27 8 | arguments. So as I said, the two reasons they gave was the |
| 11:38:44 9 | other GNRH agonist side effect and undesirable side effect, |
| 11:38:49 10 | I pointed out what those are. I pointed out the places in |
| 11:38:51 11 | the specification where those are described. Dr. Shore put |
| 11:38:56 12 | in his declaration it was easy for him to discern which were |
| 11:39:01 13 | these undesirable side effects based on the teaching in the |
| 11:39:05 14 | specification from both the language and the tables. And in |
| 11:39:12 15 | terms of, in a subject with a reduced likelihood, I would |
| 11:39:16 16 | just say that is similar, the arguments are similar to what |
| 11:39:20 17 | we saw with terms 3 and 4. |
| 11:39:23 18 | THE COURT: All right. Anything further, |
| 11:39:25 19 | Mr. Aly? |
| 11:39:27 20 | MR. ALY: Yes, Your Honor. Thank you. I would |
| 11:39:30 21 | simply say that what I heard from counsel confirms to us the |
| 11:39:33 22 | problem which is there are individual side effects like the |
| 11:39:37 23 | example of musculoskeletal disorders that counsel mentioned |
| 11:39:42 24 | that they could have and did, in fact, claim. The issue |
| 11:39:45 25 | here is different. It's not for any individual side effect, |

63

| | |
|---|---|
| 11:39:48 1 | the indefiniteness is to the group of other GNRH side |
| 11:39:53 2 | effects and that is where there is confusion and no |
| 11:39:56 3 | definition and not even Dr. Shore said here is the list. |
| 11:39:59 4 | Even if we look to the specification and cherry picked |
| 11:40:02 5 | individual side effects, we still don't know that that's the |
| 11:40:05 6 | list because that would be one subset of something in a |
| 11:40:08 7 | table and not all other GNRH side effects. So that's what |
| 11:40:13 8 | makes the claim indefinite, Your Honor. |
| 11:40:15 9 | As to undesirable, finally, that's really a |
| 11:40:18 10 | broad automatic issue. There is nothing they have done to |
| 11:40:22 11 | fix that except to say all side effects are undesirable |
| 11:40:25 12 | which again, Your Honor, I point out in the specification |
| 11:40:28 13 | they made a distinction between side effects which are side |
| 11:40:32 14 | effects undesirable, and you saw the table that didn't make |
| 11:40:35 15 | any distinction at all. |
| 11:40:37 16 | THE COURT: Thank you. That's the end of the |
| 11:40:40 17 | terms that we have: is that right? |
| 11:40:43 18 | MS. BOURKE: Correct, Your Honor. |
| 11:40:45 19 | MR. ALY: Yes, Your Honor. |
| 11:40:45 20 | THE COURT: All right. So I want to take a |
| 11:40:49 21 | break for a little while and figure out which of the terms I |
| 11:40:53 22 | can rule on today. So let's take a break and come back at |
| 11:41:03 23 | 1 o'clock and I'll give you the ruling on whatever terms I |
| 11:41:07 24 | can at that time. All right. |
| 11:41:11 25 | (A brief recess was taken.) |

64

| | |
|---|---|
| 12:55:28 1 | THE COURT: All right. Thank you for the |
| 13:01:49 2 | arguments today. At issue we have eight patents, in four |
| 13:01:53 3 | families, and nine disputed claim terms. |
| 13:01:55 4 | I am prepared to rule on eight of the disputes. |
| 13:01:58 5 | I will not be issuing a written opinion, but I will issue an |
| 13:02:01 6 | order stating my rulings. I want to emphasize before I |
| 13:02:05 7 | announce my decisions that although I am not issuing a |
| 13:02:07 8 | written opinion, we have followed a full and thorough |
| 13:02:10 9 | process before making the decisions I am about to state. I |
| 13:02:14 10 | have reviewed the patents in dispute. I have also reviewed |
| 13:02:16 11 | the portions of the prosecution history, the European |
| 13:02:20 12 | proceedings, the invalidity contentions, and the responses |
| 13:02:22 13 | to interrogatories, all of which were included in the joint |
| 13:02:26 14 | appendix, as well as the declarations of Dr. Neal Shore and |
| 13:02:30 15 | Dr. J. Bruce Robertson. There was briefing on each of the |
| 13:02:33 16 | disputed terms. There were tutorials submitted by the |
| 13:02:37 17 | parties. And there has been argument here today. All of |
| 13:02:39 18 | that has been carefully considered. |
| 13:02:42 19 | I am not going to read into the record my |
| 13:02:47 20 | understanding of claim construction law and indefiniteness |
| 13:02:50 21 | generally. I have a legal standard section that I have |
| 13:02:54 22 | included in earlier opinions, including recently in *Gentex* |
| 13:03:02 23 | *Corp. v. Galvion Ltd.*, C.A. No. 19-921. I incorporate that |
| 13:03:04 24 | law and adopt it into my ruling today and will also set it |
| 13:03:08 25 | out in the order that I issue. |

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| FERRING PHARMACEUTICALS INC., FERRING INTERNATIONAL CENTER S.A., FERRING B.V., and POLYPEPTIDE LABORATORIES A/S | ) ) ) ) ) |
| Plaintiffs, | ) C.A. No. 20-cv-431 (MN) ) |
| v. | ) **CONFIDENTIAL—** ) **SUBJECT TO PROTECTIVE ORDER** ) |
| FRESENIUS KABI USA, LLC, | ) ) |
| Defendant. | ) |

**OPENING EXPERT REPORT OF NEAL D. SHORE, M.D., FACS REGARDING INFRINGEMENT OF U.S. PATENT NOS. 9,579,359, 10,729,739, AND 10,973,870**

patient's prostate cancer with a reduced likelihood of causing a testosterone spike or other GnRH agonist side effect.

96.     Accordingly, in my opinion, a physician administering Fresenius's ANDA product in accordance with Fresenius's proposed package insert will meet this limitation.

### B.     A physician or other healthcare provider will directly infringe asserted claim 3 of the '359 patent

97.     Asserted claim 3 of the '359 patent claims, "The method of claim 1, wherein the treated subject has a decreased likelihood of developing or experiencing an undesirable side effect during treatment compared to treatment with the gonadotrophin releasing hormone (GnRH) agonist leuprolide." (**Ex. C ['359 patent]** at claim 3.) In my opinion, a physician administering Fresenius's ANDA product in accordance with Fresenius's proposed package insert will perform all the steps of the method described above.

#### 1.     Limitation 3a: "The method of claim 1,"

98.     As discussed in Section VII.A, above, a physician administering Fresenius's ANDA product in accordance with Fresenius's proposed package insert will infringe each and every limitation of claim 1 of the '359 patent.

#### 2.     Limitation 3b: "wherein the treated subject has a decreased likelihood of developing or experiencing an undesirable side effect during treatment compared to treatment with the gonadotrophin releasing hormone (GnRH) agonist leuprolide."

99.     In my opinion, a physician reading the side effect patents, including Tables 6, 7, 11, 16, and 17, would understand that the term "wherein the treated subject has a decreased likelihood of developing or experiencing an undesirable side effect during treatment compared to treatment with the gonadotrophin releasing hormone (GnRH) agonist leuprolide" in claim 3 of the '359 patent to mean that a subject with prostate cancer, who is administered degarelix according to the claimed dosing schedule, will have a decreased likelihood of experiencing an

undesirable side effect (in other words, an adverse event) during treatment compared to treatment with leuprolide.

100.    When I read the common specification, it is very clear to me from the descriptions, specifically at column 27, line 64 to column 28, line 49 and Table 11, that "undesirable side effect[s]" include musculoskeletal and connective tissue disorders, urinary tract infections, reproductive system and breast disorders, and cardiac disorders. These side effects are oftentimes very debilitating. Decreasing the likelihood for musculoskeletal and connective tissue disorders, urinary tract infections, reproductive system and breast disorders, and cardiac disorders are especially impactful regarding patient quality of life and oftentimes patient survival.

101.    Fresenius's proposed package insert provides that, in Ferring's CS21 clinical trial, the subjects treated with 240/80 mg degarelix had a decreased likelihood of developing or experiencing an undesirable side effect during treatment compared to treatment with the GnRH agonist leuprolide. (**Ex. G [Fresenius package insert]** at FKDEG009917-FKDEG009918 (§ 14 Clinical Studies).)

102.    Table 2 demonstrates that a subject treated with degarelix has a decreased likelihood of developing or experiencing an undesirable side effect, such as arthralgia or urinary tract infection:

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FERRING PHARMACEUTICALS INC., FERRING INTERNATIONAL CENTER S.A., FERRING B.V., and POLYPEPTIDE LABORATORIES A/S )))))) | |
| Plaintiffs, )) | C.A. No. 20-cv-431 (MN) |
| v. )))) | **CONFIDENTIAL— SUBJECT TO PROTECTIVE ORDER** |
| FRESENIUS KABI USA, LLC, )) | |
| Defendant. )) | |

**OPENING EXPERT REPORT OF NEAL D. SHORE, M.D., FACS
REGARDING  OBJECTIVE EVIDENCE OF NON-OBVIOUSNESS
OF U.S. PATENT NOS. 9,579,359, 10,729,739, AND 10,973,870**

26.     Degarelix was able to overcome many of the problems that occurred with the development of other antagonists described above. Degarelix was developed to have a slow release from its subcutaneous depot resulting in the desired long duration of action. This was not just a result of the uniqueness of the molecule itself but also due to the unique dosing regimen. Dosing, volume, and concentration all played a role and this was all maintained as proprietary information to Ferring. Degarelix is administered at an initial dose of 240 mg given as two simultaneous subcutaneous injections of 120 mg at a concentration of 40 mg/mL and monthly maintenance doses of 80 mg at a concentration of 20 mg/mL. The subcutaneous injections allow degarelix to form a gel depot that facilitates sustained release of the drug. This dosage regimen provides the prolonged suppression of LH and testosterone, which, in comparative studies, displayed a longer duration of action than other GnRH antagonists. (**Ex. 11 [Broqua 2002]** at FKEDEG011709- FKEDEG011710.)

27.     As set forth in my background and experience, I was a principal investigator for one of the 21 sites for the pivotal Phase III CS21 trial which demonstrated the superior efficacy and safety of degarelix compared to leuprolide.  This is described in detail in the '359 specification at column 16, line 4 to column 45, line 44 ("Clinical Study of Degarelix for the Treatment of Prostate Cancer").) The results showed degarelix, delivered at the 240/80 mg dosing regimen, produced a rapid and effective suppression in testosterone levels, which remained low throughout the 364-day treatment period. (**Ex. 3 ['359 patent]** at 23:20-23, Figure 2.) And, further, degarelix suppressed testosterone significantly faster than leuprolide. As shown in Figure 3 (reproduced below), at day 3, castrate testosterone ($\leq$0.5 ng/ml) was reached by around 96% of patients in the degarelix 240/160 and 240/80 mg groups; in contrast, no patients on leuprolide had achieved castrate levels:



(**Ex. 3 ['359 patent]** at 23:47-62, Figure 3; *see also* **Ex. 3 ['359 patent]** at 8:4-7 ("FIG. 3 is a graphical representation comparing the effect of degarelix 240 mg/80 mg dosing with the effect of Lupron [leuprolide] 7.5 mg dosing on the percentage change in plasma testosterone from day 0 to day 28 of treatment."); **Ex. 12 [Klotz 2008]** at FERDEG01278819.) Moreover, as we reported in the peer-reviewed article Klotz 2008, 80% of patients receiving leuprolide experienced a testosterone surge (increase from baseline of ≥15% on any 2 days in the initial 2 weeks of therapy) versus none in the degarelix groups. (**Ex. 3 ['359 patent]** at Fig. 3.) Specifically, we reported in Klotz 2008 that degarelix's "immediate onset of action achieves a more rapid suppression of testosterone and PSA than leuprolide," allowing for "no need for antiandrogen supplements to prevent the possibility of clinical 'flare.'" (**Ex. 12 [Klotz 2008]** at FERDEG01278818 (Abstract).)

28.     The invention claimed in the side effect patents stems from a retrospective analysis of the CS21 clinical trial results. While the overall occurrence of adverse events was

similar in the two degarelix treatment groups and the leuprolide control group, a large majority of such events for the degarelix treatment groups were mere injection site reactions related to the subcutaneous/depot delivery system employed for degarelix. This was expected. (**Ex. 3 ['359 patent]** at 26:46-53.) However, a further detailed statistical analysis was performed in order to characterize the types of adverse events, other than injection site reactions, that must be occurring in the leuprolide treatment group to account for the overall similar adverse event occurrence rates. (**Ex. 3 ['359 patent]** at 26:56-62.)

29.     In examining the adverse events associated with degarelix treatment as compared to leuprolide, several areas of increased risk for leuprolide as compared to degarelix emerged. For example, musculoskeletal and connective tissue disorders occurred in 26% of leuprolide patients, as compared to only 17% of degarelix patients overall (and even lower, 15% in the degarelix 240/80 mg treatment group). Furthermore, renal and urinary disorders occurred in 19% of leuprolide patients, but only 13% of degarelix patients, while reproductive system and breast disorders occurred in 10% of leuprolide patients, but only 5% of degarelix patients. Furthermore, cardiac disorders occurred at a slightly increased overall frequency for leuprolide treatment (13%) than for degarelix (9% overall between the two treatment groups). (**Ex. 3 ['359 patent]** at 27:64-28:49.) This is shown in Table 6, reproduced below:

## TABLE 6

### Treatment-Emergent Adverse Events by System Organ Class

| MedDRA System Organ Class | Degarelix | | | Leuprolide |
|---|---|---|---|---|
| | 240/160 mg N (%) | 240/80 mg N (%) | Total N (%) | 7.5 mg N (%) |
| ITT analysis set | 202 (100%) | 207 (100%) | 409 (100%) | 201 (100%) |
| Treatment-emergent adverse events | 167 (83%) | 163 (79%) | 330 (81%) | 156 (78%) |
| BLOOD & LYMPHATIC SYSTEM DISORDERS | 11 (5%) | 5 (2%) | 16 (4%) | 12 (6%) |
| CARDIAC DISORDERS | 19 (9%) | 17 (8%) | 36 (9%) | 27 (13%) |
| CONGENITAL, FAMILIAL & GENETIC DISORDERS | | | | 1 (<1%) |
| EAR & LABYRINTH DISORDERS | 3 (1%) | 6 (3%) | 9 (2%) | 3 (1%) |
| ENDOCRINE DISORDERS | 2 (<1%) | | 2 (<1%) | 3 (1%) |
| EYE DISORDERS | 4 (2%) | 6 (3%) | 10 (2%) | 5 (2%) |
| GASTROINTESTINAL DISORDERS | 33 (16%) | 38 (18%) | 71 (17%) | 39 (19%) |
| GENERAL DISORDERS & ADMINISTRATION SITE CONDITIONS | 102 (50%) | 92 (44%) | 194 (47%) | 36 (18%) |
| HEPATOBILIARY DISORDERS | 2 (<1%) | 2 (<1%) | 4 (<1%) | 3 (1%) |
| IMMUNE SYSTEM DISORDERS | 1 (<1%) | 1 (<1%) | 2 (<1%) | |
| INFECTIONS & INFESTATIONS | 38 (19%) | 45 (22%) | 83 (20%) | 49 (24%) |
| INJURY, POISONING & PROCEDURAL COMPLICATIONS | 11 (5%) | 10 (5%) | 21 (5%) | 17 (8%) |
| INVESTIGATIONS | 58 (29%) | 54 (26%) | 112 (27%) | 62 (31%) |
| METABOLISM & NUTRITION DISORDERS | 26 (13%) | 14 (7%) | 40 (10%) | 15 (7%) |
| MUSCULOSKELETAL & CONNECTIVE TISSUE DISORDERS | 37 (18%) | 31 (15%) | 68 (17%) | 53 (26%) |
| NEOPLASMS BENIGN, MALIGNANT & UNSPECIFIED (INCL CYSTS AND POLYPS) | 12 (6%) | 10 (5%) | 22 (5%) | 16 (8%) |
| NERVOUS SYSTEM DISORDERS | 27 (13%) | 24 (12%) | 51 (12%) | 23 (11%) |
| PSYCHIATRIC DISORDERS | 16 (8%) | 16 (8%) | 32 (8%) | 21 (10%) |
| RENAL & URINARY DISORDERS | 26 (13%) | 28 (14%) | 54 (13%) | 39 (19%) |
| REPRODUCTIVE SYSTEM & BREAST DISORDERS | 13 (6%) | 9 (4%) | 22 (5%) | 21 (10%) |
| RESPIRATORY, THORACIC & MEDIASTINAL DISORDERS | 17 (8%) | 25 (12%) | 42 (10%) | 18 (9%) |
| SKIN & SUBCUTANEOUS TISSUE DISORDERS | 21 (10%) | 18 (9%) | 39 (10%) | 10 (5%) |
| SURGICAL & MEDICAL PROCEDURES | 2 (<1%) | | 2 (<1%) | |
| VASCULAR DISORDERS | 65 (32%) | 71 (34%) | 136 (33%) | 60 (30%) |

N = number of patients with adverse events
% = percentage of patients with adverse events

(**Ex. 3 ['359 patent]** at 27:1-28 (Table 6).)

30.     Based on these findings a further statistical analysis was performed to determine whether any of the advantages in diminished side effects of degarelix over leuprolide were particularly pronounced in certain patient subgroups. These results are set out in Tables 11 to 19. For example, Table 11 presents notably statistically significant findings in the total trial population:

# TABLE 11

Crude Incidence of Treatment-Emergent Adverse Events by MedDRA System Organ Class and Preferred Term

| | One-Month Controlled | |
|---|---|---|
| MedDRA System Organ Class/Preferred Term | Degarelix N (%) | LUPRON DEPOT ® 7.5 mg N (%) |
| Exposed Subjects | 409 (100%) | 201 (100%) |
| Total No. of Subjects with Adverse Events | 330 (81%) | 156 (78%) |
| BLOOD AND LYMPHATIC SYSTEM DISORDERS | 16 (4%) | 12 (6%) |
| Myocardial ischaemia | 2 (<1%)* | 5 (2%)* |
| GENERAL DISORDERS AND ADMINISTRATION SITE CONDITIONS | | |
| Oedema peripheral | 8 (2%)* | 10 (5%)* |
| Chest pain | 2 (<1%)* | 6 (3%)* |
| INFECTIONS AND INFESTATIONS | | |
| Urinary tract infection | 13 (3%)** | 18 (9%)** |
| INVESTIGATIONS | 113 (28%) | 62 (31%) |
| Cardiac murmur | | 3 (1%)* |
| MUSCULOSKELETAL AND CONNECTIVE TISSUE DISORDERS | 68 (17%)** | 53 (26%)** |
| Arthralgia | 17 (4%)* | 18 (9%)* |
| Musculoskeletal stiffness | | 3 (1%)* |

| TABLE 11-continued | | |
| --- | --- | --- |
| Crude Incidence of Treatment-Emergent Adverse Events by MedDRA System Organ Class and Preferred Term | | |
| | One-Month Controlled | |
| MedDRA System Organ Class/Preferred Term | Degarelix N (%) | LUPRON DEPOT ® 7.5 mg N (%) |
| PSYCHIATRIC DISORDERS | | |
| Libido decreased | 0 | 3  (1%)* |
| RENAL AND URINARY DISORDERS | | |
| Urinary retention | 5  (1%)* | 9  (4%)* |
| Cystitis noninfective | | 4  (2%)* |
| REPRODUCTIVE SYSTEM AND BREAST DISORDERS | 22  (5%)* | 21  (10%)* |
| Erectile dysfunction | 6  (1%)* | 9  (4%)* |
| VASCULAR DISORDERS | | |
| Deep vein thrombosis | 0 | 3  (1%)* |

Note:
P values as flagging device used only in the Phase 3 study (head to head comparison to LUPRON DEPOT 7.5 mg),
* = 0.01 < P ≤ 0.05,
** = 0.001 < P ≤ 0.01,
*** = P ≤ 0.001 (Fisher exact, two-sided).

(**Ex. 3 ['359 patent]** at 36:38-37:28.)

31.     We also published these results in the peer-reviewed article Klotz 2008, stating that, in addition to the difference in injection-site reactions due to the different route of administration between degarelix and leuprolide, "[t]here were additional differences between the degarelix and leuprolide groups for urinary tract infections (3% vs 9% $P<0.01$, respectively) [and] arthralgia (4% vs 9%, $P<0.05$, respectively)." (**Ex. 12 [Klotz 2008]** at FERDEG01278818 (Abstract).) Thus, Klotz 2008 concluded that there was a significantly lower reported incidence

12

of musculoskeletal events (arthralgia) and [urinary tract infections "UTI"] with degarelix as compared with leuprolide." (**Ex. 12 [Klotz 2008]** at FERDEG01278824.)

32.     Specifically, patients in the degarelix treatment groups exhibited statistically significantly fewer myocardial infarctions (0.5% versus 2.5%), urinary tract infections (3% versus 9%), erectile dysfunction (1.5% versus 4.5%), musculoskeletal and connective tissue disorders (17% versus 26%), and arthralgia (4.2% versus 9%). (**Ex. 3 ['359 patent]** at 35:35-65.) Musculoskeletal and connective tissue disorders and arthralgia superiority was not just confined to the metastatic stage patients, but in all disease stage subgroups; specifically, arthralgia was statistically significant in locally advanced patients. (**Ex. 3 ['359 patent]** at 37:29-34.)

33.     Further, the results shown in Tables 16 and 17 demonstrate that treated subjects had a significantly reduced risk of developing coronary artery disease, heart failure, myocardial infarction, cardiac arrhythmia, coronary artery disease or heart failure when receiving androgen depletion therapy with degarelix as compared to leuprolide:

### TABLE 16

Incidence Rate (in 1,000 py) of Cardiovascular Events compared to Background Incidence Rates

| CV Event type | Degarelix | | | | LUPRON DEPOT ® 7.5 mg | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | N (%) | PY | Incidence Rate | 95% CI | N (%) | PY | Incidence Rate | 95% CI | |
| Stroke | 3 (<1%) | 0.354 | 8.49 | [1.75; 24.8] | 1 (<1%) | 0.178 | 5.63 | [0.142; 31.4] | P = 1.0 |
| Coronary artery disease | 12 (3%) | 0.351 | 34.2 | [17.7; 59.7] | 11 (5%) | 0.174 | 63.4 | [31.6; 113] | P = 0.2 |
| Heart failure | 5 (1%) | 0.354 | 14.1 | [4.59; 33.0] | 5 (2%) | 0.176 | 28.4 | [9.21; 66.2] | P = 0.42 |
| MI | 2 (<1%) | 0.354 | 5.64 | [0.683; 20.4] | 4 (2%) | 0.177 | 22.6 | [6.15; 57.8] | P = 0.2 |

Note:

P values as flagging device used only in the Phase 3 study (head to head comparison to LUPRON DEPOT 7.5 mg),

* ≈ 0.01 < P ≤ 0.05,

** = 0.001 < P ≤ 0.01,

*** = P ≤ 0.001 (Fisher exact, two-sided).

### TABLE 17

Incidence Rate of Cardiovascular Events defined by High Level Group Terms

| MedDRA HLGT | Degarelix | | | | LUPRON DEPOT ® 7.5 mg | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | N (%) | PY | Incidence Rate | 95% CI | N (%) | PY | Incidence Rate | 95% CI | |
| Central nervous system vascular disorders | 5 (1%) | 0.353 | 14.2 | [4.60; 33.1] | 1 (<1%) | 0.178 | 5.63 | [0.142; 31.4] | P = 0.69 |
| Cardiac arrhythmias | 20 (5%) | 0.347 | 57.7 | [35.3; 89.1] | 17 (8%) | 0.170 | 100 | [58.2; 160] | P = 0.13 |
| Coronary artery disorders | 12 (3%) | 0.351 | 34.2 | [17.7; 59.7] | 11 (5%) | 0.174 | 63.4 | [31.6; 113] | P = 0.21 |
| Heart failures | 5 (1%) | 0.354 | 14.1 | [4.59; 33.0] | 5 (2%) | 0.176 | 28.4 | [9.21; 66.2] | P = 0.42 |

Note:

P values as flagging device used only in the Phase 3 study (head to head comparison to LUPRON DEPOT 7.5 mg),

* = 0.01 < P ≤ 0.05,

** = 0.001 < P ≤ 0.01,

*** = P ≤ 0.001 (Fisher exact, two-sided).

(**Ex. 3 ['359 patent]** at 42:21-26; 41:27-67 (Tables 16, 17).) While this analysis did not prove to be statistically significant, there were still numerically significant differences in the incidence rates. This was thought provoking in the medical community.

34.     Thus, this further retrospective analysis demonstrated there was a reduced incidence of undesirable side effects associated with degarelix treatment compared to leuprolide treatment. The results of this work were unexpected and filled the unmet medical need for GnRH antagonist treatment that avoided the testosterone spike and other undesirable side effects of agonist therapy.

14

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FERRING PHARMACEUTICALS INC.,<br>FERRING INTERNATIONAL CENTER S.A.,<br>FERRING B.V., and<br>    POLYPEPTIDE LABORATORIES A/S<br><br>                Plaintiffs,<br><br>v.<br><br>FRESENIUS KABI USA, LLC,<br><br>                Defendant. | C.A. No. 20-cv-431 (MN) |

**REBUTTAL EXPERT REPORT OF NEAL D. SHORE, M.D., FACS
<u>REGARDING VALIDITY OF U.S. PATENT NOS. 9,579,359, 10,729,739, AND 10,973,870</u>**

40.     Dr. Yun opines that claim 3 of the '359 patent and claims 3 and 16 of the '739 patent would have been obvious over Doehn in combination with the knowledge of a POSA (Yun Report at §§ X.A.3, X.B.3, X.B.7.) He repeats his opinions in this regard with respect to claim 3 of the '739 patent and for claims 3 and 16 of the '739 patent. (*Compare* Yun Report at § X.A.3 (¶¶ 83-113) ('359 patent, claim 3) *with* Yun Report at § X.B.3 (¶¶ 181-209) ('739 patent, claim 3) and § X.B.7 (¶¶ 260-288) ('739 patent, claim 16).) Because of the similarities between the language of claim 3 of the '359 patent and claims 3 and 16 of the '739 patent and Dr. Yun's repetitious opinions, I provide one consolidated response to his opinions in paragraphs 83-113 and 181-209 and 260-288 on these claims.[1] As described below, I disagree with Dr. Yun's opinions.

41.     In paragraphs 83 and 84, Dr. Yun opines:

> 83. Claim 3 of the '359 patent is directed to a method of treating prostate cancer in a subject by administering a particular regimen of degarelix, resulting in a reduced level of side effects associated with the testosterone spike as compared with leuprolide. All elements of this claim were described in the art, and would have been obvious to a person of skill in the art as of February 2008.

> 84. As described above, the Doehn prior art expressly disclosed preclinical and clinical results of testing with degarelix, the effects of treatment with leuprolide, and comparisons in mechanism and expected effects between the two treatments. Moreover, a person of ordinary skill in the art would have had an expect[ation] that administration of degarelix would avoid the testosterone spike caused by the GnRH agonist leuprolide, and so would have expected a reduced likelihood of testosterone spike side effects associated with leuprolide.

(Yun Report at ¶¶ 83-84.) Although a POSA would have had an expectation that "administration of degarelix would avoid the testosterone spike caused by the GnRH agonist leuprolide," and as

---

[1] When I cite it Dr. Yun's paragraphs, I generally only cite to the first time that paragraph appears in the sections I am addressing, although verbatim or nearly verbatim paragraphs can be found in the other sections.

such, "would have expected a reduced likelihood of testosterone spike side effects" (Yun Report at ¶ 84), the side effect patents do not claim a reduced likelihood of *those* side effects. Instead, in my opinion, the claimed "undesirable side effect[s]" ('359 patent, claim 3; '739 patent, claims 3 and 16) are musculoskeletal and connective tissue disorders such as arthralgia, renal and urinary disorders, reproductive system and breast disorders, and cardiac disorders. Those undesirable side effects are not disclosed in Doehn and there was no expectation of a reduced likelihood of those side effects upon administration degarelix.

### a. "a reduced likelihood of causing a testosterone spike or other gonadotropin releasing hormone (GnRH) agonist side-effect" limitation

42. With respect to the "a reduced likelihood of causing a testosterone spike or other gonadotrophin releasing hormone (GnRH) agonist side-effect" limitation, Dr. Yun opines, specifically in paragraph 87:

> Doehn also teaches that, an "advantage of GnRH receptor antagonists over agonists is that their use is not associated with a flare reaction." *Id.* A person of skill in the art would have understood that avoiding the flare reaction would also avoid the negative side effects associated with the clinical flare identified previously.

(Yun Report at ¶ 87.)

43. As previously stated, I agree that a POSA "would have understood that avoiding the flare reaction would also avoid the negative side effects associated with the clinical flare." (Yun Report at ¶ 87.) Both the common specification and the prior art clearly describe the clinical flare symptoms that can be linked to the testosterone spike. The patentee acknowledges that "[t]he testosterone surge stimulates prostate cancer and can lead to a worsening of current symptoms or appearance of new symptoms such as spinal cord compression, bone pain and urethral obstruction." (**Ex. 10 ['359 patent]** at 2:20-24.) Similarly, the prior art discloses that "[t]he main symptoms associated with a clinical flare include bone pain, bladder outlet

obstruction, ureteral obstruction, spinal cord compression, and cardiovascular effects," further noting that "cardiovascular events" "might not necessarily have been related to GnRH agonist treatment" and, therefore, not linked to the testosterone spike. (**Ex. 11 [Van Poppel Review 2008]** at FKDEG011984; *see also* **Ex. 2 [Doehn]** at FKDEG011721 ("This 'flare reaction' (also known as a 'clinical flare') is dangerous and often painful, producing symptoms such as bone pain, blockage of one or both ureters and compression of the nerve root and spinal cord.").) Specifically, the prior art acknowledges that the clinical flare side effects—"ureteric obstruction and severe pain from bone metastasis"—were known "not [to] occur with GnRH antagonists, but that the other "[a]dverse effects of antagonists are largely the same as those with agonists." (**Ex. 12 [Huirne]** at FKDEG011807, FKDEG011804.) Therefore, the improved safety profile due to the reduction of the claimed "undesirable side effect[s]"— musculoskeletal and connective tissue disorders such as arthralgia, renal and urinary disorders, reproductive system and breast disorders, and cardiac disorders—was not expected.

44. Plaintiffs are not asserting claim 1 of the '359 patent, which is directed to "reduc[ing the] likelihood of causing a testosterone spike or other gonadotrophin releasing hormone (GnRH) agonist side-effect." Plaintiffs are asserting claim 3 of the '359 patent and claims 3 and 16 of the '739 patent, which are directed to "decreas[ing the] likelihood of developing or experiencing an undesirable side effect." As explained below, the undesirable side effects are those that were unexpected, namely the musculoskeletal and connective tissue disorders such as arthralgia, renal and urinary disorders, reproductive system and breast disorders, and cardiac disorders. (**Ex. 10 ['359 patent]** at 27:64-28:49.)

**b. "undesirable side effect" limitation**

45. Importantly, the patentee intended to claim only those side effects degarelix-treated patients were less likely to "develop[] or experience[]" (see, e.g., **Ex. 10 ['359 patent]** at

claim 3) as compared to GnRH agonist-treated patients. Therefore, the inventors of the side effect patents purposely excluded the testosterone spike from the claimed "undesirable side effect" limitation because prostate cancer patients administered degarelix do not "develop[] or experience[]" the testosterone spike.

46.     The common specification clearly identifies the undesirable side effects as those that degarelix-treated patients unexpectedly did not experience. In the "Detailed Analysis of Adverse Events," the inventors note that "[w]hile the overall occurrence of adverse events was similar in the two degarelix treatment groups and the leuprolide control group, a large majority of such events for the degarelix treatment groups were mere injection site reactions related to the subcutaneous/depot delivery system employed for degarelix." (**Ex. 10 ['359 patent]** at 26:47-53.) These injection site reactions were expected. (**Ex. 10 ['359 patent]** at 13:10-15; **Ex. 12 [Huirne]** at FKDEG011804.) The common specification then explains the rationale for the post-hoc analysis of the adverse event data stating: "[a]ccordingly, a detailed analysis of the precise type of adverse events occurring in each study group was undertaken to characterize the types of adverse events, other than injection site reactions, that must be occurring in the leuprolide treatment group to account for the overall similar adverse event occurrence rates." (**Ex. 10 ['359 patent]** at 26:56-62.)

47.     The specification then sets forth tables of treatment-emergent adverse events by system organ class, (**Ex. 10 ['359 patent]** at 27:1-38 (Table 6)), and preferred terms within the system organ classes (**Ex. 10 ['359 patent]** at 29:8-45 (Table 7)). Based on these data, the inventors conclude:

> The increased risk for cardiac disorders, musculoskeletal and connective tissue disorders, renal and urinary disorders, and reproductive system disorders for leuprolide as compared to degarelix likely account for the overall similarity in adverse events

> between leuprolide and degarelix, despite the fact that most of the
> adverse events seen with degarelix were mere injection site
> reactions related to the mode of subcutaneous delivery and not to
> adverse systemic effects on other organ systems.

(**Ex. 10 ['359 patent]** at 28:57-65.)

48.     The common specification further notes that adverse reactions due to testosterone

suppression were expected. (**Ex. 10 ['359 patent]** at column 13, generally.) As set forth above, a

post-hoc analysis on the adverse event data was performed to identify which adverse events

related to GnRH agonist treatment would account for the similar overall safety profile given the

significantly greater adverse events for degarelix related to injection site reactions. (See **Ex. 10**

**['359 patent]** at 27:1-38 (Table 6), 29:8-45 (Table 7, specifically "General Disorders and

Administration Site Conditions").) It is the adverse events related to GnRH-agonist treatment—

the musculoskeletal and connective tissue disorders such as arthralgia, renal and urinary

disorders, reproductive system and breast disorders, and cardiac disorders—that were unexpected

and thus formed the basis of the invention that the patentee later claimed as "undesirable side

effect[s]" in claim 3 of the '359 patent and claims 3 and 16 of the '739 patent. This is explained

in the common specification, as follows:

> Therefore, while degarelix treatment resulted in a significant
> number of subjects experiencing minor injection site reactions, these
> adverse effects were remarkably less serious than many of those
> associated with the GnRH agonist leuprolide.

(**Ex. 10 ['359 patent]** at 31:34-38.)

49.     Furthermore, the expected testosterone spike-related adverse events (*e.g.*, the

testosterone spike and clinical flare side effects) are transient in nature and far less serious in

nature than the "undesirable side effect[s]" claimed. Musculoskeletal and connective tissue

disorders such as arthralgia, renal and urinary disorders, reproductive system and breast

disorders, and cardiac disorders develop over time. Most require treatment and can have a

significant effect on quality of life. The clinical flare side effects are only present when testosterone levels are surging within the first two to four weeks of GnRH-agonist treatment or upon re-administration of the GnRH agonist through the monthly maintenance dosing and, generally speaking, because of their transient nature, do not require treatment. (**Ex. 10 ['359 patent]** at column 13, generally.) In sum, the claimed "undesirable side effect[s]" are chronic, whereas the clinical flare side effects are acute. Arthralgia, which by definition is joint pain, for example, differs from bone pain because arthralgia develops in a patient after long-term hormonal imbalance as result of both pituitary and extrapituitary GnRH-receptor activity, while bone pain or pain associated with bone metastasis is felt only when testosterone levels are surging as a result of administration of a GnRH agonist.

50.     Again, these claimed side effects are not solely attributable to the testosterone spike. Those attributable to the testosterone spike or the clinical flare reaction are transient and the symptoms appear only during the first two to four weeks of GnRH agonist treatment or when the ADT induces surging levels of testosterone. (**Ex. 13 [Kuhn]** at FERDEG02424379 (Figure 1).) The claimed side effects are experienced by patients more chronically and do not manifest during the initial weeks of treatment, but present much later during the treatment period.

51.     While the mechanism of action is unclear, experts have been hypothesizing about the different mechanisms of action behind these undesirable side effects. First, "a number of extrapituitary tissues, including [prostate cancer] cells, express GnRH receptors on their surface." (**Ex. 14 [Klotz 2014]** at FERDEG00525447.) Likewise, "GnRH receptors have been identified on epithelial and smooth muscle cells of the prostate, on peripheral lymphocytes infiltrating the prostate as well as on the bladder mucosa," which allows for the "down-regulation of pro-inflammatory cytokines, various growth factors and even $\alpha1$-adrenoreceptors

with potential implications for smooth muscle relation in prostate strips and [total prostate volume] reduction." (**Ex. 15 [Axcrona 2012]** at FERDEG00528069.) Thus, "direct effects on [the] extra-pituitary receptors" have been linked to the reduced likelihood of the chronic side effects of ADT such as lower urinary tract symptoms. (**Ex. 16 [Mason 2013]** at FERDEG00528524 (Abstract); *see also* **Ex. 14 [Klotz 2014]** at FERDEG00525447.)

52.     Second, the literature points to follicle-stimulating hormone ("FSH") suppression as aiding in the amelioration of joint, musculoskeletal, and urinary tract symptoms through degarelix treatment because of "its possible role in tumour growth, bone resorption, and regulation of adipocytes and obesity." (**Ex. 14 [Klotz 2014]** at FERDEG00525447 (citations omitted); *see also* **Ex. 17 [Crawford 2015 Abstract]** at FERDEG00528980.)

53.     Finally, experts have hypothesized that urinary tract symptoms and cardiovascular effects "may not be solely attributable to differences in the onset of testosterone suppression," "rais[ing] the possibility of other driving mechanisms" such as "direct effects on prostate cells including pro-apoptotic and antiproliferative effects, regulation of growth hormones, and even anti-inflammatory effects." (**Ex. 18 [Anderson 2013]** at FERDEG00527917; *see also* **Ex. 11 [Van Poppel Review 2008]** at FKDEG011984.)

54.     Finally, Dr. Yun opines that:

> Doehn provides clinical data regarding side effects of administration of degarelix. Doehn at 568-69. In particular, the side effect profile of degarelix from the Phase II trials is described as being "associated with the drug's intended action in decreasing the secretion of testosterone." *Id.* at 568. A person of skill in the art would understand this to refer to the typical side effects of castration, similar to the effects of an orchiectomy. There are no reports of side effects associated with a testosterone flare in Doehn, confirming the expectation of a skilled artisan that administration of degarelix reduces those side effects as compared with a GnRH agonist. In fact, Doehn confirms, that "degarelix was well tolerated with no evidence of testosterone surge or systemic allergic reactions."

20

(Yun Report at ¶ 105.) Dr. Yun again misses the point. The claimed comparative side effect profile was not discovered until the phase III CS21 study was conducted. The phase II studies summarized in Doehn were not comparator trials. The surprising reduction of undesirable side effects discovered in the post hoc statistical analysis of the comparative adverse event profile from Ferring's CS21 study had not been disclosed at the time Doehn was published.

### c.     "two subcutaneous injections" limitation

55.     With respect to the "two subcutaneous injections" limitation, Dr. Yun opines, in paragraphs 95 and 96:

> 95. The initial dose that was accompanied by the most data was 240 mg of degarelix. Doehn reports that this dose was tested in concentrations of, at least, 20 mg/mL, 40 mg/mL and 60 mg/mL. Doehn at 568. As such, the doses would require between 4 mL, 6 mL, or 12 mL of fluid to achieve administration of 240 mg of drug. It would have been well understood by a person of skill in the art in February 2008 that large volumes of fluid are uncomfortable to be injected subcutaneously. As a result, it would have been obvious to split a larger volume injection across two injection sites.

> 96. Additionally, Doehn presents phase I clinical data that would make multiple injections obvious. In particular, the second phase I study discussed resulted in the finding that "the dose volume and dose concentration influenced the release of degarelix." Doehn 567-68. In particular, "small injection volumes increased the subcutaneous release of degarelix compared with large injection volumes." *Id.* at 658. Additionally, Doehn reports that dose concentration was "negatively correlated to bioavailability." *Id.* This means that a skilled artisan would have preferred to use a lower concentration of degarelix, which would have necessitated a higher volume injection. But, because lower volume injections increase the release of the drug, a person of skill in the art would have been motivated to split the initial dose into two subcutaneous injections to achieve the better bioavailability of a lower concentration, and the improved release associated with smaller injection volumes, as reported in the clinical data of Doehn.

(Yun Report at ¶¶ 95-96.) First, I disagree that "it would have been obvious to split a larger volume injection across two injection sites" simply because "large volumes of fluid are

V.    THE ASSERTED CLAIMS OF THE SIDE EFFECT PATENTS ARE NOT INVALID AS INDEFINITE

98.    In my opinion, the asserted claims of the side effect patents are not invalid as indefinite. The terms disputed at the claim construction hearing are clear on their face. Their plain and ordinary meaning is readily understood by a POSA, and thus such a meaning provides enough clarity to clinicians such as myself to allow me understand when I am, and am not, practicing the invention as claimed in the side effect patents.

A.    "in a subject with a reduced likelihood of causing a testosterone spike or other gonadotrophin releasing hormone (GnRH) agonist side effect"

99.    Dr. Robertson opines that "a POSA would not understand with reasonable certainty the metes and bounds for the claim term 'in a subject with a reduced likelihood of causing a testosterone spike or other gonadotrophin releasing hormone (GnRH) agonist side effect.'" (Robertson Report at ¶ 24.) I disagree. In my opinion, this term is readily understood by a POSA. In the context of the claims as whole (claim 1 of the '359 patent and claims 1 and 14 of the '739 patent) and the common specification, I understand the term to mean that a subject with prostate cancer, who is administered degarelix according to the claimed dosing schedule, will have a reduced likelihood of experiencing a testosterone spike or other GnRH agonist side-effect.

100.    I further disagree with Dr. Robertson's opinion that a POSA "would not know by reading the claim and specification what side effects are and are not covered by the claims." (Robertson Report at ¶ 25.) Quite the opposite is true in fact. The common specification describes a clinical trial—Ferring's CS21 study—comparing two degarelix dosing regimens and a GnRH agonist (leuprolide) treatment and includes data demonstrating the superior adverse event profile of the degarelix treatment. (**Ex. 10 ['359 patent]** at 16:4-45:44 ("Clinical Study of Degarelix for the Treatment of Prostate Cancer").)

101.    The common specification clearly identifies "what side effects are and are not covered by the claims." (*See* ¶¶ 46-48, *supra*.)

102.    The tables in the common specification further clarify "what side effects are and are not covered by the claims." The data from CS21, the open-label, multi-center, randomized, parallel-group study described by the common specification, teaches a POSA that a subject with prostate cancer will have a reduced likelihood of experiencing a testosterone spike or other GnRH agonist side-effect when administered degarelix. For example, Table 6 of the common specification (reproduced below) reports data for adverse events based on system organ class which demonstrates, for example, a reduced incidence of musculoskeletal and connective tissue disorders (26% of leuprolide patients compared to 17% of pooled degarelix patients), renal and urinary disorders (19% of leuprolide patients compared to 13% of pooled degarelix patients), reproductive system and breast disorders (10% of leuprolide patients compared to 5% of pooled degarelix patients, and cardiac disorders (13% of leuprolide patients compared to 9% of pooled degarelix patients) when subjects with prostate cancer were administered degarelix as compared to leuprolide. (**Ex. 10 ['359 patent]** at 27:1-38 (Table 6); *see also* **Ex. 10 ['359 patent]** at 27:64-28:49.)

TABLE 6

Treatment-Emergent Adverse Events by System Organ Class

| MedDRA System Organ Class | Degarelix 240/160 mg N (%) | Degarelix 240/80 mg N (%) | Degarelix Total N (%) | Leuprolide 7.5 mg N (%) |
|---|---|---|---|---|
| ITT analysis set | 202 (100%) | 207 (100%) | 409 (100%) | 201 (100%) |
| Treatment-emergent adverse events | 167 (83%) | 163 (79%) | 330 (81%) | 156 (78%) |
| BLOOD & LYMPHATIC SYSTEM DISORDERS | 11 (5%) | 5 (2%) | 16 (4%) | 12 (6%) |
| CARDIAC DISORDERS | 19 (9%) | 17 (8%) | 36 (9%) | 27 (13%) |
| CONGENITAL, FAMILIAL & GENETIC DISORDERS | | | | 1 (<1%) |
| EAR & LABYRINTH DISORDERS | 3 (1%) | 6 (3%) | 9 (2%) | 3 (1%) |
| ENDOCRINE DISORDERS | 2 (<1%) | | 2 (<1%) | 3 (1%) |
| EYE DISORDERS | 4 (2%) | 6 (3%) | 10 (2%) | 5 (2%) |
| GASTROINTESTINAL DISORDERS | 33 (16%) | 38 (18%) | 71 (17%) | 39 (19%) |
| GENERAL DISORDERS & ADMINISTRATION SITE CONDITIONS | 102 (50%) | 92 (44%) | 194 (47%) | 36 (18%) |
| HEPATOBILIARY DISORDERS | 2 (<1%) | 2 (<1%) | 4 (<1%) | 3 (1%) |
| IMMUNE SYSTEM DISORDERS | 1 (<1%) | 1 (<1%) | 2 (<1%) | |
| INFECTIONS & INFESTATIONS | 38 (19%) | 45 (22%) | 83 (20%) | 49 (24%) |
| INJURY, POISONING & PROCEDURAL COMPLICATIONS | 11 (5%) | 10 (5%) | 21 (5%) | 17 (8%) |
| INVESTIGATIONS | 58 (29%) | 54 (26%) | 112 (27%) | 62 (31%) |
| METABOLISM & NUTRITION DISORDERS | 26 (13%) | 14 (7%) | 40 (10%) | 15 (7%) |
| MUSCULOSKELETAL & CONNECTIVE TISSUE DISORDERS | 37 (18%) | 31 (15%) | 68 (17%) | 53 (26%) |
| NEOPLASMS BENIGN, MALIGNANT & UNSPECIFIED (INCL CYSTS AND POLYPS) | 12 (6%) | 10 (5%) | 22 (5%) | 16 (8%) |
| NERVOUS SYSTEM DISORDERS | 27 (13%) | 24 (12%) | 51 (12%) | 23 (11%) |
| PSYCHIATRIC DISORDERS | 16 (8%) | 16 (8%) | 32 (8%) | 21 (10%) |
| RENAL & URINARY DISORDERS | 26 (13%) | 28 (14%) | 54 (13%) | 39 (19%) |
| REPRODUCTIVE SYSTEM & BREAST DISORDERS | 13 (6%) | 9 (4%) | 22 (5%) | 21 (10%) |
| RESPIRATORY, THORACIC & MEDIASTINAL DISORDERS | 17 (8%) | 25 (12%) | 42 (10%) | 18 (9%) |
| SKIN & SUBCUTANEOUS TISSUE DISORDERS | 21 (10%) | 18 (9%) | 39 (10%) | 10 (5%) |
| SURGICAL & MEDICAL PROCEDURES | 2 (<1%) | | 2 (<1%) | |
| VASCULAR DISORDERS | 65 (32%) | 71 (34%) | 136 (33%) | 60 (30%) |

N = number of patients with adverse events
% = percentage of patients with adverse events

103.    In addition, Table 7 of the '359 patent and '739 patents (reproduced below) more specifically classifies the adverse events within a given system organ class. For example, the further analysis demonstrates a reduced incidence of urinary tract infections (9% of leuprolide patients as compared to only 3% of all degarelix-treated patients) and arthralgia (9% of leuprolide patients while only 4% of all degarelix-treated patients), when subjects with prostate cancer were administered degarelix as compared to leuprolide. (**Ex. 10 ['359 patent]** at 29:8-45 (Table 7); *see also* **Ex. 10 ['359 patent]** at 29:66-30:46.)

## TABLE 7

Adverse Events by System Organ Class and Preferred
Term Occurring in ≥5% of any Treatment Group

| MedDRA System Organ Class/ Preferred Term | Degarelix | | | Leuprolide |
|---|---|---|---|---|
| | 240/160 mg N (%) | 240/80 mg N (%) | Total N (%) | 7.5 mg N (%) |
| ITT analysis set | 202 (100%) | 207 (100%) | 409 (100%) | 201 (100%) |
| Treatment-emergent adverse events | 167 (83%) | 163 (79%) | 330 (81%) | 156 (78%) |
| GASTROINTESTINAL DISORDERS | 33 (16%) | 38 (18%) | 71 (17%) | 39 (19%) |
| Nausea | 11 (5%) | 9 (4%) | 20 (5%) | 8 (4%) |
| Constipation | 6 (3%) | 11 (5%) | 17 (4%) | 10 (5%) |
| GENERAL DISORDERS AND ADMINISTRATION SITE CONDITIONS | 102 (50%) | 92 (44%) | 194 (47%) | 36 (18%) |
| Injection site pain | 61 (30%) | 58 (28%) | 119 (29%) | 1 (<1%) |
| Injection site erythema | 48 (24%) | 36 (17%) | 84 (21%) | |
| Injection site swelling | 14 (7%) | 13 (6%) | 27 (7%) | |
| Fatigue | 13 (6%) | 7 (3%) | 20 (5%) | 13 (6%) |
| Injection site induration | 11 (5%) | 8 (4%) | 19 (5%) | |
| Injection site nodule | 13 (6%) | 6 (3%) | 19 (5%) | |
| Chills | 7 (3%) | 11 (5%) | 18 (4%) | |
| INFECTIONS AND INFESTATIONS | 38 (19%) | 45 (22%) | 83 (20%) | 49 (24%) |
| Urinary tract infection | 3 (1%) | 10 (5%) | 13 (3%) | 18 (9%) |
| INVESTIGATIONS | 58 (29%) | 54 (26%) | 112 (27%) | 62 (31%) |
| Weight increased | 22 (11%) | 18 (9%) | 40 (10%) | 24 (12%) |
| Alanine aminotransferase increased | 17 (8%) | 20 (10%) | 37 (9%) | 11 (5%) |
| Aspartate aminotransferase increased | 10 (5%) | 11 (5%) | 21 (5%) | 6 (3%) |
| METABOLISM AND NUTRITION DISORDERS | 26 (13%) | 14 (7%) | 40 (10%) | 15 (7%) |
| Hypercholesterolaemia | 12 (6%) | 7 (3%) | 19 (5%) | 5 (2%) |
| MUSCULOSKELETAL AND CONNECTIVE TISSUE DISORDERS | 37 (18%) | 31 (15%) | 68 (17%) | 53 (26%) |
| Back pain | 12 (6%) | 12 (6%) | 24 (6%) | 17 (8%) |
| Arthralgia | 6 (3%) | 11 (5%) | 17 (4%) | 18 (9%) |
| VASCULAR DISORDERS | 65 (32%) | 71 (34%) | 136 (33%) | 60 (30%) |
| Hot flush | 52 (26%) | 53 (26%) | 105 (26%) | 43 (21%) |
| Hypertension | 14 (7%) | 12 (6%) | 26 (6%) | 8 (4%) |

N = number of patients with adverse events
% = percentage of patients with adverse events

A POSA, who has reviewed the data in the common specification, can easily discern which side effects were more prevalent with leuprolide than with degarelix and therefore which "other GnRH agonist side-effects" are covered by the claims.

104.   Further, the common specification notes that "[f]urther statistical analysis of the CS21 clinical study results was undertaken in order to determine whether any of the advantages in superior efficacy and/or diminished side effects of degarelix over leuprolide treatment were

particularly pronounced in certain patient subgroups." (**Ex. 10 ['359 patent]** at 31:49-53.) Table

11 presents notably statistically significant findings in the total trial population:

| TABLE 11 | | |
|---|---|---|
| Crude Incidence of Treatment-Emergent Adverse Events by MedDRA System Organ Class and Preferred Term | | |
| | One-Month Controlled | |
| MedDRA System Organ Class/Preferred Term | Degarelix N (%) | LUPRON DEPOT ® 7.5 mg N (%) |
| Exposed Subjects | 409 (100%) | 201 (100%) |
| Total No. of Subjects with Adverse Events | 330 (81%) | 156 (78%) |
| BLOOD AND LYMPHATIC SYSTEM DISORDERS | 16 (4%) | 12 (6%) |
| Myocardial ischaemia | 2 (<1%)* | 5 (2%)* |
| GENERAL DISORDERS AND ADMINISTRATION SITE CONDITIONS | | |
| Oedema peripheral | 8 (2%)* | 10 (5%)* |
| Chest pain | 2 (<1%)* | 6 (3%)* |
| INFECTIONS AND INFESTATIONS | | |
| Urinary tract infection | 13 (3%)** | 18 (9%)** |
| INVESTIGATIONS | 113 (28%) | 62 (31%) |
| Cardiac murmur | | 3 (1%)* |
| MUSCULOSKELETAL AND CONNECTIVE TISSUE DISORDERS | 68 (17%)** | 53 (26%)** |
| Arthralgia | 17 (4%)* | 18 (9%)* |
| Musculoskeletal stiffness | | 3 (1%)* |

| TABLE 11-continued | | |
| --- | --- | --- |
| Crude Incidence of Treatment-Emergent Adverse Events by MedDRA System Organ Class and Preferred Term | | |
| | One-Month Controlled | |
| MedDRA System Organ Class/Preferred Term | Degarelix N (%) | LUPRON DEPOT ® 7.5 mg N (%) |
| PSYCHIATRIC DISORDERS | | |
| Libido decreased | 0 | 3 (1%)* |
| RENAL AND URINARY DISORDERS | | |
| Urinary retention | 5 (1%)* | 9 (4%)* |
| Cystitis noninfective | | 4 (2%)* |
| REPRODUCTIVE SYSTEM AND BREAST DISORDERS | 22 (5%)* | 21 (10%)* |
| Erectile dysfunction | 6 (1%)* | 9 (4%)* |
| VASCULAR DISORDERS | | |
| Deep vein thrombosis | 0 | 3 (1%)* |

Note:
P values as flagging device used only in the Phase 3 study (head to head comparison to LUPRON DEPOT 7.5 mg),
*= 0.01 < P ≤ 0.05,
**= 0.001 < P ≤ 0.01,
*** = P ≤ 0.001 (Fisher exact, two-sided).

(**Ex. 10 ['359 patent**] at 36:38-37:28 (Table 11).)

105. Specifically, patients in the degarelix treatment groups exhibited statistically significantly fewer myocardial infarctions (0.5% versus 2.5%), urinary tract infections (3% versus 9%), erectile dysfunction (1.5% versus 4.5%), musculoskeletal and connective tissue disorders (17% versus 26%), arthralgia (4.2% versus 9%), and musculoskeletal stiffness (0% versus 1%). (**Ex. 10 ['359 patent**] at 35:35-65.) Musculoskeletal and connective tissue disorders and arthralgia superiority was not just confined to the metastatic stage patients, but in all disease stage subgroups; specifically, arthralgia was statistically significant in locally advanced patients. (**Ex. 10 ['359 patent**] at 37:29-34.)

106. Further, the results shown in Tables 16 and 17 demonstrate that treated subjects had a significantly reduced risk of developing coronary artery disease, heart failure, myocardial

infarction, cardiac arrhythmia, coronary artery disease or heart failure when receiving androgen depletion therapy with degarelix as compared to leuprolide:

TABLE 16

Incidence Rate (in 1,000 py) of Cardiovascular Events compared to Background Incidence Rates

| CV Event type | Degarelix | | | | LUPRON DEPOT ® 7.5 mg | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | N (%) | PY | Incidence Rate | 95% CI | N (%) | PY | Incidence Rate | 95% CI | |
| Stroke | 3 (<1%) | 0.354 | 8.49 | [1.75; 24.8] | 1 (<1%) | 0.178 | 5.63 | [0.142; 31.4] | P = 1.0 |
| Coronary artery disease | 12 (3%) | 0.351 | 34.2 | [17.7; 59.7] | 11 (5%) | 0.174 | 63.4 | [31.6; 113] | P = 0.2 |
| Heart failure | 5 (1%) | 0.354 | 14.1 | [4.59; 33.0] | 5 (2%) | 0.176 | 28.4 | [9.21; 66.2] | P = 0.42 |
| MI | 2 (<1%) | 0.354 | 5.64 | [0.683; 20.4] | 4 (2%) | 0.177 | 22.6 | [6.15; 57.8] | P = 0.2 |

Note:

P values as flagging device used only in the Phase 3 study (head to head comparison to LUPRON DEPOT 7.5 mg),

* = 0.01 < P ≤ 0.05,

** = 0.001 < P ≤ 0.01,

*** = P ≤ 0.001 (Fisher exact, two-sided).

TABLE 17

Incidence Rate of Cardiovascular Events defined by High Level Group Terms

| MedDRA HLGT | Degarelix | | | | LUPRON DEPOT ® 7.5 mg | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | N (%) | PY | Incidence Rate | 95% CI | N (%) | PY | Incidence Rate | 95% CI | |
| Central nervous system vascular disorders | 5 (1%) | 0.353 | 14.2 | [4.60; 33.1] | 1 (<1%) | 0.178 | 5.63 | [0.142; 31.4] | P = 0.69 |
| Cardiac arrhythmias | 20 (5%) | 0.347 | 57.7 | [35.3; 89.1] | 17 (8%) | 0.170 | 100 | [58.2; 160] | P = 0.13 |
| Coronary artery disorders | 12 (3%) | 0.351 | 34.2 | [17.7; 59.7] | 11 (5%) | 0.174 | 63.4 | [31.6; 113] | P = 0.21 |
| Heart failures | 5 (1%) | 0.354 | 14.1 | [4.59; 33.0] | 5 (2%) | 0.176 | 28.4 | [9.21; 66.2] | P = 0.42 |

Note:

P values as flagging device used only in the Phase 3 study (head to head comparison to LUPRON DEPOT 7.5 mg),

* = 0.01 < P ≤ 0.05,

** = 0.001 < P ≤ 0.01,

*** = P ≤ 0.001 (Fisher exact, two-sided).

(**Ex. 10 ['359 patent]** at 42:21-26; 41:27-67 (Tables 16, 17).)

107.    Clinicians rely on exactly this type of clinical data in the practice of medicine. Indeed, there is a hierarchy of evidence in medicine clinicians rely on when diagnosing, treating, or prescribing medication to treat prostate cancer, and a randomized clinical trial like the one described in the common specification is near the top of the evidence hierarchy. For example, the 2012 European Association of Urology Guidelines on Prostate Cancer describes and ranks the

45

type of evidence used in making recommendations for treatment of prostate cancer. "Evidence

from at least one randomized trial" is considered Level 1b evidence:

| Level | Type of evidence |
|-------|------------------|
| 1a | Evidence obtained from meta-analysis of randomised trials |
| 1b | Evidence obtained from at least one randomised trial |
| 2a | Evidence obtained from one well-designed controlled study without randomisation |
| 2b | Evidence obtained from at least one other type of well-designed quasi-experimental study |
| 3 | Evidence obtained from well-designed non-experimental studies, such as comparative studies, correlation studies and case reports |
| 4 | Evidence obtained from expert committee reports or opinions or clinical experience of respected authorities |

Table 1: Level of evidence*

*Modified from Sackett, et al. (1).

(**Ex. 22 [Heidenreich 2012]** at FERDEG01032932.)

108.     In paragraph 26, Dr. Robertson refers to Tables 14 and 15 in stating that "the side

effects are the same between antagonist and agonists." (Robertson Report at ¶ 26.) I disagree.

Tables 14 and 15 simply demonstrate the differing side effects in patient sub-groups. For

instance, Table 14 differentiates patients by body weight, (**Ex. 10 ['359 patent]** at 39:27-40:26

(Table 14).), while Table 15 isolates patient data for white males. (**Ex. 10 ['359 patent]** at 40:27-

41:26; 42:1-21 (Table 15).). Tables identifying the different clinical effects on different patient

sub-groups assist clinicians like myself to pay particular attention to those GnRH agonist side

effects that can be reduced by administering degarelix. For example, if a patient is susceptible to

arthralgia, and weighs under 70 kg or over 90 kg, Table 14 provides data demonstrating that

clinician may want to consider administering degarelix instead of a GnRH agonist to avoid the

patient experiencing arthralgia. This does not mean that patients between 70 and 90 kg should

not be administered degarelix instead of a GnRH agonist if susceptible to arthralgia, just that

there was no distinguishable reduction in arthralgiac symptoms in patients administered

degarelix as opposed to leuprolide.

109.    In paragraph 27, Dr. Robertson states that Tables 14 and 15 refer only to one specific GnRH agonist, leuprolide, but that the claims are broader than that as they "open the door to any other agonists that may be clinically available, and the specification provides no guidance about those other agonists and whether or not they are also subject to the exact same side effects as those for leuprolide or not." (Robertson Report at ¶ 27.) However, Dr. Robertson then seems to recognize that the side effect profile for all agonists would be expected to be identical. That is correct as the mechanism of action for all GnRH agonists is the same. The GnRH agonists only differ in their delivery mechanism or route of administration. In other words, a POSA would expect a class effect from all GnRH agonists.

110.    I take issue with Dr. Robertson's opinions in Paragraph 28 wherein he states there is "no information or guidance provided as to how to determine if the likelihood of side effects has been reduced in any individual or not…." (Robertson Report at ¶ 28.) While it is true that "likelihoods" are derived from statistics based on randomized clinical trials involving population data not individuals, clinicians rely on exactly this type of clinical data in making treatment decisions for an individual patient. (*See* ¶ 102, above.) The art of medicine requires all clinicians to evaluate and assess the individual patient in conjunction with both published literature and guideline recommendations. While a clinician can never know *a priori* how an individual patient will respond to treatment, the data in the common specification inform a POSA as to whether a subject has a reduced likelihood of experiencing a side effect or not.

111.    In paragraph 29, Dr. Robertson states how a POSA would understand the language of the claim—"a POSA would understand the claim language to be saying that any given patient would experience fewer side effects when given degarelix as opposed to a GnRH agonist"—with which I agree to an extent, but then suggests that to support that statement both

47

degarelix and a GnRH agonist would have to have been administered to the same individual, with a wash out period between administrations followed by a defined period of observations for the evolution of side effects in order to support the claim that any given patient would experience fewer side effects when given degarelix as opposed to a GnRH agonist. (Robertson Report at ¶ 29.) While that may be a "routine clinical study," such a study is neither necessary nor practicable to support the language in the claims.

112.     In paragraph 31, Dr. Robertson points to another alleged problem with this claim limitation—namely, that it does not specify when comparison measurements are to be taken, stating that "[t]he patent specification [] explains that, over time, 'adverse events were mostly transient,' meaning that they appeared at a certain time and were of short duration." (Robertson Report at ¶ 31 (citing **Ex. 10 ['359 patent]** at 13:16-32).) Dr. Robertson's citation mischaracterizes the specification—the "transient" adverse events being discussed were injection site reactions which a POSA would expect to be transient. But this is not true for the other adverse events that I have mentioned above, as individual patient adverse events will develop over time and are chronic in nature.

113.     For all these reasons, it is my opinion that this claim limitation is readily understood by a POSA.

   **B.     "the [treated] subject has a decreased likelihood of developing or experiencing an undesirable side effect during treatment compared to treatment with [the] gonadotrophin releasing hormone (GnRH) agonist leuprolide"**

114.     In paragraph 33, Dr. Robertson opines that "a POSA would not understand with reasonable certainty the metes and bounds for the claim term 'the [treated] subject has a decreased likelihood of developing or experiencing an undesirable side effect during treatment compared to treatment with [the] gonadotrophin releasing hormone (GnRH) agonist leuprolide.'"

48

(Robertson Report at ¶ 33.) For the reasons discussed above with respect to the first term, I disagree. In my opinion, this term is readily understood by a POSA. In the context of claim 3 of the '359 patent and claims 13 and 16 of the '739 patent as a whole and the common specification, I understand the term to mean that a subject with prostate cancer, who is administered degarelix according to the claimed dosing schedule, will have a decreased likelihood of experiencing an undesirable side effect during treatment compared to treatment with leuprolide. I have explained above what I understand to be the undesirable side effects based on the description in the common specification and the tables presenting CS21's clinical data, particularly Tables 7 and 11. (*See* ¶¶ 46-48, *supra*; *see also* § V.A.)

115.    Plaintiffs are not asserting claim 1 of the '359 patent, which is directed to "reduc[ing the] likelihood of causing a testosterone spike or other gonadotrophin releasing hormone (GnRH) agonist side-effect." Plaintiffs are asserting claim 3 of the '359 patent and claims 3 and 16 of the '739 patent, which are directed to "decreas[ing the] likelihood of developing or experiencing an undesirable side effect." Importantly, the patentee intended to claim only those side effects degarelix-treated patients were less likely to "develop[] or experience[]" (see, e.g., **Ex. 10 ['359 patent]** at claim 3) as compared to GnRH agonist-treated patients. Therefore, the inventors of the side effect patents purposely excluded the testosterone spike from the claimed "undesirable side effect" limitation because prostate cancer patients administered degarelix do not "develop[] or experience[]" the testosterone spike. The undesirable side effects are those that were unexpected, namely the musculoskeletal and connective tissue disorders such as arthralgia, renal and urinary disorders, reproductive system and breast disorders, and cardiac disorders (**Ex. 10 ['359 patent]** at 27:64-28:49.)

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FERRING PHARMACEUTICALS INC., FERRING INTERNATIONAL CENTER S.A., FERRING B.V., and POLYPEPTIDE LABORATORIES A/S <br><br> Plaintiffs, <br><br> v. <br><br> FRESENIUS KABI USA, LLC, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 20-cv-431 (MN) <br><br> **CONFIDENTIAL –** <br> **SUBJECT TO PROTECTIVE ORDER** |

**REPLY EXPERT REPORT OF NEAL D. SHORE, M.D., FACS
REGARDING INFRINGEMENT AND OBJECTIVE INDICIA OF NONOBVIOUSNESS
OF U.S. PATENT NOS. 9,579,359, 10,729,739, AND 10,973,870**

improperly focuses on testosterone spike and related clinical flare symptoms instead of the chronic undesirable side effects that were shown to be less prevalent with degarelix than with leuprolide. For these reasons and others as set forth below, I disagree with Dr. Yun's analysis.

### A. Long felt need

22.     First, Dr. Yun argues that "Dr. Shore has not identified a nexus, or direct link, between the alleged need in the industry and the asserted claims of the Side Effect Patents." (Yun Responsive Report at ¶ 186.) Dr. Yun further argues that "the need for an additional therapy for prostate cancer was not strong in February 2008. GnRH agonist therapy was widely used, and considered highly effective for treatment of advanced prostate cancer." (Yun Responsive Report at ¶ 187.) I disagree with Dr. Yun's arguments. In February of 2008, I had been treating patients with prostate cancer for over fifteen years. Based on my experience there was clearly a long felt need for improved treatments for testosterone suppression in advanced prostate cancer patients. I and others in the field understood that the mechanism of action of GnRH agonists was counterintuitive and so there was a need for an improved mechanism of action for testosterone suppression. With degarelix, not only was the mechanism of action better in terms of the lack of testosterone surge and related clinical flare symptoms, but we also discovered other benefits from the GnRH antagonist not present with the GnRH agonist that resulted in a reduced risk of cardiovascular events and other undesirable side effects. The nexus exists because the asserted claims in the side effect patents are directed to reducing the likelihood of patients developing these chronic, undesirable side effects—musculoskeletal and connective tissue disorders such as arthralgia, renal and urinary disorders such as urinary tract infections, reproductive system and breast disorders, and cardiac disorders—which are not associated with the testosterone surge or related clinical flare symptoms.

23.     My Objective Indicia Opening Report explicitly calls out these undesirable side effects throughout—both in reference to the common specification and literature after the patent was filed that identifies the industry's long-felt need for a solution to these side effects and the unexpected results in finding that degarelix solved this need. (*See, generally,* Shore Objective Indicia Report at ¶¶ 19-40.) Dr. Yun ignores this, and only focuses on the testosterone spike.

24.     In preparing this report, counsel provided me with portions of the file history of the patent application that became the '870 patent. One of the documents I reviewed was titled "Amendment and Reply to Office Action," which contained a section titled "Election/Restriction." In that document, the patentee elected the subject matter of Group I, which was "allegedly drawn to a method of treating locally advanced prostate cancer in a subject which has a decreased likelihood of developing a musculoskeletal disorder or a connective tissue disorder during treatment." (Ex. 2 [9.14.2020 Amendment and Reply to Office Action] at FERDEG02422537-38.) The patentee elected Group I over Group II, which was "allegedly drawn to a method of treating locally advanced prostate cancer in a subject which has a decreased likelihood of developing a urinary or renal system disorder during treatment," and Group III, which was "allegedly drawn to a method of treating locally advanced prostate cancer in a subject which has a decreased likelihood of developing a cardiovascular side effect during treatment." (Ex. 2 [9.14.2020 Amendment and Reply to Office Action] at FERDEG02422537.) I understand that these subject matter groups were presented as dependent claims in the original application to which the '870 patent claims priority. (*Compare* Ex. 3 [12.24.2013 Preliminary Amendment] *with* Ex. 4 [12.8.2014 Restriction Requirement].) Having elected the subject matter of Group I, the patentees further elected the species "A) musculoskeletal disorder, B) experiencing, and C) arthralgia." (Ex. 2 [9.14.2020 Amendment and Reply to Non-Final Office

# EXHIBIT 6



# Transcript of Edward J. Yun, M.D.

**Date:** November 9, 2021
**Case:** Ferring Pharm., Inc. -v- Fresenius Kabi USA, LLC

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

25

1    construction order for undesirable side
2    effects, you know, include -- is the plain and
3    ordinary meaning of that phrase. And my
4    opinion is that it includes the
5    testosterone-related side effects.
6    BY MS. BOURKE:
7       Q   Is it your understanding, Doctor, that the
8    claim construction -- that the term "other GnRH side
9    effects" and "undesirable side effects" were
10   construed during claim construction, those terms?
11       "Other GnRH agonist side effects" or
12   "undesirable side effects"; correct?
13      A   Well, I wasn't present during claim
14   construction, but my understanding is that the claim
15   construction is the plain and ordinary meaning.
16       I also understand that Dr. Shore's
17   original declaration also defined "undesirable side
18   effect" as an adverse event, and I agree with that.
19      Q   Doctor, in your opening report, you
20   provide what was construed, do you not?
21      A   If you don't mind, I'll turn the page.
22   And it does look --
23      Q   Paragraph 35.
24      A   Yes.
25      Q   Paragraph 35 identifies the terms that

26

1    were subject to the claim construction. And the
2    term "other GnRH agonist side effect" was not a term
3    that was construed, was it, Doctor?
4       MR. WALLACE: Objection to form. And it
5       mischaracterizes the document.
6       THE WITNESS: My reading of the chart in
7       paragraph 35 is that an "undesirable side
8       effect" is to have its plain and ordinary
9       meaning.
10       And also, in 36, that any term not
11       specifically defined by the court is to use its
12       plain and ordinary meaning.
13   BY MS. BOURKE:
14      Q   So did you review the specification of the
15   side effect patents, Doctor?
16      A   I'm sure I have at some point during this
17   past year, but I don't have a photographic memory of
18   the specifications, no.
19      Q   Can we have -- do you have Exhibit 27 in
20   your binder?
21      A   I do, yes. Thank you.
22      Q   Okay. Do you recognize that as the --
23   what we can call US Patent 10,695,398?
24      A   Yes.
25      Q   Do you recognize that as one of the side

27

1    effect patents? I'm sorry. Maybe I've given you
2    the wrong -- no, no, no. Maybe I've given you the
3    wrong one to look at. Hang on one minute.
4       I meant to have you look at Exhibit 33.
5       (Exhibit 33 was marked.)
6    BY MS. BOURKE:
7       Q   Which is US Patent 9,579,359.
8       Do you recognize that as one of the side
9    effect patents?
10      A   Yes.
11      Q   Okay. And do you see Claim 1 of that
12   patent?
13      A   Just so that we're at the same location,
14   Ms. Bourke, what -- what column are you on in the
15   patent?
16      Q   Do you know where the claims are? They're
17   at the end of the patent, in Column 45.
18       MS. BOURKE: If you can put it on the
19       screen. If we can put it on the screen, Column
20       45, Claim 1.
21       THE WITNESS: Yes, I can see it here as
22       well.
23   BY MS. BOURKE:
24      Q   And can you see that the term -- there is
25   a claim term there called "other GnRH agonist side

28

1    effect"; right?
2       A   Yes.
3       Q   Can you point to me, in the specification,
4    anything that supports your opinion that term
5    includes the testosterone spike side effects?
6       MR. WALLACE: Objection to form, and
7       mischaracterizes testimony.
8       THE WITNESS: Could you repeat the
9       question, Ms. Bourke?
10   BY MS. BOURKE:
11      Q   Okay. Let me -- let me start with another
12   question; all right?
13       So you see in Claim 1, there's the term
14   "other GnRH agonist side effect"; correct?
15      A   I see it's listed twice. To which are you
16   referring?
17      Q   It doesn't matter. You see it's a claim
18   term used in Claim 1; correct, Doctor?
19      A   Yes.
20      Q   And you see Claim 3?
21       You understand that Claim 1 is not being
22   asserted by the plaintiffs; right?
23      A   That's my understanding, yes.
24      Q   Okay. And you see Claim 3?
25      A   Yes.

41

1  your question, because there are three
2  different tables.
3  BY MS. BOURKE:
4     Q  Which tables are you referring to, Doctor?
5     A  In terms of adverse events and side
6  effects, my understanding is they're listed in
7  Table 5, 6, and 7.
8     Q  So, Doctor, let's look at Table 7.  Isn't
9  it fair that the undesirable side effects, to which
10 the patentee is claiming, would be those that are
11 identified from the comparison between degarelix and
12 leuprolide?
13        MR. WALLACE:  Objection to form, and calls
14    for a legal conclusion.
15        THE WITNESS:  I'm not certain what's fair
16    or not.  That -- that might be something for
17    the attorneys to figure out.
18        But my understanding is that not all the
19    side effects listed here have been discussed in
20    subsequent reports or deposition testimony.
21        So I'm not -- I'm not -- I'm not
22    certain --
23 BY MS. BOURKE:
24    Q  What do you mean by that?
25    A  Well, I'm not sure I understand your

42

1  question, then.
2     Q  What do you mean by the last answer you
3  just gave, Doctor?
4     A  What I mean is that you're -- you're
5  trying -- my understanding is that you're referring
6  to all of the side effects listed in this table, but
7  not all of them are discussed in subsequent -- or in
8  the -- in the deposition testimony -- testimonies
9  that I've read.  And so I'm not exactly sure which
10 side effects you're talking about.
11    Q  What deposition testimony have you read?
12    A  Dr. Shore's testimony with regard to side
13 effects.
14    Q  What is your opinion on whether the
15 undesirable side effects are those that are shown
16 that are where leuprolide is worse than degarelix in
17 this comparative table?
18        MR. WALLACE:  Objection to form.
19        THE WITNESS:  For clarification, are you
20    asking which side effects show a higher
21    incidence in leuprolide compared to degarelix
22    in Table 7?
23 BY MS. BOURKE:
24    Q  Isn't it -- wouldn't those be the
25 undesirable side effects, those that showed a higher

43

1  incidence in leuprolide relative to degarelix?
2     A  I think all of the side effects listed are
3  undesirable side effects.  Some have a higher
4  incidence, according to Table 7, with degarelix, and
5  some of the side effects are seen with a higher
6  number of patients in the leuprolide group.
7        And so it's a -- the chart shows kind of
8  mixed results.
9     Q  Right.  And you understand that the
10 claims -- they're claiming the reduced likelihood of
11 having the undesirable side effect of the GnRH
12 agonist when you administered degarelix; right?
13    A  Yes, I believe so.
14    Q  So those that had a higher incidence for
15 degarelix relative to leuprolide would not be the
16 ones that the patentee is claiming; right?
17    A  Well, that -- that does make sense to me.
18 Thank you.
19    Q  Okay.  Thank you.
20        MS. BOURKE:  Why don't we take a break for
21    now.  We've been going an hour.
22        And I will tell you -- I will caution you
23    not to have a discussion about the substance of
24    your testimony with your counsel over the
25    break.

44

1        THE VIDEOGRAPHER:  Okay.  The time is
2     12:09 p.m.  We're off the record.
3        (A brief recess is had from 12:09 p.m. to
4     12:26 p.m.)
5        THE VIDEOGRAPHER:  We are on the record at
6     12:26 p.m.
7  BY MS. BOURKE:
8     Q  Welcome back, Doctor.
9     A  Thank you.
10    Q  Did you have discussions with counsel
11 during the break?
12    A  No.
13    Q  No discussions about anything?
14    A  Well, he just said, let's get some coffee,
15 so I went to my break room to get coffee here in
16 southern California, and I just got back.
17    Q  Okay.  I want to go over a little bit of
18 your background, if I can.
19        Your BS was in cellular and molecular
20 biology from the University of Michigan; right?
21    A  Yes.
22    Q  And then from there, you went to med
23 school in Columbia; correct?
24    A  Yes.
25    Q  And you got your MD in 1998, and then you

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| FERRING PHARMACEUTICALS INC., | ) | |
| FERRING INTERNATIONAL CENTER S.A., | ) | |
| FERRING B.V., and | ) | |
| POLYPEPTIDE LABORATORIES A/S | ) | C.A. No. 20-431 (MN) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CONTAINS CONFIDENTIAL |
| | ) | INFORMATION |
| FRESENIUS KABI USA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**EDWARD J. YUN, M.D.'S REPLY EXPERT REPORT**

> 1.     **Claim 3 of the '359 Patent, and Claims 3 and 16 of the '739 Patent Would Have Been Obvious over Doehn in Combination with the Knowledge of a POSA**

11.     As described in my Opening Report, claim 3 of the '359 patent and claims 3 and 16 of the '739 patent would have been obvious to a person of ordinary skill in the art based on Doehn alone in combination with the knowledge of a person of ordinary skill in the art as of the filing date of these patents. Dr. Shore has grouped his analysis of these claims, and so I will do the same.

12.     In paragraph 41, for the first time in this case as I am aware, Dr. Shore offers the opinion that "the side effect patents do not claim a reduced likelihood of *those* side effects" referring to side effects caused by the testosterone spike. Shore Resp. ¶ 41 (emphasis in original) Instead, Dr. Shore now takes the position that the side effect patents are only directed to the "other" side effects of "musculoskeletal and connective tissue disorders such as arthralgia, renal and urinary disorders, reproductive system and breast disorders, and cardiac disorders." Shore Resp. ¶ 41. I disagree.

13.     First, the plain language of the claims states that the claimed method will result in "a reduced likelihood of causing a testosterone spike or other gonadatrophin releasing hormone (GnRH) agonist side effect." The use of "or" indicates to a person of skill in the art that the claim is directed to reducing either the testosterone spike side effects or "other" GnRH agonist side effects.

14.     While the asserted claims also include the language "undesirable side effect," there is no indication that this limitation is intended to exclude the testosterone spike side effects, which are also undesirable. Dr. Shore asserts that this narrow construction is warranted because the testosterone spike side effects were already known, and therefore obvious. Shore Resp. ¶ 48. This analysis makes little sense, because claim 1 of both the '359 and '739 patents indisputably

3

also include the testosterone spike side effects. Moreover, the text cited by Dr. Shore does not support his opinion in paragraph 48 that claim 3 of the '359 patent and claims 3 and 16 of the '739 patent are only directed to the narrow set of side effects. Instead the quote compares the severity of the side effects as greater for GnRH agonists as compared to the injection site reactions associated with degarelix. The testosterone spike side effects are severe, and so this quote is applicable to both spike and "other" side effects.

15.    However, Dr. Shore states that the spike-related side effects are "transient in nature and far less serious" than the "other side effects" claimed. I disagree. The spike side effects, such as spinal cord compression can result in total paralysis below the affected area, resulting in paraplegia or quadriplegia of patients, which is a life threatening and serious side effect. Moreover, a side effect such as arthralgia is also considered treatable and may not be severe. The specification provides no qualitative or quantitative data to support Dr. Shore's assertion that the "other" side effects are more or less severe than the spike side effects. These data were simply presented in the patents, and so cannot form the basis of Dr. Shore's comparison.

16.    To further support his opinion, Dr. Shore identifies a number of papers published in 2014 and 2015 to point to a potential mechanism of action for the difference between GnRH agonist and antagonist side effects. Shore Resp. ¶¶ 51-53. These papers would not have been available to a person of ordinary skill in the art in 2008, and so are entirely irrelevant to the analysis of obviousness or to the meaning of the terms of the claims at the time of filing.

17.    Instead, it appears that Dr. Shore is attempting to narrow the broad claims of the '359 and '739 patent to avoid the prior art that renders the subject matter invalid on its face.

18.     Dr. Shore does not offer any opinion regarding the validity of these three claims if the scope of the claims includes reducing the likelihood of testosterone spike side effects. As I have stated repeatedly, these claims do include a limitation of reducing the likelihood of testosterone spike side effects.

19.     Instead, Dr. Shore repeats his "unexpected results" analysis from his Opening Report that a person of ordinary skill in the art would not have expected that treatment with degarelix would have reduced the musculoskeletal and connective tissue disorders, renal and urinary disorders, reproductive system and breast disorders, and cardiac disorders. I have already addresses this assertion in my Responsive Report, and so incorporate the analysis here.

20.     Additionally, the result claimed—the reduction of "other" side effects—is an inherent property of the administration of degarelix to subjects receiving degarelix for the treatment of prostate cancer as opposed to receiving leuprolide. Dr. Shore does not dispute that it would have been obvious to a person of skill in the art to administer degarelix to avoid the testosterone spike side effects. Given that it was obvious to administer degarelix to avoid side effects associated with GnRH agonists, that administration would have also avoided the "other" side effects that Dr. Shore now states is non-obvious. Taken as a whole, the prior art taught that administration of degarelix would result in a reduction of side effects as compared with GnRH agonist treatment, which Dr. Shore does not dispute. As such, a person of skill in the art would have been motivated to administer degarelix, in the claimed dosing regimen, to achieve the claimed reduction in side effects associated with GnRH agonists.

21.     Dr. Shore also disputes that the Doehn reference alone renders obvious the claim limitation that the initiation dose is administered as two injections. I disagree with Dr. Shore.

5

**PROPOSED PRETRIAL ORDER**

**EXHIBIT 20-C**

**REPLY IN SUPPORT OF FRESENIUS'S MOTION *IN LIMINE***

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FERRING PHARMACEUTICALS INC., FERRING INTERNATIONAL CENTER, S.A., FERRING B.V., and POLYPEPTIDE LABORATORIES A/S <br><br> Plaintiffs, <br><br> v. <br><br> FRESENIUS KABI USA, LLC, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

C.A. No. 20-cv-431 (MN)

## <u>FRESENIUS KABI'S REPLY BRIEF IN SUPPORT OF ITS MOTION IN LIMINE</u>

During claim construction briefing of the term "undesirable side effects," Plaintiffs' stated that "undesirable side effects" includes both testosterone spike and other side effects, and Plaintiffs' expert, Dr. Shore, confirmed this ordinary meaning of the term. D.I. 77 at 17, 19-20; D.I. 79 ¶ 43. The Court found the term has its "plain and ordinary meaning." D.I. 141 at 2.

Plaintiffs now want to argue, through Dr. Shore, that this term does not have its "plain and ordinary meaning," but that it has a narrower meaning from the specification. Pls' Resp. at 2-3. Such a construction is directly contrary to Dr. Shore's previous statement that the meaning of "undesirable side effects" as "an adverse event" was based "[i]n context of claim 3 of the '359 patent and claims 13 and 16 of the '739 patent as a whole and ***the specifications of the '359 and '739 patents***." D.I. 79, ¶ 43 (emphasis added). Further, Dr. Yun's testimony does not support Plaintiffs' position, as he merely agreed that the claims are not generally directed to side effects that are made worse by degarelix, as compared with the GnRH agonist. Pls' Resp. at 4.

Plaintiffs cite no law that would allow Dr. Shore to testify about a claim terms for which he intentionally did not apply the Court's claim construction.

Dated: December 13, 2021

Respectfully submitted,
Farnan LLP


*/s/      Michael J. Farnan*
Brian E. Farnan (#4089)
Michael J. Farnan (#5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

OF COUNSEL:

Imron T. Aly (admitted *pro hac vice*)
Joel M. Wallace (admitted *pro hac vice*)
Matthew Wilkerson (admitted *pro hac vice*)
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
(312) 258-5500
ialy@schiffhardin.com
jwallace@schiffhardin.com
trammer@schiffhardin.com

John K. Hsu
SCHIFF HARDIN LLP
901 K Street NW
Suite 700
Washington, DC 20001
202.778.6400 (tel.)
202.778.6460 (fax)
jhsu@schiffhardin.com

*Attorneys for Defendant*
*Fresenius Kabi USA, LLC*